**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **KAWA FOAD, ESQ.**, an individual,<br><br>　　*Plaintiff,*<br><br>v.<br><br>**THE HARRIS-GALVESTON SUBSIDENCE DISTRICT**;<br><br>**MICHAEL TURCO**, in his official and individual capacities;<br><br>**DYLAN P. JONES**, in his official and individual capacities;<br><br>**BRIAN LADD**, in his official and individual capacities;<br><br>**KYLE SEARS**, in his official and individual capacities;<br><br>**ALAN P. PETROV**, in his official and individual capacities;<br><br>**HELEN STEWART TRUSCOTT, ESQ.**, in her official and individual capacities;<br><br>**GREGORY M. ELLIS, ESQ.**;<br><br>**GM ELLIS LAW, P.C.**;<br><br>**NATASHA J. MARTIN, ESQ.**;<br><br>**BOBBY SALEH, ESQ.**;<br><br>**GRAVES, DOUGHERTY, HEARON & MOODY, P.C.**;<br><br>**LORI J. ROBINSON, ESQ.**;<br><br>**GUNNAR P. SEAQUIST, ESQ.**; | **PLAINTIFF KAWA FOAD'S FIRST VERIFIED AMENDED COMPLAINT**<br><br>*(Civil Rights — 42 U.S.C. § 1983; Supplemental State-Law Claims)*<br><br>Civil Action No. 4:26-cv-05348<br><br>Judge Lee H. Rosenthal<br><br>JURY TRIAL DEMANDED |

**BICKERSTAFF HEATH DELGADO ACOSTA LLP**; and

**JOHN** and **JANE DOES** 1–10,

    *Defendants*.

§
§
§
§
§
§
§

---

Plaintiff Kawa Foad, Esq. (referred to herein as "***Plaintiff***" generally, and "***Mr. Foad***" where the context so requires), appearing *pro se*, files this Verified First Amended Complaint against the above-named defendants (collectively, "***Defendants***"), and, in support of the relief sought, alleges as follows:

## NATURE OF THE ACTION

1.    This action is primarily brought under 42 U.S.C. § 1983 to redress Defendants', under color of state law, deprivation of Plaintiff's *First* and *Fourteenth* amendment rights. As specified herein, certain defendants—without giving notice or providing a meaningful opportunity to be heard—unilaterally denied Plaintiff his constitutionally-guaranteed right to, *inter alia*, petition and speak, and pursue his chosen profession free from stigmatizing state action.

2.    At all material times, Plaintiff represented a Texas resident and well-operator, Mr. Bradley Davis ("***Mr. Davis***"), and his solely-owned entities Woodloch MHP LLC ("***Woodloch***"), Mesquite MHP LLC, and Miller MHP LLC (the "***Companies***," and together with Mr. Davis, "***Clients***," who are not litigants/parties in this action) in a dispute with the Harris-Galveston Subsidence District ("***HGSD***" or the "***District***") and associated parties concerning, primarily, the renewal of Woodloch's aggregate groundwater well permit (the "***Permit***") for its two groundwater wells located in a mobile home park, providing roughly two-hundred low-income tenants with their only source of drinking water.

3. More specifically, the dispute arose from an unjustified-and-punitive $106,901 penalty—labeled a "disincentive" fee (the "*Penalty*")—issued by HGSD-staff to Woodloch without ever affording Woodloch a statutorily-required notice and Board hearing (and, thus, in violation of controlling law) in an extortionate manner. Thereafter, the dispute evolved to include (i) unlawfully stonewalled requests for public information under Texas law submitted by Plaintiff to HGSD, where most of the information sought remains outstanding to this very day (over a year now); (ii) HGSD's retaliatory-and-discriminatory refusal to renew the Permit; and (iii) an HGSD-administrative proceeding—declared a so-called "contested hearing" under HGSD's rules (the "*Contested Hearing*")—presided over by an incurably-conflicted hearing examiner, Defendant Helen Stewart Truscott, Esq. ("*Truscott*" or the "*Hearing Examiner*"), who, among a plethora of disqualifying defects, engaged in ex parte communications prohibited by HGSD's own rules; was unilaterally appointed by HGSD, without Woodloch having any say in the selection; and remained on HGSD's payroll throughout—her compensation subject to review by the very General Manager whose six-figure demand she was adjudicating.

4. In addition, Defendants Natasha J. Martin, Esq. ("*Martin*"), Truscott, and Gregory M. Ellis, Esq. ("*Ellis*") (together, the "*UPL Accusers*") publicly-and-unjustifiably accused Plaintiff of having engaged in unauthorized practice of law—which, in certain instances, is a third-degree felony in the State of Texas—in connection with the Contested Hearing. For instance:

i. On Friday October 17, 2025, Martin, representing HGSD's General Manager in the Contested Hearing, via electronic mail sent to Truscott—the District-appointed hearing examiner presiding over the Contested Hearing—accused Plaintiff of engaging in unlawful practice of law;

ii.　　On Monday October 20, 2025, Truscott—without notice of her intended ruling, much less a hearing—issued a legally-deficient ruling filled with incompatible/contradictory legal conclusions that prohibited Plaintiff from representing Woodloch any further in the Contested Hearing (the "***Disqualification Ruling***"); and

iii.　　On March 30, 2026, Ellis—who, via electronic mail, had previously confirmed Plaintiff could discuss anything related to Woodloch's dispute with HGSD with **any** District staff member—threateningly issued a no-contact directive, forbidding Plaintiff from communicating with any HGSD party (the "***No-Contact Directive***").

5.　　Through this Verified Complaint, Plaintiff seeks (a) a declaration that the Disqualification Ruling and No-Contact Directive are void as a matter of law as the public charge of unauthorized practice was not just unfounded but, in fact, discriminatorily issued against Plaintiff to silence him because he had uncovered, and questioned, the Defendants' fraudulent schemes; (b) permanent injunctive relief against their enforcement and against further retaliation; (c) compensatory and punitive damages against the individual Defendants in their individual capacities; and (d) costs and fees to the extent permitted by law.

### I.　　JURISDICTION

6.　　This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) over this action because Plaintiff's claims primarily arise from Defendants' *ultra vires* acts violative of Plaintiff's constitutionally-protected rights under, *inter alia*, the *First* and *Fourteenth* amendments to the US Constitution, respectively,

7.　　In any event, Plaintiff was barred from representing Woodloch in the Contested Hearing, and is suing Defendants to vindicate his own First and Fourteenth Amendment rights (but not to

relitigate the renewal of the Permit). Also, Plaintiff has no rehearing remedy to await under HGSD's regulatory framework; regardless, none is required before filing suit under § 1983.

8.      Lastly, on May 22, 2026, Truscott closed the Contested Hearing, which gives rise to a number of the claims advanced herein, is no longer ongoing as she closed the proceeding, and remanded the matter with a report and recommendation to HGSD's board of directors (the "***Board***") for action, and, as such, abstention is therefore not warranted.[1]

9.      Additionally, the Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202, Federal Rules of Civil Procedure 57 and 65, and *Ex parte Young*, 209 U.S. 123 (1908).

10.      Moreover, this Court has pendant jurisdiction over the state-law claims as they share a common nucleus of operative fact with the federal claims, supporting supplemental jurisdiction under 28 U.S.C. § 1367(a). Supplemental jurisdiction over the claims for violations of the Texas Public Information Act (advanced under Count IV) is particularly appropriate. It arises from the same records, the same custodians, and the same concealment that evidence the retaliation claims; and it presents no novel issue of state law: The OAG already issued a letter ruling largely in favor of Plaintiff, and Count IV seeks to enforce that ruling (the "***OAG Ruling***").

11.      The Court also has personal jurisdiction over the Defendants. HGSD is a special-purpose political subdivision created under Article XVI, Section 59 of the Texas Constitution and the Enabling Act, and is not an arm of the State of Texas.[2] The individual Defendants are sued in their individual capacities for damages, and in their official capacities for prospective relief due to *ultra vires* conduct, and, as such no *Eleventh Amendment* bar attaches.

[1] *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) (*Younger* abstention is limited to three exceptional categories and is not warranted merely because a state proceeding touches the same subject).

[2] *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (local school board is not an arm of the State entitled to Eleventh Amendment immunity); *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979) (Eleventh Amendment does not extend to political subdivisions or regional entities).

## II.   VENUE

12.   Venue is proper under 28 U.S.C. § 1391(b) because HGSD is located in this District, and a substantial part of the events giving rise to the claims occurred herein. Likewise, assignment to the Houston Division is proper because HGSD is located within the counties served by the Houston Division.

## III.   PARTIES[3]

### A. Plaintiff

13.   Plaintiff is Florida-licensed attorney in good standing (Fla. Bar No. 1005257), and the principal of Kawa Foad Law Group, P.A. d/b/a KF Law, located at 1000 Brickell Avenue, Suite 715, Miami, Florida 33131.

14.   At all materials times, Plaintiff, to the best of his knowledge and information obtained after considerable research, permissibly represented his Clients with respect to the groundwater well permit-dispute by and between his Clients and HGSD.

### B. Defendants[4]

15.   Defendant HGSD is a governmental conservation-and-reclamation district organized under Chapter 8801 of the Texas Special District Local Laws Code (the "***Enabling Act***"). HGSD is a special-purpose district created in 1975 to regulate groundwater withdrawal in Harris and Galveston counties. The Permit authorizes a combined withdrawal from two closely-situated wells at the Woodloch park—lead well No. 3606 and well No. 7694.

---

[3] Mr. Davis and the Companies are, and at all material times have been, Plaintiff's clients; they are not parties hereto, and their dispute with HGSD is pleaded only to the extent necessary to show Plaintiff's protected advocacy, Defendants' motive, and Plaintiff's injury.

[4] This Complaint refers to each individual Defendant by surname; as referenced above, "***UPL Accusers***" means Martin, Truscott, and Ellis. Each act is attributed to its actor. Robinson and Seaquist, Bickerstaff attorneys, acted as HGSD's agents in its records function under Turco. Per Rules 8 and 10, each Count incorporates only pertinent paragraphs, and references specifically-named defendants.

16.     HGSD is governed by the Board, which is authorized under the Enabling Act and/or promulgated HGSD-rules (each, a "*Rule*" and collectively, the "Rules") as well as the 2013 regulatory plan currently in effect to delegate duties and/or authority to:

i.      A general manager, such as Defendant Michael Turco ("*Turco*" or the "*General Manager*"), who is responsible running HGSD's day-to-day operations and supervising HGSD staff;

ii.     HGSD staff, like Defendant Dylan P. Jones ("*Jones*");

iii.    Hearing examiners, like Defendant Truscott who was appointed by HGSD and also compensated by HGSD to preside over the Contested Hearing where the General Manager was Woodloch's adversary;

iv.     Paid outside general counsel, like defendant Ellis, acting by and through GM Ellis Law, P.C. ("*Ellis Law*");

v.      Paid outside counsel, acting by and through their respective law firm, to, *inter alia*:

a.   represent the General Manager in contested hearings (such as the one at issue here), like Defendant Martin with Graves Dougherty Hearon & Moody, P.C. ("*GDHM*"); and/or

b.   handle request for public information submitted to HGSD pursuant to the Texas Public, like Defendants Lori J. Robinson ("*Robinson*") and Gunnar Seaquist ("*Seaquist*") with Bickerstaff Heath Delgado Acosta LLP ("*Bickerstaff*"). and

vi.    HGSD is sued for declaratory and injunctive relief and for the official policies, customs, and final-policymaker decisions pleaded below.[5]

---

[5] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 694 (1978) (local governments are § 1983 "persons" liable for deprivations caused by official policy, custom, or final-policymaker decisions).

17. At all material times, (i) Defendant Turco was HGSD's general manager and HGSD's custodian of records and/or information, and is sued in his official and individual capacities as he acted under color of state law and personally directed, ratified, and/or acquiesced in the conduct alleged herein.

18. Defendant Jones is the HGSD's Director of Compliance & Enforcement, and is sued in his official and individual capacities for, *inter alia*, authoring the Violation Letters concerning the Penalty (each defined below); appearing in the metadata of the disputed August 26, 2025 hearing notice discussed below (the "***Hearing Notice***"); submitting an affidavit—which Truscott ordered Turco to execute—in support of the General Manager's May 4, 2026, Motion for Remand that contains verifiably-false findings of purported facts but nonetheless was adopted by Truscott as part of her report and recommendation submitted to the Board for action.

19. Defendant Brian Ladd ("***Ladd***") is an HGSD Information Technology Specialist, and is sued in his official and individual capacities. On information and belief, Ladd posted, modified, or backdated the "Hearing Notice September 9, 2025" entry on HGSD's public website, as described below.

20. Defendant Kyle Sears ("***Sears***") is an HGSD director, and is sued in his official and individual capacities. Sears moved the April 9, 2025 Board action on the Penalty and, at the Board's July 8, 2026 meeting, examined HGSD's counsel with leading questions to the detriment of Plaintiff (as well as his Clients), as described below.

21. Defendant Alan P. Petrov ("***Petrov***") is an HGSD director and the chairman of its Board (the "***Chairman***"), and is sued in his official and individual capacities. Petrov presided over the

Board's July 8, 2026 meeting, at which he recognized the District's presenters as often as they wished to speak and refused Plaintiff's request to respond to them, as described below.[6]

22.    Defendant Truscott is the hearing examiner who presided over the Contested Hearing, and is sued in her official and individual capacities. She entered the Disqualification Ruling, reaffirmed it, and closed the Contested Hearing without ever holding an evidentiary hearing. Damages are sought only for conduct to which judicial immunity does not attach, as pleaded in the Anticipated Defenses section below; prospective relief is sought against her officially.

23.    Defendant Ellis is HGSD's outside general counsel, and is sued in his individual capacity for conduct undertaken under color of state law in the exercise of delegated governmental authority, including his authorship of the No-Contact Directive.

24.    Defendant GM Ellis Law is the firm through which Ellis serves HGSD, and is sued for the conduct of Ellis as he is its principal, having acted within the scope of his agency.

25.    Defendant Martin is a GDHM attorney retained to represent the General Manager in the Contested Hearing, and is sued individually for conduct under color of state law. She first asserted the UPL charge on October 17, 2025.

26.    Defendant GDHM is the law firm through which Martin and Saleh acted, and is sued for the conduct of its attorneys within the scope of their agency, including under the doctrine of respondeat superior as pleaded in Count VIII below.

---

[6] Plaintiff names Directors Petrov and Sears in their individual capacities in part because both are licensed attorneys: Petrov is a name partner of the Johnson Petrov LLP law firm, and Sears reminded the July 8, 2026 audience of "the normal, routine matters that those of us that practice law deal with in lawsuits." (App. Ex. M, APP-0099.) Of all the Board's members, these two were the best equipped to recognize — and the most clearly duty-bound to honor — the due-process rights at stake: notice, an opportunity to be heard, a neutral decision-maker, and the right of a party to respond to its accusers. A lay director might not appreciate what is wrong with entering rulings no one moved for, silencing the only sworn speaker, or adopting findings without an evidentiary hearing. A lawyer does. Their participation was not inadvertence; it was choice.

27.    Defendant Bobby Saleh, Esq. ("*Saleh*") is a GDHM attorney, and is sued in his individual capacity for conduct under color of state law. Saleh appeared for the General Manager at the Board's July 8, 2026 meeting and made the public statements described below.

28.    Defendant Robinson is a Bickerstaff partner who directed HGSD's responses to the Requests, and is sued individually for conduct under color of state law, including the serial written representations of complete production pleaded below.

29.    Defendant Seaquist is a Bickerstaff partner who participated in HGSD's public-information function, and is sued individually for conduct under color of state law.

30.    Defendant Bickerstaff is sued for its attorneys' acts within their agency.

31.    Defendants John and Jane Does 1–10 are those HGSD directors, officers, employees, or agents, or personnel of its retained firms, who personally participated in, directed, or ratified the acts alleged herein—including any person other than Ladd who posted, modified, or backdated the website entry described below—whose identities will be established in discovery.

## IV.    FACTUAL ALLEGATIONS

### A.  2024: The Unauthorized Penalty and the Conflicting Violation Letters

32.    On August 22, 2024, before Plaintiff was retained, Jones—acting under Turco's authority—sent Woodloch a letter styled "Compromise and Settlement Agreement Offer," demanding the $106,901 Penalty within thirty days for allegedly exceeding Woodloch's authorized withdrawal during the 2023–2024 permit year.

33.    As of August 22, 2024, no violation had been adjudicated, no hearing had been noticed or held, and the Board had taken no action of any kind.[7] Staff on their own authority purported to

---

[7] Tex. Spec. Dist. Loc. Laws Code §§ 8801.157–58 (permit and related enforcement decisions are made by the Board, after a noticed public hearing, within 60 days, considering statutory factors including "the economic impact on the applicant"); id. § 8801.151 (the general manager administers HGSD subject to the Board's oversight).

adjudicate a violation, fix a six-figure penalty, and demand payment on a thirty-day deadline—functions the Enabling Act and the Rules assign to the Board after notice and hearing.

34.    The First Violation Letter, Reference No. CS2024-114691, referenced Well No. 3606. On September 27, 2024, HGSD sent a second letter—"Settlement Offer – SECOND AND FINAL ATTEMPT"—bearing the same reference number but a different well, No. 7694, and demanding the same $106,901 within ten days (the "***Second Violation Letter***").

35.    A third iteration, later provided to Plaintiff in PDF by GM Ellis Law, reverted to Well No. 3606 but bore a code matching neither letter—CS2024-113829—and metadata identifying as its author an HGSD staff member other than Defendant Jones, its signatory (the "***Third Violation Letter***," and collectively the "***Violation Letters***").

36.    Three letters, one demand, two well numbers, two reference codes, and an author who was not the signer: These are the governmental records on which a six-figure exaction was pressed against the sole water source of hundreds of low-income tenants.

37.    In the First Request (submitted on April 29, 2025), Plaintiff sought the "Board agenda, minutes, resolution, or audio authorizing Turco to make the $106,901 settlement demand 'on behalf of the Board.'" More than a year later, none has been produced, and HGSD has never claimed such a record exists.

**B. Ellis Violates The Board's Unanimously-Passed Resolution Barring Ellis's Appearance At Settlement Discussions By And Between Mr. Davis And HGSD Staff**

38.    On October 9, 2024, Mr. Davis appeared before the Board and explained the alleged excess withdrawal.[8] The Board, by motion captured in its own minutes and audio recording, directed that Ellis not participate in settlement negotiations between HGSD staff and Mr. Davis.

39.    The Board's own minutes record a motion having been made—by Director Augustus Campbell and seconded by Director Shaun Theriot-Smith—following an executive session, which was "to authorize the General Manager and Staff to negotiate a payment plan with the permit holder to include an agreed lien [and] [i]f the permit holder does not agree to the options, then the general counsel is authorized to seek a judgement lien." Directors Don Johnson and Jason Long opposed even that measure. The audio recording of the meeting captures Mr. Davis's presentation in full — his acknowledgment of fault, his community's twenty-three-year compliance history, and his plea that the Board accept the ordinary $500 overage fee. (App. Ex. A, APP-0004; App. Ex. B, APP-0005–11, at APP-0007.)

> 9.  EXECUTIVE SESSION. The Board went into executive session at 10:44 a.m. The Board of Directors returned from executive session at 11:39 a.m. Mr. Petrov asked if there were any motions. Mr. Campbell moved to authorize the General Manager and Staff to negotiate a payment plan with the permit holder to include an agreed lien. If the permit holder does not agree to the options, then the general counsel is authorized to seek a judgement lien. We also encourage the permit holder to seek entry into a groundwater reduction plan (GRP). It was seconded by Mr. Theriot-Smith. Chairman Petrov put the question, and after the vote, announced the motion carried. Mr. Johnson and Mr. Long opposed.

*Figure 1 — Official minutes of the October 9, 2024 Board meeting (Item 9): the Board authorizes the General Manager and Staff to negotiate a payment plan while specifying that the general counsel (i.e., Ellis) is authorized to act only "if the permit holder does not agree to the options." (App. Ex. A, APP-0003–04.)*

---

[8] The Woodloch park's tenant population had nearly tripled during the permit year—an increase driven by the COVID-19 pandemic and its displacement effects—and Woodloch had self-reported its withdrawals.

40. On February 13, 2025, Ellis attended the in-person settlement conference from which the Board had excluded him. At that conference, Mr. Davis disclosed confidential business information solely for settlement purposes.

41. On March 12, 2025, at the Board's regular meeting, Ellis disclosed Mr. Davis's confidential settlement information to the Board—the body that would later decide both the Penalty and the Permit renewal—and, on information and belief, represented that payment could be compelled by burdensome legal process, such as demanding Mr. Davis to produce filed tax returns.

### C. Plaintiff Is Retained; The April 2025 Board Meeting

42. On March 10, 2025, upon being retained, Plaintiff first contacted HGSD's general counsel, Defendant Ellis, by electronic mail concerning the Penalty, and requested a continuance of Woodloch's expected appearance before the Board two days later (i.e., March 12, 2025) in order to have time to sufficiently examine all relevant records, circumstances, etc., which was granted by Ellis (later, Ellis also, via electronic mail, confirmed Plaintiff was allowed to engage with any member of HGSD's staff in order to obtain information, asks questions, etc.).

43. Thereafter, Plaintiff attempted, via diligent and good faith-efforts, to obtain all the relevant information from HGSD staff, like Jones, for instance, but was stonewalled (Jones provided only part of the requested information and did so belatedly in a piecemeal fashion).

44. At 12:31 p.m. on April 8, 2025—less than twenty hours before the Board's April 9 meeting—Jones, copying Ellis, finally provided records Plaintiff had sought for weeks; however, it was only a partial production, containing abbreviated terms not explained.

45.     On April 9, 2025, Jones declined to relay Plaintiff's request to appear remotely before the Board on his Clients' behalf, and the Board acted on the Penalty in Plaintiff's absence, with Martin present in the Board-counsel role.[9]

46.     The District's own minutes and audio recording of the April 9, 2025 meeting confirm each element:

i.     Item 9 records that "Ms. Natasha Martin of Graves Daugherty updated the Board on recent litigation"—that is, Martin was acting as the Board's counsel;

ii.     Item 10 records that "the attorney for Mr. Brad Davis, Kawa Foad, had called the District office requesting a continuance for his client" and that "[t]he Board decided to take up the matter in executive session"; and

iii.     Item 12 records that, upon returning from a closed session at which no permittee representative could be present, Sears moved "that the request for continuance be denied, that the counteroffer be rejected, and that the District proceed according to Rule No. 9.3 of the District Rules," seconded by Director Long and carried without opposition.

47.     The recording shows the entire open-session disposition — from return to open session to the vote — took under one minute. (App. Ex. C, APP-0013; App. Ex. D, APP-0014–16.)

---

[9] Later on, in on early October 2025, Martin subsequently "switched sides" in terms representation when the Contested Hearing commenced: After having first represented the Board, which has the final say in the Contested Hearing, she informed Plaintiff (and Mr. Davis) she would represent the General Manager during the contested hearing. See Tex. Disciplinary Rules Prof'l Conduct R. 1.06(a) (stating that a lawyer may not represent different parties in the same matter) and R. 1.09(a) (a lawyer may not represent another person in a matter adverse to a former client where the matter is the same or substantially related).

> 9. LEGAL & LEGISLATIVE MATTERS. Ms. Natasha Martin of Graves Daugherty updated the Board on recent litigation on groundwater issues and legislative matters.
>
> 10. CONSIDER AND POSSIBLE ACTION ON A COMPROMISE AND SETTLEMENT COUNTEROFFER, WELL NO. 3606 – WOODLOCH MHP, LLC, BRAD DAVIS. No permittee or permittee representative is present. Chairman Petrov received a message from Staff that the attorney for Mr. Brad Davis, Kawa Foad, had called the District office requesting a continuance for his client. The Board decided to take up the matter in executive session.
>
> 11. CONSIDER AND POSSIBLE ACTION ON A COMPROMISE AND SETTLEMENT COUNTEROFFER, WELL No. 4710 – SURATI, NEIL. Chairman Petrov invited Mr. Neil Surati to address the Board regarding a counteroffer.
>
> 12. EXECUTIVE SESSION. The Board went into executive session at 10:50 a.m. The Board of Directors returned from executive session at 11:19 a.m.
>
> Mr. Petrov asked if there were any motions regarding Item 10, Woodloch MHP, LLC, Well No. 3606. Mr. Sears made a motion that the request for continuance be denied, that the counteroffer be rejected, and that the District proceed according to Rule No. 9.3 of the District Rules. It was seconded by Mr. Long. Chairman Petrov put the question, and after the vote, announced the motion carried. None opposed.
>
> Mr. Petrov asked if there were any motions on Item 11, Neil Surati, Well No. 4710. Mr. Sears made a motion to take no action and for the District to proceed according to the District Rules. It was seconded by Ms. Baird. Chairman Petrov put the question, and after the vote, announced the motion carried. None opposed.

*Figure 2 — Official minutes of the April 9, 2025 Board meeting: Item 9 (Martin of "**Graves Daugherty**" giving the Board's legal update), Item 10 (Plaintiff's continuance request), and Item 12 (the post-executive-session motion denying the continuance and rejecting the counteroffer). (App. Ex. C, APP-0012–13.)*

### D. Plaintiff Begins the Public-Records Investigation

48. On April 29, 2025, Plaintiff served a request for public information on HGSD's custodian of records (the "***First Request***"). A "Second Request" followed on September 30, 2025, and a "Third Request" on November 10, 2025 (together with the First Request, the "***Requests***").

49. On June 23, 2025, Plaintiff filed a Response in Opposition to HGSD's request for an Attorney General opinion (OAG Tracking ID OR25027579), showing that HGSD's own request was untimely—made after the ten-business-day deadline of § 552.301—and rested on misleading assertions by Robinson; on July 11, 2025, he filed a Supplemental Filing. He advised HGSD in writing that he would pursue all lawful remedies, including litigation, and sought to bring HGSD's conduct to public attention.

50. On July 16, 2025, Plaintiff served on the Turco, Ellis, Robinson, and Jones—copying Mr. Davis—a written Demand for Various Relief, including an (i) immediate renewal of Woodloch's permit to avert what the demand warned was an imminent public-health crisis for hundreds of low-income residents; (ii) waiver of renewal fees; and (iii) vacatur of the Penalty.[10]

51. No Defendant granted, or substantively answered, any part of the July 16, 2025 demand. HGSD did not process an emergency renewal; on August 1, 2025, Woodloch was forced to apply to renew the Permit, which HGSD had allowed to expire the day before.

52. On August 20, 2025, after HGSD failed to comply with TPIA § 552.301, the OAG ordered the release of records (OR2025-030042, the "***OAG Ruling***").[11]

**E. Plaintiff Prevails Before the Attorney General But Defendants Still Refuse To Fully Comply With The Requests**

On August 25, 2025, five days after the OAG Ruling issued, Plaintiff transmitted the Ruling to Robinson, and reported, via electronic mail with Robinson copied, HGSD's noncompliance to the Assistant Attorney General who authored the OAG Ruling, but never received a response.

53. On September 5, 2025, Robinson acknowledged in writing that "HGSD has received a copy of the ruling and is working to prepare redactions to the legal fee invoices that can be released," promising that information "by close of business on Friday, September 19, 2025," and attaching in the interim only "information that the AG ruled must be released." September 19, 2025 came and went without any production from Robinson or HGSD.

---

[10] Mr. Davis had "implemented drastic measures to reduce groundwater withdrawal and now monitors the well meters on [a] daily basis"; the demand invoked the District's duty of "expeditious action in emergencies" under Rule 5.5.

[11] The TPIA establishes a strong policy of disclosure and prompt access; a governmental body wishing to withhold information must timely seek an Attorney General decision, and failure to do so renders the information presumptively public. Tex. Gov't Code §§ 552.001, 552.021, 552.221, 552.301, 552.302; *see also See Simmons v. Kuzmich*, 166 S.W.3d 342 (Tex. App.—Fort Worth 2005, no pet.) (governmental body that fails to comply with the TPIA's procedures must produce the information); *Hancock v. State Bd. of Ins.*, 797 S.W.2d 379 (Tex. App.—Austin 1990, no writ) (mandamus lies to compel disclosure of public information)

54.    On September 22, 2025, Robinson wrote that "[d]ue to unforeseen circumstances, the remaining information responsive to your request will be provided by Monday, October 29"—an extension of more than five weeks.[12]

### F.  The Website Alteration

55.    On September 26, 2025, Plaintiff, via electronic mail, sent Turco (with Jones copied) a number of questions relating to certain entries made in Woodloch's online profile/account maintained on HGSD's online permit portal, which, in particular, concerned a hearing notice HGSD had purportedly mailed out to Woodloch on August 26, 2025 (the "***Hearing Notice***").

56.    Later that same day, Turco sent a same-day reply that did not answer the questions; however, Turco attached a PDF file purporting to be the Hearing Notice and represented it "was sent to" Woodloch's address. HGSD possesses no record showing the mailing actually occurred (e.g., postage fees, invoice, payment record).

57.    Two days later, on Sunday, September 28, 2025, Ellis—whom Plaintiff had not copied—joined the thread, confirming that the correspondence was circulating among HGSD's lawyers in real time. The after-the-fact alteration of HGSD's public website that followed is documented by contemporaneous, timestamped captures that bracket the alteration.

58.    On September 30, 2025, Plaintiff captured HGSD's public "2025 Hearing Notices" page. The capture lists hearing notices for nine 2025 dates. Absent is any "Hearing Notice September 9, 2025"—the notice HGSD cites as noticing the September 9, 2025 hearing:

---

[12] The TPIA requires that public information be produced "promptly." Tex. Gov't Code § 552.221(a).

*Figure 3 — HGSD website, "2025 Hearing Notices," captured on or around September 30, 2025 (no September 9, 2025 notice).*

59.    That same day, September 30, 2025, at 3:59 p.m., Plaintiff wrote to Martin, Robinson, and Ellis demanding the native-format Hearing Notice and its mailing records.

60.    On October 6, 2025 (the day before the October 7 public hearing—Plaintiff wrote to Martin, Robinson, Seaquist, and Ellis (copying Turco and his Clients), demanding complete TPIA production and written confirmation that his noticed absence from the hearing was to ensure his Clients would not be prejudiced.

61.    Thereafter, a "Hearing Notice September 9, 2025" entry appeared on HGSD's website where none had existed on September 30, 2025, as shown below:

**2025 HEARING NOTICES**

Hearing Notice October 7, 2025
Hearing Notice September 9, 2025
Hearing Notice August 12, 2025
Hearing Notice July 8, 2025
Hearing Notice June 10, 2025
Hearing Notice May 13, 2025
Annual Groundwater Hearing April 29, 2025
Hearing Notice April 8, 2025
Hearing Notice March 11, 2025
Hearing Notice February 11, 2025
Hearing Notice January 7, 2025

*Figure 4 — HGSD website after the insertion of the "Hearing Notice September 9, 2025" entry.*

62. Although the Hearing Notice bears an August 26, 2025 date, the PDF Turco attached to his September 26, 2025 email identifies "Dylan P. Jones" as its author and bears a creation timestamp of that same morning—September 26, 2025, at 11:38 a.m., roughly two and a half hours before Turco sent it (*see* Figure 5 below; (each person who posted, modified, or backdated the entry, whether presently known or a Doe Defendant, is identified in HGSD's own systems and will be named upon discovery later—inconsistent with its face date).

63. On information and belief, the posting, modification, or backdating of the "Hearing Notice September 9, 2025" entry described above was performed by Ladd, whose duties include maintaining HGSD's public website, acting at the direction of one or more of Turco, Jones, or Does 1–10.



*Figure 5 — Document properties of the Hearing Notice PDF Turco attached on September 26, 2025: author "Dylan P. Jones"; created September 26, 2025, 11:38 a.m.*

### G.  October 2025: Martin Accuses Plaintiff of the Unauthorized Practice of Law; The Hearing Examiner's Disqualification Ruling

64.    On October 7, 2025, Plaintiff appeared on his Clients' behalf at the public hearing on the Permit renewal. The matter was designated a Contested Hearing and recessed. Plaintiff appeared openly, as counsel.

65.    On October 14 and 15, 2025, the Hearing Examiner circulated a proposed Contested Case Hearing Order and discovery schedule; counsel conferred; Plaintiff replied, thanking the Hearing Examiner. He was, in every respect, treated as counsel of record.

66.    For months, HGSD and its lawyers dealt with Plaintiff as opposing counsel without objection, negotiating settlement, scheduling, and production with him. The Hearing Examiner herself designated Plaintiff as Petitioner's counsel of record—listing his full Miami, Florida address. Only after Plaintiff's records demands sharpened did Martin and Ellis raise the UPL objection on which his removal was engineered.

67.    On October 14, 2025, at 12:12 p.m., the Hearing Examiner emailed the General Manager's counsel—excluding Woodloch, Mr. Davis, and Plaintiff—contrary to Rule 7.5(k).[13] A verified omnibus motion later served on the Hearing Examiner and all counsel—seeking, inter alia, the disqualification of Truscott, Martin, and Ellis (the "***Omnibus Motion***")—documented this ex parte communication; the email is reproduced below:

**From:** Helen Truscott <hstlaw@msn.com>
**Sent:** Tuesday, October 14, 2025 12:12 PM
**To:** Natasha J. Martin <NMartin@gdhm.com>
**Subject:** Harris-Galveston Subsidence District Permit No. 3606, Woodloch MHPLLC

Kawa S. Foad
KF Law
1000 Brickell Ave. Ste 715
Miami, FL 33131-3047

Natasha J. Martin
GRAVES DOUGHERTY HEARON & MOODY, P.C.
401 Congress Ave., Suite 2700
Austin, Texas 78701-3744

Greetings,

On October 7, 2025, during the Public Hearing on the above referenced permit, the attorneys agreed to provide a prospective date for a pre-hearing conference. One or more prehearing conferences will be held in accordance with Rule 7.5(a) to (1) formulate and simplify issues; (2) determine the necessity or desirability of amending the application or other pleadings; (3) determine the possibility of making admissions or stipulations; (4) approving the Docket Control Order and scheduling discovery; (5) identification of and specification of the number of witnesses; (6) the filing and exchange of prepared testimony and exhibits; and (7) the procedure at the hearing. The initial prehearing conference to establish the issues to be contested and adopt the Docket Control Orde  and may be held in person or remotely.

Please provide me with the date that you are requesting.

Thank you.

Helen Stewat Truscott
Hearing Examiner
Harris-Galveston Subsidence District
281.433.1584
hstlaw@msn.con

*Figure 6 — The Hearing Examiner's October 14, 2025, 12:12 p.m. ex parte email to the General Manager's counsel, excluding Petitioner's side.*

68.    Her designation of Plaintiff as counsel of record listed his full Florida address, including the nine-digit ZIP code 33131-3047—an extension appearing in his public Florida Bar profile and, on information and belief, nowhere else she would have encountered it:

69.    On October 16, 2025, Martin corresponded with Plaintiff, as counsel, regarding a proposed procedural schedule. The parties did not reach agreement.

---

[13] Rule 7.5(k): "The Hearings Examiner may not communicate, directly or indirectly, in connection with any issue of fact or law with any agency, person, party, or their representatives, except on notice and opportunity for all parties to participate."



*Figure 7 — The Hearing Examiner's designation of Plaintiff as counsel of record with his full Florida address (ZIP+4), matching his public Florida Bar profile.*

70.     Plaintiff cited Rule 7.5(c), which permits an interested person to appear "by representative"; Section 8801.109(c) of the Enabling Act; and the Texas Supreme Court's October 1, 2024 amendment of Disciplinary Rule 5.05. Neither the UPL Accusers nor the Hearing Examiner ever addressed those authorities.

71.     On October 17, 2025—a Friday—at 1:02 p.m., Martin objected for the first time, in an electronic mail to the Hearing Examiner's personal "msn.com" address—that Plaintiff was engaged in the "unauthorized practice of law." Plaintiff acknowledged he is not Texas-licensed and invoked HGSD's rules permitting representative appearance.

72.     Martin's October 17, 2025 email itself acknowledged "lawful pathways available to Mr. Foad," such as associating local counsel, and asked only that the client "obtain properly licensed counsel to proceed." She did not move that Plaintiff be barred from the matter altogether.

73.     On October 20, 2025, Truscott entered an order barring Plaintiff from representing Woodloch, ruling that the applicant could represent himself or retain a Texas-licensed attorney.

The order issued on the strength of a Friday email, without motion, notice, briefing, or any opportunity to be heard, and granted relief no party had requested.

74. The one-page order said the Hearing Examiner would "follow state law precedent and not allow the representation." It confined Rule 7.3(c)(3) to "informal or technical proceedings"—a limit found nowhere in the rule—and cited no precedent. No HGSD Rule requires Texas licensure; Rule 7.5(c) permits appearance "by representative." On information and belief, Martin and Ellis procured the Disqualification Ruling to remove Plaintiff and in retaliation for his advocacy.

75. No motion to disqualify was ever filed. On Monday, October 20, 2025—the next business day after Martin's Friday email—Truscott ruled, before any response was possible, invoking Rule 7.3(c), a "General Procedures" provision, while ignoring Rule 7.5(c) and the amended Rule 5.05 Plaintiff had placed before her.

76. When Plaintiff later raised the *ex parte* communication on the record, neither Truscott, Martin nor HGSD denied, explained, or disclosed; the record reflects only silence from parties and an adjudicator under a duty of candor.

**H. The Stonewalling Continues; Ellis Issues The No-Contact Directive**

77. On November 7, 2025, Robinson provided a file-sharing link to what "HGSD believes is responsive to the remaining items"—which not only was more than fourteen weeks after the OAG Ruling ordered disclosure, but still did not fully satisfy the requests for information (which is still the case to this very day).

78. On November 10, 2025, Plaintiff gave written notice that continued noncompliance with the TPIA request would result in more decisive action being taking, including potentially filing a federal complaint.

79.    Also on November 10, 2025, Plaintiff wrote to Ellis personally, appealing to his "professionalism" and "ability to resolve issues," offering to show Ellis the evidence and the federal complaint Plaintiff had prepared, and expressing the hope that the matter could be resolved without litigation. Ellis did not respond. On November 17, 2025, Plaintiff followed up, asking for a brief telephone call before taking further action. (App. Ex. H, APP-0028.)

80.    On November 20, 2025, having received no substantive response, Plaintiff transmitted to Ellis a copy of the Omnibus Motion — the motion seeking, among other relief, the disqualification of the Hearing Examiner, Martin, and Ellis himself — and expressly invited Ellis to "advise if there is any rule, policy, etc, that would make the submission hereof improper, and on what grounds." Ellis never identified any rule, policy, or ground of impropriety. (App. Ex. H, APP-0028.)

81.    On November 24, 2025, Plaintiff formally submitted the Omnibus Motion and accompanying records to Ellis, Martin, Robinson, and Seaquist, requesting written confirmation that the attachments had been delivered to their respective clients and intended recipients — including the Hearing Examiner. The Omnibus Motion was thus in the hands of every lawyer for the District, and before the tribunal, from November 2025 forward; it was re-served on the Hearing Examiner and all counsel on March 30–31, 2026, verified on April 1, 2026, and resubmitted on May 18, 2026. No one has ever ruled on it. (App. Ex. I, APP-0029–0068.)

82.    Importantly, the No-Contact Directive and the closure of the Contested Hearing took place after Defendants were noticed Plaintiff intended to file suit in federal court for relief.

83.    On November 25, 2025, responding to the Third Request, Robinson issued a cost estimate so high that Plaintiff rejected it in writing as prohibitive.

84.     On December 9, 2025, Plaintiff also bifurcated his requests and demanded that HGSD "[i]mmediately release all previously-requested records that are long overdue."

85.     Robinson's December 16, 2025, response re-attached the same conflicting PDF Violation Letters, and she insisted that the demand for native-format records with metadata had been satisfied—*however*, they have not been satisfied (to this very day).

86.     Between March 26 and 30, 2026, HGSD noticed a status conference to Mr. Davis only scheduled to take place on April 7, 2026, regarding the Contested Hearing without copying/noticing Plaintiff.

87.     After Mr. Davis had informed Plaintiff of the April 7, 2026, status conference and Plaintiff intervened by asking to be copied on future communications, Ellis responded by stating that Plaintiff was not allowed to "contact the District or any person associated with the Woodloch MHP LLC contested case hearing except through local counsel" although there is no District Rule requiring Plaintiff to appear via local counsel in the Contested Hearing.

### I.    April–May 2026: The Transcript, The Closure of The Contested Hearing, And The Adopted Findings And Conclusions of Law

88.     On March 31, 2026, Plaintiff served the Omnibus Motion—seeking, among other relief, the disqualification of Truscott, Martin, and Ellis—on the Hearing Examiner and counsel; he served the verified version on April 1, 2026, and resubmitted it on May 18, 2026 under a cover letter addressed to the Hearing Examiner and to the Board via its Chairman (i.e. Petrov).[14]

89.     On April 6, 2026 — the afternoon before the April 7, 2026 status conference — Turco, through Martin, served the General Manager's Motion for Remand, attaching the General

---

[14] Plaintiff had previously, on numerous occasions, submitted the Omnibus Motion, asking the Hearing Examiner as well as the Boad to rule on it (after Truscott ignored it); *however*, Ellis refused to submit the Omnibus Motion to the Board for adjudication. No one—not the Hearing Examiner, the Board, or any counsel—ever ruled on it or substantively answered it.

Manager's proposed findings of fact and conclusions of law. In the same email, Martin announced that "Ms. Robinson and Mr. Se[a]quist have not made an appearance in this proceeding and have been removed" from the correspondence. An eve-of-conference filing of dispositive proposed findings — findings later shown to have been drafted from a template prepared for a different agency — left one evening to respond. It was an ambush.

90.     On April 7, 2026, at a video status conference, Plaintiff argued that the Hearing Examiner had erred in requiring Texas licensure and noted that he appeared "as an interested party according to the district rules ... on my own behalf." The Hearing Examiner reiterated that Plaintiff would not be permitted to represent the Permit holder.

91.     At the same conference, Plaintiff stated that Woodloch had never requested a Contested Hearing—it had sought a continuance Ellis himself proposed. The Hearing Examiner agreed on the record: "You did ask for a continuance, but because of the contentiousness of that hearing . . . I declared that it was a contested hearing."

92.     Martin nonetheless asserted twice at the same conference that Woodloch had "requested" the contested case, and the adopted findings fault Woodloch for failing to "pursue[] or prosecute[]" it—assertions irreconcilable with the Hearing Examiner's own admission.

93.     The Hearing Examiner then declined to remand without process: "[B]efore I remand it back, I think I need to determine whether or not there are any . . . legal issues that need to be resolved because I'm not trying to deny anyone their right to due process." She ordered an evidentiary hearing "within six weeks" and directed Martin to prepare a docket-control order.

### J. The April 8, 2026 Board Meeting: The Hearing Examiner's Six-Week Commitment — And the Minutes That Erased It

94.     The very next morning, April 8, 2026, at the Board's regular meeting, the Hearing Examiner repeated that commitment to the Board itself. Presenting her report under agenda item

4, she stated, per the District's own audio recording, at 0:05:51: "We had a status conference on the renewal application for Woodloch … Basically, it has been reset for the parties to actually submit a proposed docket control order, with an actual date for the permit hearing, within the next six weeks." (App. Ex. L, APP-0074.)

95.    The District's official minutes of that meeting record none of it. Item 4 of the minutes reduces the Hearing Examiner's entire report to a single sentence — "Judge Helen Stewart Truscott presented the Hearing Examiner's Report for March 2026 and prior" — followed by the Board's vote to accept the recommendations. The six-week commitment, announced to the Board in open session and captured on the District's own recording, was omitted from the official record. (App. Ex. K, APP-0070.) Chairman Petrov was absent from the April 8, 2026 meeting; Secretary Pete Côté presided.

**MINUTES**
**HARRIS-GALVESTON SUBSIDENCE DISTRICT**
**REGULAR MEETING OF THE BOARD OF DIRECTORS**
**APRIL 8, 2026**
**10:00 A.M.**

OF THE BOARD PRESENT: Bill Alcorn, Patricia Alvarez, Emily Anderson, Sarah John Bowen, Chris Canonico, Pete Côté, Brian Freedman, Don Johnson, Jason Sears, Shaun Smith

OF THE BOARD ABSENT: Rosa Alvarez, Susan Baird, Steve Gillett, Katherine elda Medrano, Alan Petrov

4.  HEARING EXAMINERS REPORT. Judge Helen Stewart Truscott presented the Hearing Examiner's Report for March 2026 and prior. Mr. Long moved to accept the recommendations presented in the Hearing Examiner's report; it was seconded by Mr. Alcorn. Secretary Cote called for abstentions. Mr. Freedman abstained from HC Pct 4/Burnett Bayland Park (Well 17119) and City of Houston (Well 1015). Secretary Cote put the question, and after the vote, announced the motion carried. None opposed.

5.  EMERGENCY PERMITS. The Board considered the General Manager's action in granting

*Figure 8 — Official minutes of the April 8, 2026 Board meeting: the attendance roll (Petrov absent; Secretary Côté presiding) and Item 4, which records the Hearing Examiner's report in a single sentence and omits her six-week docket-control-order statement entirely. (App. Ex. K, APP-0070.)*

96. At the same conference, when Plaintiff asked, "May I interject?", the Hearing Examiner answered: "No, sir, because I've already ruled that you are not allowed."

97. When Plaintiff protested that the Disqualification Ruling issued with "no hearing, no opportunity for us to respond, nothing whatsoever," she answered that for an unlicensed attorney, "no hearing would be required. I would simply ask you to sit down." She also acknowledged she had "not reviewed any motions or anything that has been filed." The pending verified filings were never addressed.

98. When Plaintiff attempted to present authority, including the amended Rule 5.05, he was repeatedly interrupted, and the ruling stood. These irreconcilable statements are pleaded as evidence of retaliatory purpose and of the absence of neutral process, and they deprive the proceeding of the appearance of neutrality that due process requires.[15]

99. Plaintiff also stated on the record, without contradiction, that he had contacted Texas local counsel who declined the engagement out of expressed fear of "losing business" from involvement in a matter adverse to HGSD. The Disqualification Ruling's nominal pathway—"retain an attorney licensed to practice in the state of Texas"—was illusory on this record.

100. At the April 7, 2026 status conference, the Hearing Examiner stated on the record: "You appeared as an attorney. I had no reason to believe at that time that you were not an attorney licensed to practice in the state of Texas."

101. In October 2025, however, the Hearing Examiner had designated Plaintiff as counsel of record with his Miami, Florida address down to a ZIP+4 (Figure 7)—months before she professed ignorance of his Florida licensure—and Plaintiff had recounted the mid-October emails about his representation on the record minutes earlier.

---

[15] *See In re Murchison*, 349 U.S. 133, 136 (1955) ("justice must satisfy the appearance of justice"); *Tumey*, 273 U.S. at 523 (pecuniary interest disqualifies); *Ward*, 409 U.S. at 60 (same, institutional interest).

102.    On April 7, 2026, Martin asserted on the record—as the General Manager's proposed findings had—that Plaintiff's non-licensure "did come up" at the October 7, 2025 hearing. Plaintiff stated on the record that it never was raised there.

103.    The Hearing Examiner's own April 13, 2026 modifications—striking proposed findings and reducing the corresponding finding to "[t]he Hearing Examiner announced a contested hearing"—corroborate that the proposed account was false. The remaining findings were adopted anyway, without any hearing at which that account could be tested.

104.    On April 13, 2026, the Hearing Examiner gave notice of intent to grant the General Manager's Motion for Remand unless a response was filed by April 20, 2026—one week, and also made clear the General Manager was to substantiate the Motion for Remand through an affidavit. The notice described Plaintiff as "counsel purporting to represent the Permit holder."

105.    The April 13, 2026 notice was a complete reversal — a 180-degree turn executed in five days, in violation of due process. On April 7, she had refused to remand without process, saying she was "not trying to deny anyone their right to due process," and ordered an evidentiary hearing within six weeks. On April 8, she assured the Board that the parties would submit a docket-control order "with an actual date for the permit hearing" within six weeks.

106.    On April 13, with no intervening filing, hearing, or event of record, she noticed her intent to adopt the General Manager's proposed findings — the same eve-of-conference submission — on seven days' notice, to a permittee whose counsel she had removed. Mr. Davis responded the same day: "Respectfully folks, you have not given me even a week to seek counsel after deciding to remove mine. Is this not moving a bit hastily? Honestly, I don't even know what the document says." No one answered the question.

107.    The notice also revealed the proposed findings' provenance: the Hearing Examiner had to order "Commission" changed to "District"—the General Manager's findings had been drafted from a template prepared for a different agency—and had to strike two proposed findings outright. Mr. Davis responded that one week was insufficient time to obtain replacement counsel.

108.    On April 15, 2026, Plaintiff transmitted a verified declaration documenting the misconduct alleged herein to HGSD's officials and twenty-four named attorneys at GDHM and Bickerstaff. No recipient responded, investigated, or corrected the conduct.[16]

109.    On May 4, 2026, Martin filed modified Findings and the required affidavit was prepared by Jones rather than the General Manager, as expressly demanded by the Hearing Examiner via her April 13, 2026, notice.

110.    On May 7, 2026, Mr. Davis asked the Hearing Examiner how the matter could proceed while records were withheld. No records followed.

111.    On May 20, 2026, Mr. Davis wrote to the Hearing Examiner that "the substance of this correspondence is my own work; Mr. Foad assisted only with form and style". On May 22, 2026, the Hearing Examiner closed the hearing "by submission," adopted the General Manager's proposal as her recommendation, and remanded to the Board—without any evidentiary hearing, and with the records Plaintiff had demanded still withheld.

112.    Between April 7 and May 21, 2026, no hearing was set, no docket-control order issued, and no hearing date was noticed. On May 22, 2026, the Hearing Examiner instead closed the hearing "by submission" and remanded—the disposition she had refused six weeks earlier as inconsistent with due process—while her narrative summary blamed the parties for the absence of the hearing only she could set.

---

[16] Plaintiff's email-tracking records confirm receipt and interaction by, among others, Turco (May 18, 2026), Jones (April 3 and May 18, 2026), Ellis (March 30, 2026), and Truscott (read within 35 minutes on May 26, 2026).

113.    On May 21, 2026, the Hearing Examiner signed her permit recommendation (the "***Recommendation***"), adopting it by her May 22, 2026 letter of transmittal. The Recommendation confirms on its face that "[n]o evidentiary hearing has occurred." Yet it recommends that renewal of the Permit be denied, declares that Woodloch "owes $106,901 in penalties," and conditions any renewal on payment of the Penalty—the very exaction that was never adjudicated.

114.    The document misspells twice refers to a nonexistent "Well No. 3603," and recommends the non-renewal of the Permit which would adversely affect two hundred low-income tenants.

115.    Adopted Finding No. 12 asserts HGSD "mailed notice to the Permitholder" on August 26, 2025. On July 1, 2026, HGSD's counsel admitted in writing that no mailing, postage, or delivery record exists. The findings assert as fact a mailing HGSD concedes it cannot document.

116.    Adopted Finding of Fact No. 21 makes a new charge: that following the Disqualification Ruling, "Permitholder's counsel continued to make appearances, file motions, and communicate with HGSD on Permitholder's behalf violating the Hearing Examiner's order." That finding—branding Plaintiff a violator of a tribunal's order—was drafted by Martin, adopted by Truscott, and transmitted to the Board, again without notice to Plaintiff or any opportunity to be heard.

117.    Adopted Findings Nos. 7 and 9 publish confidential settlement communications as findings: HGSD's "B Credit" offer ($66,994) and Mr. Davis's February 13, 2025 counteroffer ($36,000 over 36 months)—from the conference Ellis was excluded from. Settlement positions became findings against the offeror, without hearing or evidence.

118.    The Hearing Examiner's May 22, 2026 letter of transmittal appends a narrative summary—prepared on no party's motion—that by its own terms exists "to explain why the Hearing Examiner did not respond or take certain actions." In it, she claims the delay in accepting the General Manager's proposal "result[ed] in additional time for the Permit Holder to obtain counsel."

119.    Between April 7, 2026 and her acceptance of the General Manager's proposal on May 21–22, 2026, Woodloch, Mr. Davis, and Plaintiff sent the Hearing Examiner numerous emails: the April 13, 2026 prematurity objection; the April 20, 2026 response; the May 7, 2026 inquiry about proceeding while records were withheld; and the Omnibus Motion, resubmitted May 18, 2026. She responded to none of them, set no hearing, and issued no docket-control order.

120.    The May 22, 2026 narrative summary also asserts that the parties never conferred on, or proposed, a procedural schedule. On October 14 through 16, 2025, Plaintiff conferred with Martin on the proposed Contested Case Hearing Order and discovery schedule and corresponded with the Hearing Examiner about them; on April 20, 2026, Mr. Davis responded in writing to the proposed hearing and procedural schedule.

121.    Under Rule 7.6(a), a Hearings Examiner's report must follow "the conclusion of the presentation of evidence," must contain "a summary of the evidence," and, "[i]n a contested case," must be delivered to the parties "by certified mail."

122.    Here, no evidence was ever presented to summarize, and neither the Recommendation nor the May 22, 2026 transmittal was served on Woodloch or Mr. Davis by certified mail—each went by email only.

123.    Under Rule 7.6(b), delivery of the report marks a contested-case party's opportunity to file written exceptions before Board action—an opportunity the manner of service obscured. The same District that cannot document mailing the Hearing Notice dispensed with the mandatory certified-mail service of the report.

124.    Throughout, the Hearing Examiner conducted official business—including receipt of filings and sensitive information—through a private email address and personal post-office box.[17]

---

[17] Public information held on private accounts remains public information. Tex. Gov't Code §§ 552.004, 552.203.

The practice frustrated the TPIA, evaded retention obligations, and kept the ex parte communications off any official record.

### K. Defendants' July 1, 2026 Admissions

125. Since April 29, 2025, HGSD's records function under Robinson has produced records piecemeal, late, and incomplete; substituted scanned PDFs for the native records requested; and never produced the Board authorizations, fee calculations, or mailing records at the heart of this dispute.

126. Four times, in writing, HGSD's counsel represented that production was complete and that "no other responsive documents exist in any format": Robinson, by email to Plaintiff on October 3, 2025; Robinson again on June 15 and June 17, 2026, the latter by email to Mr. Davis at 2:03 p.m., copying Turco, Jones, and the Hearing Examiner; and Robinson again on June 30, 2026 at 5:48 p.m. Each representation was false when made: records produced afterward—including the fee worksheet produced July 1, 2026—were responsive, existed when each representation was made, and had been requested.

127. Between April 2025 and July 2026, HGSD produced records only in partial tranches: Jones's April 8, 2025 eve-of-meeting release; Robinson's June 20, 2025 release of the engagement agreements; her September 2025 release of redacted legal-fee invoices after the OAG Ruling; the November 7, 2025 ShareFile release; and the June 20, June 30, and July 1, 2026 releases. Each release followed—and disproved—a prior written representation that production was already "complete." As of the filing of this Complaint, production remains incomplete: the Board authorizations, the native-format Violation Letters, the mailing records for the Hearing Notice, the materials transmitted ex parte to the Hearing Examiner, and the Hearing Examiner's compensation records, all identified in the ledger below, have never been produced.

128. On July 1, 2026, Martin conceded in writing that Jones "uses an Excel worksheet to calculate the fees" underlying the $106,901 demand—a native, responsive, dispositive record that had existed all along, had been squarely requested, and was produced only after the fourth assurance of completeness.

129. The same July 1, 2026 correspondence admitted that HGSD possesses no mailing, postage, or delivery record of any kind for the Hearing Notice.

130. The PDF-only production was a choice, not a limitation. HGSD maintains its well records natively in Excel: its full well database — 15,296 well records with 74 data fields each, including per-well, meter-derived annual pumpage for every year from 1976 through 2024, and the permit numbers and permit terms for every well — exists as a single native workbook. HGSD released that native workbook to a member of the public; having been voluntarily released, it is public information as a matter of law. Tex. Gov't Code § 552.007. Yet to Plaintiff — who had expressly and repeatedly invoked § 552.228(b)'s right to production "in the requested medium" — Robinson delivered scanned and exported PDFs, stripping the metadata Plaintiff had demanded.

131. The double standard admits of one explanation: the native records, with their authorship, revision, and calculation metadata intact, were withheld from the one requestor investigating the records' integrity. (App. Ex. N, APP-0135; the native workbook accompanies the Appendix.)

132. The District's own native database also contradicts the public charge that Woodloch was an outlaw operator: the December 2025 edition lists Permit No. WP2025-115048 for Wells Nos. 3606 and 7694 with a permit term of August 1, 2025 through July 31, 2026 — a current term — in the very period when Ellis was telling the Board that Woodloch "ha[d] now operated without" a permit. This concealment implicates Robinson, who ran the production; Martin and Saleh, who delivered the "General Manager's PIA Response" of July 1, 2026; and Ellis, who discussed and

defended the District's handling of Plaintiff's TPIA requests before the Board at the July 8, 2026 meeting. (App. Ex. N, APP-0135.)

133.    On July 1, 2026, an item-by-item reconciliation of every record requested against every record produced was transmitted; notably, no Defendant ever responded to it item by item, identified an error in it, or produced the records it identified as outstanding.

134.    The following table—drawn from a July 1, 2026 item-by-item reconciliation produced in an electronic mail, which no Defendant has rebutted—summarizes what was requested, what was produced, and what remains withheld:

| Record Requested | Status | Detail |
| --- | --- | --- |
| Board agendas, minutes, and resolutions authorizing the General Manager to contract with GM Ellis Law, Johnson Petrov LLP, and GDHM (First Request, Item A). | Not produced | HGSD claims no responsive records (11/7/25). |
| Executed engagement / legal-services agreements with those three firms, including amendments (First Request, Item B). | Produced | Released 6/20/25. |
| All invoices submitted by those three firms, plus proof of payment (First Request, Item C). | Partially produced | GM Ellis Law invoices and check-payment records released; Johnson Petrov / GDHM invoices not confirmed. |
| The three Violation / settlement-demand letters in native Word format with metadata (First Request, Item D). | Not produced | Only conflicting PDFs given; HGSD: requestors 'not entitled to a specific format.' |
| Board agenda, minutes, resolution, or audio authorizing Turco to make the $106,901 settlement demand 'on behalf of the Board' (First Request, Item D). | Not produced | No authorizing record ever produced. |
| Records substantiating the alleged over-withdrawal, and the methodology used to calculate the $106,901 figure (First Request / ongoing). | Not produced | No supporting proof or calculation produced. |

| Record Requested | Status | Detail |
|---|---|---|
| Records of Board hearings and published notices on permit / disincentive fees, 2013–present (First Request, Item E). | Partially produced | General agendas/minutes released; no record of any hearing or notice specific to disincentive fees. |
| Internal written communications between HGSD staff concerning Mr. Davis / Woodloch (First Request, Item 1, as narrowed). | Produced | Released 11/7/25 (ShareFile). |
| The public Hearing Notice dated 8/26/25 in native Word format with metadata (Second Request; renewed 6/2/26 & 6/22/26). | Not produced | PDF only. |
| Records proving the 8/26/25 Hearing Notice was actually mailed — tracking, postage/payment, proof of delivery (Second Request; June 2 request #4). | Not produced | HGSD affirmatively claims no responsive records exist. |
| The materials HGSD prepared and transmitted to Hearing Examiner Truscott (demanded 10/1/25). | Not produced | Ex parte submissions never released. |
| All executed settlement agreements, 1/1/2020–11/10/25 (~1,926), plus remaining responsive information (Third Request). | Not produced | HGSD issued a cost/time estimate; agreements never produced. |
| Dylan Jones's Woodloch worksheets for 2023 & 2024 in native Excel (June 2 request #1). | Partially produced | Excel spreadsheets sent 6/30/26; native format / metadata disputed. |
| Woodloch's total groundwater withdrawals, 2020–2025, in Excel (June 2 request #5). | Partially produced | Excel spreadsheets sent 6/30/26; native format / metadata disputed. |
| Woodloch renewal applications, District meter photos, and annual reports, 2020–25 (June 2 requests #2, #3, #6). | Produced | Accepted by requestor. |
| Written confirmation that Woodloch's permit is in good standing / renewed during pendency (June 22 request). | No response | Unanswered. |
| Hearing Examiner Truscott: all rulings/orders 2017–present; compensation from HGSD and the Fort Bend Subsidence District 2017–present; appointment/engagement records. | No response | Outstanding as of 7/1/26; statutory clock running. |

| Record Requested | Status | Detail |
|---|---|---|
| Responsive records generally in native electronic format with intact metadata, per Tex. Gov't Code § 552.228(b) (throughout). | Refused | HGSD substituted scanned/merged PDFs and Excel exports. |

135. On June 17, June 30, and July 1, 2026, Robinson and Martin again represented in writing that production was complete—even as the July 1 admissions were made. HGSD's own permit portal lists twenty-three Workflow items, including "Review Recommendations" entries completed November 5, 2025, December 3, 2025, and January 7, 2026, with logged comments. None was produced despite the OAG Ruling.

136. The July 1, 2026 admissions confirmed the timing: until October 17, 2025, HGSD's lawyers negotiated with Plaintiff without objection, and within days of his September 30 and October 6, 2025 demands—for the fee worksheet, the Workflow entries, the mailing records, and the website records—the same actors pivoted to the UPL charge, the Disqualification Ruling, and later the No-Contact Directive.

137. After HGSD ignored the OAG Ruling, Plaintiff reported the noncompliance to the Assistant Attorney General who issued it and sought enforcement. He received no response. Only then did Plaintiff invoke this Court's jurisdiction.

138. The false assurances pleaded above are evidence of retaliatory motive and consciousness of wrongdoing, and constitute fraudulent concealment tolling any limitations period any Defendant may invoke.

### L. The July 8, 2026 Board Meeting

139. On July 8, 2026, at its regular meeting, the Board took up the Recommendation as agenda item 6.1. The Hearing Examiner presented the Recommendation and the adopted findings in open session. HGSD recorded the meeting and posted the recordings publicly.

140.    Presenting the Recommendation, the Hearing Examiner stated that it is "based solely on the record of the District, solely upon the applications that were submitted and any reports that were made by the district staff"; that "we actually never had a contested hearing"; and that she had declared the contested case because "it was basically confusion. Nobody was in agreement to anything."

141.    Ellis then addressed the Board as its counsel. Ellis stated that this was "the very first" contested case in HGSD's history and that the process "went off the rails" at the scheduling stage.

142.    Ellis told the Board that "[t]he word penalty was used" in the Recommendation and recommended "that you remove that"; that "I do not . . . believe that you have the authority to penalize anybody"; that "[y]ou do not have the ability to impose a civil penalty"; and that the $106,901 demand is "not in any way shape or form a penalty." A director responded, "that's what the examiner said," and, "I think we need to fix that."

143.    Ellis further acknowledged that an agreed scheduling order "would have continued the existing permit"; that the Hearing Examiner could have approved a temporary permit for "up to four months at a time while [the] contested case was going on," so that a permittee would not "be in violation just because they contested"; and that no temporary permit issued. In the same meeting, Ellis stated that, absent settlement, HGSD would "end up having to file a lawsuit" seeking civil penalties of up to $5,000 per day for unpermitted operation.

144.    Asked by Sears whether the Board could question him, Ellis answered: "You can ask us questions now. You can ask me questions in executive session. . . . If you're going to be asking about the strengths and weaknesses of our case, let's do that in the executive session." Asked by Sears whether HGSD's rules and state law had been followed, Ellis answered "Yes, sir" to each.

145. Through leading questions, Sears framed the record before the Board: that Woodloch "no-showed" the first public hearing; that "to this day, Woodloch has never submitted to the hearing examiner a proposed schedule"; and that "the applicant made no request to the hearing officer" that HGSD produce anything. Ellis confirmed each.

146. Ellis went further, telling the Board that "there weren't motions or things filed with the hearing examiner from — from that attorney," and — in answer to Sears's question whether Woodloch ever submitted any request for discovery — that "no discovery was requested." Each statement was knowingly false when made. Ellis had personally received the Omnibus Motion on November 20, 2025 — with an express invitation to identify any impropriety in its submission, which he never did — and again on November 24, 2025; the motion was served on the Hearing Examiner and all counsel on March 30–31, 2026, verified April 1, 2026, and resubmitted May 18, 2026. It sought, among other relief, the disqualification of the Hearing Examiner, of Martin, and of Ellis himself.

147. The "attorney" who supposedly filed nothing had filed the one motion none of them ever answered — the motion seeking their own disqualification. (App. Ex. M, APP-0102; App. Ex. H, APP-0028; App. Ex. I, APP-0029–0068.) As for schedules, Plaintiff had conferred with Martin on the Hearing Examiner's proposed Contested Case Hearing Order and discovery schedule on October 14–16, 2025, and Mr. Davis responded in writing to the proposed schedule on April 20, 2026.

148. The Board's own members exposed the unauthorized-counsel problem in real time. When Saleh presented for the General Manager, Director Don Johnson asked: "When did you become the general manager's attorney?" Saleh answered: "I don't know when my firm was retained." Director Johnson's response — "I just didn't realize we had that relationship" — is the sound of a

sitting director learning, from the podium, of a law-firm relationship his own Board never authorized. (App. Ex. M, APP-0120.)

149.    Plaintiff addressed the Board and declared that his statements were made under penalty of perjury. No other speaker at the meeting was sworn. Plaintiff recounted, among other things, the records still outstanding under the OAG Ruling, the October 14, 2025 ex parte communication, the entry of the Disqualification Ruling without notice or hearing, and the unanswered disqualification motions. No speaker contradicted Plaintiff's account under oath.

150.    Saleh appeared for the General Manager and told the Board that "no ex parte communications ever took place." The Hearing Examiner's October 14, 2025 email to Martin is reproduced at Figure 6 above. Saleh also stated, of GDHM's retention, "I don't know when my firm was retained," and stated that HGSD possesses no mailing records: "we can't create things and provide it to them if they don't exist."

151.    Ellis's intervention in the TPIA colloquy betrayed the same conflict. At the outset of the meeting Ellis told the Board, "I am counsel to the board of directors in this matter. I don't represent any of the parties." (App. Ex. M, APP-0097.) Yet when the dais pressed Saleh on Plaintiff's public-information requests, Ellis rose and argued the General Manager's records defense alongside Saleh — narrating the Attorney General process, asserting that the District had "follow[ed]" the OAG Ruling and released what was required, and volunteering that the next step for a dissatisfied requestor "would be to file a suit against the district," which he said "did not happen." (App. Ex.

152.    M, APP-0120.) Counsel to the adjudicating body thus advocated the records position of one party before that body — on the very requests whose obstruction is the subject of this suit, and whose outstanding items included his own firm's undocumented engagement and invoices. Martin

did the same in reverse: after disclaiming any role in open-records matters in writing on June 22, 2026, she delivered the "General Manager's PIA Response" nine days later.

153.    Turco, asked about the $36,000-over-36-months figure that appears in adopted Finding No. 9, stated that it "was an offer from the district staff to Woodloch," however, adopted Finding No. 9 attributes that figure to Mr. Davis as his counteroffer.

154.    Saleh informed that Martin "had been representing the general manager," to which Director Johnson, as noted above, responded by stating the following: "I just didn't realize we had that relationship."

155.    After Saleh's presentation, Plaintiff asked: "Mr. Chairman, may I please make some clarification statements?" to which Petrov answered: "No, you had your opportunity, sir." Plaintiff stated for the record that GDHM was operating under an unexecuted legal-services agreement. The General Manager's counsel had been afforded a presentation and questioning; Plaintiff was afforded no opportunity to respond to it.

156.    The asymmetry Petrov enforced ran throughout the meeting. The Hearing Examiner held the floor and took the dais's questions from approximately 15:54 to 31:19 of the recording, then returned to the podium at approximately 1:01:27 to supplement her account with "information that I received from the district." Ellis addressed the Board from approximately 31:22 to 1:02:29 and thereafter interjected at least four more times during Mr. Davis's and Saleh's segments. Saleh was afforded a full presentation. The District's presenters were thus permitted to speak, return, and speak again—roughly an hour of the open session in the aggregate, much of it elicited through leading questions from the dais—while Plaintiff spoke once, under penalty of perjury, and was refused even "some clarification statements" in rebuttal.

157.    Petrov, presiding, administered each of these rulings on recognition. The silencing repeated, in open session and on camera, the pattern already pleaded: the Disqualification Ruling entered without notice or hearing, the No-Contact Directive, and the closure of the Contested Hearing without any evidentiary hearing.

158.    The physical choreography made the asymmetry unmistakable. Ellis and the Hearing Examiner did not merely speak once: each was free to rise from a seat, walk back to the podium or speak from the dais, and supplement the record whenever a prior speaker's account needed shoring up — the Hearing Examiner returning after Ellis's hour to add "information that I received from the district," and Ellis interjecting at will during Mr. Davis's and Saleh's segments. No one recognized them; no one needed to. The one speaker who had testified under oath asked once for "some clarification statements" and was told he had had his opportunity. (App. Ex. M, APP-0121.) In a proceeding on which Plaintiff's reputation and his Clients' water supply depended, the accusers enjoyed standing invitations to the microphone and the accused was rationed to a single turn.

159.    On information and belief, each of the District's presenters knew the statements pleaded above concerning the July 8, 2026 presentations were false or misleading when made, because each spoke with the contradicting records in his or her possession or readily available:

160.    the Hearing Examiner had authored the October 14, 2025 email (Figure 6) and had received the parties' scheduling correspondence when she told the Board that no schedules were offered and that no one wished to proceed.

161.    Ellis had received that same correspondence, and had authored the No-Contact Directive, when he assured the dais—in answer to Sears's leading questions—that HGSD's rules and state law had been followed.

162.    Saleh's firm possessed the October 14, 2025 email when Saleh told the Board that "no ex parte communications ever took place," and possessed the unexecuted 2021 engagement proposal when he professed not to know when his firm was retained. None of these statements was made under oath, and Petrov's refusal ensured that none could be answered by the one speaker who was sworn.

163.    Directors questioned Mr. Davis about raising tenant rents and questioned a tenant advocate about her personal rent. No director asked the Hearing Examiner, Ellis, or Saleh about the October 14, 2025 email, the absence of mailing records, the relief granted without a motion, or the absence of certified-mail service.

164.    The Board then met in executive session for approximately two hours. Upon reconvening at 12:36 p.m., a director moved, without further open deliberation, to continue the hearing on the Recommendation to the Board's August 2026 regular meeting, at which the Board will consider a remand conditioned on receipt of a signed, agreed scheduling order and on Woodloch "having retained local counsel licensed to practice law in the state of Texas and/or an admission of its current counsel pursuant to applicable Texas law and rules" pro hac vice. The motion carried unanimously.

165.    The Board did not vacate or modify the Disqualification Ruling, the No-Contact Directive, or the adopted findings. Each remains in force.

## M. Conflicts; No Neutral Adjudicator

166.     HGSD appointed and compensates the Hearing Examiner, supplied the General Manager's evidence through its own Director of Compliance, stood to collect the $106,901, and pressed for closure "by submission" without any evidentiary hearing.[18]

167.     On March 31, 2026, the Omnibus Motion sought the disqualification of the Hearing Examiner as incurably biased, and of Martin and Ellis as incurably conflicted: she is selected and compensated by the respondent District, with no party input, in an arrangement of roughly ten years' standing, her fees subject to review by Turco—the very official whose demand she was adjudicating; she had engaged in the October 14, 2025 ex parte communication prohibited by Rule 7.5(k); and she had barred Plaintiff without process. No one ever ruled on the motion.

168.     On May 21–22, 2026, the same examiner adopted the General Manager's own proposed findings without any evidentiary hearing—findings she had had to correct for another agency's name.

169.     Martin advised the Board at its April 9, 2025 meeting, including its closed session, then appeared as the General Manager's counsel in the Contested Hearing arising from that same action—both sides of one matter. Ellis, excluded by his own client's Board from settlement negotiations, participated anyway and disclosed the other side's confidences to the decision-maker; the Board records authorizing his compensation do not exist, per HGSD.

170.     Ellis's refusal to step aside was brazen. Upon discovering that Ellis had attended the February 13, 2025 settlement conference from which the Board had excluded him — and had then relayed Woodloch's confidential business and financial information, disclosed solely for

---

[18] *See Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (adjudicator with a direct pecuniary interest in the outcome violates due process); *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972) (institutional financial interest of the adjudicator's principal likewise disqualifies); *Withrow v. Larkin*, 421 U.S. 35, 47 (1975) (due process requires a tribunal free of actual bias or its probability).

settlement purposes, to the very Board that would decide the Penalty and the Permit — Plaintiff specifically demanded Ellis's recusal, and renewed that demand in the Omnibus Motion, which sought Ellis's disqualification by name and was placed in Ellis's own hands on November 20 and 24, 2025 and served on the tribunal repeatedly thereafter. (App. Ex. H, APP-0028; App. Ex. I, APP-0029–0068.) Ellis never responded to the demand, never addressed it, and never recused.

171. Instead he escalated: he authored the No-Contact Directive against the lawyer seeking his disqualification, and he continued advising the Board on the very matter — through and including the July 8, 2026 meeting, where he vouched to the dais, in answer to Sears's questions, that HGSD's rules and state law had been followed. (App. Ex. M, APP-0099–0100.)

172. The same conduct transgressed the standards Texas sets for its lawyers: Martin's successive adverse roles in the same matter; the written completeness representations disproved by HGSD's own later productions; and Ellis's acquisition and disclosure of settlement confidences after the Board excluded him.[19]

173. Neither Martin nor GDHM has produced an executed engagement agreement authorizing its work: the only GDHM engagement letter produced is an unexecuted 2021 proposal scoped to public-information responses—a role Martin disclaimed in writing on June 22, 2026 ("I do not represent the District on open records matters"), only to deliver the "General Manager's PIA Response" on July 1, 2026. No Board agenda, minutes, or resolution authorizes Martin or GDHM to represent the General Manager in the Contested Hearing.

174. The admission is HGSD's own, in writing. Plaintiff's TPIA requests sought the legal-services agreements for Bickerstaff, GDHM, and GM Ellis Law, together with their billing records,

---

[19] *See* Tex. Disciplinary Rules Prof'l Conduct 1.05, 1.06, 1.09, 3.08 (confidentiality, conflicts, successive roles, lawyer as witness); 4.01(a) (truthfulness in statements to others); 4.04, 8.04(a)(3) (respect for rights of third persons; dishonesty, deceit, misrepresentation).

and the Board agendas and minutes authorizing them. On November 7, 2025, Robinson answered that "there was no information responsive to a portion of your request, including the following: Board meeting agenda(s) [and] minutes containing information regarding legal services agreement(s) … executed with GM Ellis Law; … executed with Johnson Petrov LLP, if any; [and] … executed with Graves, Dougherty Hearon & Moody ('GDHM')." No Board authorization exists — by the District's own account. As to billing records, Robinson produced some GM Ellis Law invoices, but no GDHM invoice and no Bickerstaff invoice was ever produced, and no proof of payment to either firm. (App. Ex. G, APP-0027.)

175.    Plaintiff has verified the admission against the District's public record. The GDHM engagement letter is dated December 22, 2021; the Bickerstaff legal-services agreement is dated January 4, 2022. The District's own posted minutes of the two Board meetings that followed — January 12, 2022 and February 9, 2022 — contain no agenda item, discussion, motion, or vote concerning the retention of either firm, any legal-services agreement, or any authorization for the General Manager to execute one. The only legal item in the January minutes is a litigation briefing by Ellis; the only legal item in the February minutes records that "District Counsel was not in attendance."

176.    And the GDHM engagement was never even executed. The December 22, 2021 letter provides, under the heading "Acceptance": "To confirm your agreement to these terms of GDHM's representation, please sign the enclosed copy of this letter and return it to us." The letter is signed by GDHM's William Christian; the "AGREED: Michael J. Turco, General Manager" block is blank. By the letter's own terms there is no agreement. GDHM — the firm that prosecuted the General Manager's case against Woodloch, drafted the adopted findings branding Plaintiff a violator, and dispatched Saleh to address the Board — appears to have performed legal services

for the District for more than four years under an unsigned engagement no Board ever authorized and no invoice ever documents. The same lawyers procured Plaintiff's removal on the accusation that he lacked authority to practice. (App. Ex. E, APP-0018; App. Ex. F, APP-0019–26.)

177.     On November 7, 2025, HGSD stated that it has no Board agenda, minutes, or resolution authorizing the General Manager to contract with GDHM or with Bickerstaff. No executed GDHM engagement has ever been produced—only the unexecuted 2021 proposal. No GDHM invoice or proof of payment has ever been produced, and none from or to Bickerstaff either; HGSD's retained counsel confirmed in writing that no responsive records exist.

**Acceptance.** To confirm your agreement to these terms of GDHM's representation, please sign the enclosed copy of this letter and return it to us. If this letter does not accurately describe the terms of this engagement and the services that you believe GDHM has agreed to provide, please notify me immediately. Also, if you do not understand anything in this letter, or you want more information or clarification, please contact me before you sign this letter.

**Termination.** The District may terminate this engagement by written notice at any time. GDHM reserves the right to withdraw from this engagement, subject to our ethical obligations and applicable judicial requirements. Otherwise, this engagement will terminate upon the completion of the legal services described above.

Please contact me promptly if you have any questions about this letter or any other aspect of GDHM's engagement in this matter. I look forward to working with you.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY
A Professional Corporation

By: _____
        William Christian

AGREED:

_____
Michael J. Turco, General Manager
Harris-Galveston Subsidence District

401 Congress Avenue. Suite 2700 | Austin. Texas 78701 | www.gdhm.com

*Figure 9 — Signature page of the December 22, 2021 GDHM engagement letter: signed by GDHM (W. Christian), with the "AGREED: Michael J. Turco, General Manager" block blank. By its own terms the engagement required the District's signature to take effect. (App. Ex. E, APP-0017–18.)*

178.    Plaintiff also diligently searched HGSD's own public online repositories—its posted Board agendas, minutes, and meeting materials—and found no item authorizing the retention of, or any payment to, either firm.

179.    On HGSD's own records[20], the GDHM and Bickerstaff engagements were never Board-authorized, never executed (GDHM), and never paid through any documented public expenditure. No Board authorization, executed contract, or documented payment for that work appears in any record HGSD has produced or identified—while the same counsel accused Plaintiff of practicing without authority.

180.    At the outset of the representation, in March 2025, Ellis confirmed to Plaintiff in writing that he could "talk to whoever [he] want[ed]" at HGSD. The No-Contact Directive Ellis later authored forbade the very communications Ellis himself had authorized. He defended HGSD's practices on the ground that, in substance, "this is how things have been done around here for the last fifty years"

181.    In the same October 6, 2025 correspondence, Ellis assured Plaintiff that "[t]he September hearing was properly noticed"—the very notice HGSD now admits it has no record of mailing.

### N. The Attorneys' Pattern of Knowingly False Statements; The Texas Disciplinary Rules

182.    The record set out above establishes a pattern of knowingly false statements by counsel, each contradicted by a document its maker possessed:

183.    (i) Saleh's July 8, 2026 assurance to the Board that "no ex parte communications ever took place," contradicted by the Hearing Examiner's October 14, 2025 email to the General Manager's counsel (Figure 6), which his own firm possessed.

---

[20] A political subdivision acts through its governing body, in meetings noticed and recorded under the Open Meetings Act, Tex. Gov't Code ch. 551; *see also* Tex. Spec. Dist. Loc. Laws Code §§ 8801.101–.102.

184.     (ii) Ellis's July 8, 2026 statements that no motions and no discovery requests were ever submitted, contradicted by the Omnibus Motion he twice received in November 2025 and that was served on the tribunal repeatedly thereafter.

185.     (iii) Ellis's answers, under Sears's questioning, that HGSD's rules and state law "have been followed," given by the author of the No-Contact Directive who had himself attended the settlement conference from which the Board excluded him.

186.     (iv) Robinson's four written representations — October 3, 2025, June 15 and 17, 2026, and June 30, 2026 — that production was complete and "no other responsive documents exist in any format," each disproved by HGSD's own subsequent productions, including the fee worksheet conceded on July 1, 2026.

187.     (v) Martin's assertions that Woodloch "requested" the contested case, irreconcilable with the Hearing Examiner's on-record admission that she declared it; and (vi) Martin's July 1, 2026 delivery of the "General Manager's PIA Response" nine days after disclaiming, in writing, any role in open-records matters.

188.     This conduct implicates the Texas Disciplinary Rules of Professional Conduct, including:

189.     Rule 3.03 (candor toward the tribunal) and Rule 3.05 (maintaining impartiality of the tribunal; ex parte contacts), as to Ellis, Martin, and the Hearing Examiner's counsel-facing conduct.

190.     Rule 4.01 (truthfulness in statements to others), as to Robinson's and Seaquist's written production representations and Saleh's public statements.

191.     Rule 1.06 (Conflict of Interest: General Rule), Rule 1.09 (Conflict of Interest: Former Client — a lawyer may not represent another person in a matter adverse to a former client where the matter is the same as, or substantially related to, the matter in which the lawyer represented the

former client), and Rule 1.11 (Successive Government and Private Employment), as to Martin's service as the Board's counsel on April 9, 2025 — including its closed session — followed by her appearance as the General Manager's adversary counsel in the Contested Hearing arising from that very action, and as to Ellis's dual roles.

192.    Rule 3.04 (fairness).

193.    Rule 5.01 (Responsibilities of a Partner or Supervisory Lawyer) and Rule 1.10 (imputation of conflicts within a firm), as to GDHM, GM Ellis Law, and Bickerstaff, each of which bears responsibility for its lawyers' conduct and the imputed conflicts pleaded herein.

194.    These violations are pleaded as evidence of the knowing and retaliatory character of Defendants' conduct — the same lawyers who pressed a criminal-unauthorized-practice charge against Plaintiff were themselves practicing under unauthorized, unexecuted, and undocumented engagements — and in support of the exemplary-damages allegations. Plaintiff reserves all rights to present the same record to the appropriate disciplinary authorities.

### O.  Disparate Treatment; No Process

195.    Plaintiff alone was accused of dishonesty and the unauthorized practice of law, barred from his Clients' matter, and ordered not to communicate except through local counsel.

196.    At no point did any Defendant afford Plaintiff notice and a meaningful opportunity to clear his name before publicly branding him and altering his legal status before HGSD. The false charge was made in conjunction with, and as the asserted justification for, that alteration of status.

### P.  Injury and Damages

197.    The Disqualification Ruling and the No-Contact Directive remain in effect. They continue to restrain Plaintiff's speech and petitioning and to brand him, on a public record, as engaged in

unauthorized practice. Since May 22, 2026, the adopted findings add a further charge. That ongoing restraint is a present injury.

198.    While the restrictions stand, Plaintiff cannot deal with HGSD on equal terms, his petitioning is chilled, and the false charge impairs his reputation and practice. Absent relief, he reasonably fears repetition.

199.    Plaintiff has also sustained compensable injury for which he seeks damages from the individual Defendants in their individual capacities, in the following categories. On Plaintiff's contemporaneous time and business records, these losses exceed $1,300,000. Plaintiff seeks compensatory damages in an amount to be determined at trial, but in no event less than $500,000, based on, *inter alia*, the following factors:[21]

    i.    *Diverted professional time, as lost business income.* Since March 2025, Plaintiff has been forced to divert approximately 1,100 hours of professional time—contemporaneously documented in correspondence, filings, records requests, and work product—from billable client work to combating the misconduct alleged herein. Plaintiff's customary and reasonable hourly rate is $1,200. This element is pleaded not as attorney's fees incident to this suit, but as actual compensatory damage: billable hours Plaintiff could not, and did not, sell to paying clients, proximately caused by Defendants' conduct and provable through Plaintiff's contemporaneous time and business records.

---

[21] Compensatory damages under § 1983 compensate proven actual injury, including monetary loss, injury to reputation, and impairment of professional standing. "[D]amages in tort cases are designed to provide compensation for the injury caused," Memphis Community School District v. Stachura, 477 U.S. 299, 306–07 (1986) (compensable injuries include out-of-pocket loss, impairment of reputation, and personal humiliation); Carey v. Piphus, 435 U.S. 247, 254–57 (1978) (damages must be grounded in actual injury). Lost income is recoverable where proved with reasonable certainty from objective records. Holt Atherton Industries, Inc. v. Heine, 835 S.W.2d 80, 84 (Tex. 1992) (lost profits require reasonably certain evidence, such as records supporting one complete calculation).

200.    During the same period, Plaintiff declined or deferred specific matters and prospective engagements because the hours this campaign consumed were unavailable to sell; those turned-away and deferred matters, identified in Plaintiff's business records, supply the demand-side predicate for the diverted-hours measure. This element is distinct from, and does not duplicate, any request for attorney's fees incident to this suit.

ii.    *The destroyed engagement.* But for the false UPL charge and the Disqualification Ruling, Plaintiff would have continued to represent Woodloch and Mr. Davis through the contested-case process and related matters, generating fees whose loss is calculable from the engagement's terms and history.

iii.    *Reputational and business injury.* The false and stigmatizing UPL charge—published to the Hearing Examiner, District staff, multiple law firms, and, on July 1, 2026, a broad distribution list—has injured Plaintiff's professional reputation, standing, and prospective business relations, including referrals and future engagements.

iv.    *Out-of-pocket expenses*, including records, transcription, travel, vendor, and administrative costs.

201.    The individual Defendants acted with malice, or with reckless or callous indifference to Plaintiff's clearly established constitutional rights, warranting punitive damages.[22] With respect to the state-law claims, the conduct of Martin, GDHM, Ellis, and GM Ellis Law constitutes fraud or malice within the meaning of Tex. Civ. Prac. & Rem. Code § 41.003(a), entitling Plaintiff to exemplary damages in an amount to be determined at trial.

---

[22] *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (punitive damages available under § 1983 for reckless or callous indifference to federally protected rights).

### Q. Anticipated Defenses

202.    Damages are sought against Truscott only for non-adjudicative conduct: the ex parte communication, the private-channel practice, and her participation, on information and belief, in the coordinated removal. As to adjudicative acts, Plaintiff seeks declaratory relief, and injunctive relief only as § 1983 permits.[23]

203.    HGSD delegated governmental functions to Martin and Ellis: Ellis issued the No-Contact Directive as an exercise of District authority; Martin prosecuted the General Manager's case in HGSD's tribunal and delivered its official records responses. Each acted jointly with District officials.

204.    To the extent any counsel Defendant claims qualified immunity, the rights at issue—freedom from retaliation for protected petitioning, and notice and an opportunity to be heard before a stigmatizing alteration of legal status—were clearly established at all relevant times.

205.    The state-law claims rest on conduct outside the scope of protected advocacy: publication of false statements of fact to recipients with no role in any judicial or quasi-judicial proceeding, including the July 1, 2026 broad-distribution email, and interference undertaken in counsel's own professional and financial self-interest rather than in any client's lawful service.

206.    Section 1983 requires no exhaustion.[24] Plaintiff also has nothing to exhaust: he is not a party to the permit proceeding—he was barred from it—and the Rules' rehearing and exceptions procedures belong to parties.

207.    Even the process nominally available was frustrated by Defendants themselves: the Rule 7.6(b) exceptions opportunity was obscured by the failure to serve the report by certified mail; the

---

[23] Section 1983 permits injunctive relief against a judicial officer where a declaratory decree is violated or declaratory relief is unavailable.

[24] *Patsy v. Board of Regents*, 457 U.S. 496, 516 (1982) (exhaustion of state administrative remedies is not a prerequisite to an action under § 1983).

Verified Omnibus Motion was never answered; and Plaintiff's referral to the Assistant Attorney General who issued the OAG Ruling drew no response of any kind. A defendant cannot demand exhaustion of avenues it ignored, obstructed, or foreclosed.

208.    Nor does *Younger v. Harris*, 401 U.S. 37 (1971), permit abstention. Under *Sprint*, abstention is reserved for three exceptional categories — state criminal prosecutions, civil enforcement proceedings akin to prosecutions, and orders uniquely in furtherance of a state court's ability to perform its judicial functions — and a permit-renewal proceeding before a district-compensated examiner is none of them. Even if it were, Plaintiff is not a party to that proceeding — he was expelled from it — and a non-party cannot be relegated to a forum that has barred him. Bad faith, retaliation, and a structurally biased tribunal independently defeat abstention. *Gibson v. Berryhill*, 411 U.S. 564 (1973). And Plaintiff's damages claims would proceed in any event, as abstention does not extend to claims for damages.

209.    *Leis v. Flynt*, 439 U.S. 438 (1979) (per curiam), is equally inapposite. *Leis* held only that an out-of-state lawyer has no freestanding constitutional right to pro hac vice admission where no state law or rule creates one. Here, unlike in *Leis*, positive law creates the entitlement: HGSD Rule 7.5(c) (appearance "by representative") and Enabling Act §§ 8801.109(c)–(d) (appearance "in person or by counsel, or both"). Where state law creates the interest, due process governs its deprivation — and Plaintiff's claims rest, independently, on retaliation and stigma, which *Leis* does not address. Nor was Plaintiff afforded even the informal process the *Leis* dissenters thought inadequate: he received none at all.

210.    Nor are these claims unripe or dependent on any future Board action. Plaintiff does not challenge a permit decision the Board has yet to make; he challenges completed and ongoing injuries to his own rights—the false public charge, the Disqualification Ruling, the No-Contact

Directive, and the adopted findings branding him a violator—each of which is in force today and none of which any future permit ruling can undo.

211.    As pleaded in the Jurisdiction section above, HGSD is a political subdivision, not an arm of the State under the Fifth Circuit's six-factor analysis, and no Defendant enjoys Eleventh Amendment immunity from any claim pleaded here. State-law immunities cannot defeat a federal cause of action, and the Legislature has itself authorized the TPIA suit.

212.    Count IV belongs in this Court with the federal claims. The withheld records are the same records whose concealment evidences the retaliation; the claim enforces an Attorney General ruling already issued; and relegating it to a parallel state proceeding would fracture one controversy.

### R.  Policy, Custom, And Ratification

213.    HGSD's Board is its final policymaker under the Enabling Act. The constitutional deprivations pleaded herein were caused, first, by HGSD's official policy and longstanding custom—admitted by its own general counsel—of conducting enforcement and records functions without Board authorization, of withholding public records notwithstanding binding OAG rulings, and of delegating unreviewed authority over contested hearings (including the Contested Hearing) to a compensated examiner and retained counsel.

214.    Second, the Board ratified the Disqualification Ruling, the No-Contact Directive, and the closed-record Recommendation: at its July 8, 2026 meeting, with Plaintiff's sworn account before it and the records still withheld, the Board left each restriction in force, conditioned any remand on the retention of Texas-licensed counsel or a pro hac vice admission, and denied Plaintiff's request to respond. Third, the Board delegated final authority over the Contested Hearing and the

records function to the officials whose acts are pleaded here. Each policy, custom, and ratification was a moving force behind the deprivations.

215.   The custom is not characterization; it is enumeration, from HGSD's own records and admissions: (i) no Board agenda, minutes, or resolution authorizing the $106,901 demand Turco pressed "on behalf of the Board"; (ii) no Board authorization for the GDHM engagement — and no executed GDHM engagement at all; (iii) no Board authorization for the Bickerstaff engagement; (iv) no produced invoice or payment record for either firm; (v) Ellis's own defense that, in substance, this is how things have been done "for the last fifty years"; (vi) the delegation of the Contested Hearing and the records function to a compensated examiner and retained counsel without Board review; and (vii) the Board's July 8, 2026 ratification, with Plaintiff's sworn account before it and the records still withheld. (App. Ex. E, APP-0017–18; App. Ex. F, APP-0019–26; App. Ex. G, APP-0027.)

## V.   CLAIMS FOR RELIEF

### COUNT I — First Amendment Retaliation (42 U.S.C. § 1983)

*(Against HGSD and Defendants Turco, Jones, Petrov, Truscott, Ellis, GM Ellis Law, P.C., Martin, and GDHM)*

216.   Plaintiff re-alleges and incorporates the allegations of the Parties section and of the Factual Allegations sections captioned "2024: The Unauthorized Penalty and the Conflicting Violation Letters" through "The Attorneys' Pattern of Knowingly False Statements; The Texas Disciplinary Rules" (inclusive), together with "Injury and Damages" and "Policy, Custom, and Ratification," as if fully set forth herein. Plaintiff does not incorporate allegations relevant only to other Counts.

217.    Plaintiff engaged in activity protected by the First Amendment: petitioning through public-information requests, opposing HGSD before the OAG, advocating on his Clients' behalf, threatening and preparing litigation, and seeking to bring HGSD's conduct to public attention.[25]

218.    This action does not ask the Court to decide the licensure question. Even if HGSD could limit who serves as counsel, it could not single Plaintiff out for false public accusations, bar and silence him without notice or hearing, and do so in retaliation for protected petitioning. The wrong is the same whoever had the better of the licensure debate.

219.    Plaintiff's petitioning is protected as his own. Plaintiff submitted the Requests, and filed the opposition in the OAG proceeding, as counsel acting on his Clients' behalf — and HGSD's own TPIA counsel treated Plaintiff himself as the requestor: Robinson's correspondence was addressed to Plaintiff, opened "Dear Requestor," and referred throughout to "your request." An attorney's petitioning of the government on a client's behalf is activity the First Amendment protects in the attorney's own right, and the retaliation pleaded herein — the UPL charge, the Disqualification Ruling, the No-Contact Directive, and the July 8, 2026 silencing — was aimed at Plaintiff personally.

220.    Petrov refused Plaintiff's request to respond because of the content and viewpoint of Plaintiff's sworn account — the only sworn account given that day — and not pursuant to any neutral rule of order, as proven by the asymmetry of podium access afforded the District's presenters. (App. Ex. M, APP-0118–0121.)

221.    Each Defendant took or is responsible for an adverse action that would deter a person of ordinary firmness: Martin, the false UPL accusation; Truscott, the Disqualification Ruling and its

---

[25] *See Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011) (the Petition Clause protects petitions to executive and administrative bodies); *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 524–25 (2002) (the right to petition extends to litigation and threatened litigation).

reaffirmation; Ellis, the No-Contact Directive; Turco and Jones, directing or implementing the restrictions and the collection effort; Petrov, silencing Plaintiff's attempted rebuttal at the July 8, 2026 meeting while affording the District's presenters unrestricted access to the floor; the firms, their attorneys' acts within their agency.

222.    One or more Defendants also threatened or pursued disciplinary process against Plaintiff and interfered with his practice's communication tools.

223.    Those actions were substantially motivated by Plaintiff's protected activity. He was treated as counsel without objection until his demands for withheld records became inconvenient, whereupon—within days—he was accused, barred, and silenced; the No-Contact Directive and the closure of the hearing followed his November 10, 2025 written notice of intended suit.[26]

224.    By accusing, barring, and silencing Plaintiff because he petitioned—through the Requests, the OAG proceeding, the July 16, 2025 demand, and his notices of intended litigation—these Defendants violated the First Amendment, actionable under 42 U.S.C. § 1983. Plaintiff is therefore entitled to compensatory damages, punitive damages against the individual Defendants, and, because the Disqualification Ruling and the No-Contact Directive remain in force, declaratory and injunctive relief.

### COUNT II — Procedural Due Process: Stigma-Plus (42 U.S.C. § 1983)
*(Against HGSD and Defendants Petrov, Truscott, Ellis, GM Ellis Law, P.C., Martin, and GDHM)*

225.    Plaintiff re-alleges and incorporates the allegations of the Parties section and of the Factual Allegations sections captioned "Ellis Violates The Board's Unanimously-Passed Resolution"

---

[26]*See Mt. Healthy*, 429 U.S. at 287 (liability where protected conduct was a substantial or motivating factor); *Hartman v. Moore*, 547 U.S. 250, 259 (2006) (retaliatory motive plus adverse action states a First Amendment claim); *Nieves v. Bartlett*, 587 U.S. 391, 398–99 (2019) (retaliation actionable where animus caused the injury).

through "Injury and Damages" (inclusive), together with "Policy, Custom, and Ratification," as if fully set forth herein. Plaintiff does not incorporate allegations relevant only to other Counts.

226.    Plaintiff has a constitutionally protected liberty interest in his good name, reputation, and ability to pursue his chosen profession.[27]

227.    Under color of state law, these Defendants publicly charged Plaintiff with unauthorized practice of law—a crime in Texas—and coupled the charge with a tangible alteration of his status: the Disqualification Ruling and the No-Contact Directive. They afforded no notice, no hearing, and no opportunity to clear his name, before a tribunal with an institutional pecuniary interest in the outcome.[28]

228.    Three facts complete the deprivation. First, Plaintiff affirmatively requested an opportunity to clear his name: through the verified Omnibus Motion; through its May 18, 2026 resubmission to the Board through its Chairman; and in person on July 8, 2026, when he asked to make "some clarification statements" and was refused. (App. Ex. I, APP-0029–0068; App. Ex. M, APP-0121.) Second, no name-clearing procedure exists in HGSD's Rules, and none was ever identified or offered by any Defendant, before or after the deprivation.

229.    Third, the status altered was a state-created entitlement, not a mere unilateral expectation: HGSD Rule 7.5(c) confers on an interested person the right to appear "by representative," and Sections 8801.109(c)–(d) of the Enabling Act confer the right to appear "in person or by counsel, or both," including before a hearings examiner. The Disqualification Ruling and the No-Contact Directive extinguished that entitlement without process.

---

[27] *See Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972) (liberty interest in good name and professional standing); *Paul v. Davis*, 424 U.S. 693, 708–10 (1976) (stigma plus alteration of legal status is actionable); *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971) (public branding requires notice and an opportunity to be heard); *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999) (Fourteenth Amendment protects the right to practice one's profession).
[28] *See Tumey*, 273 U.S. at 523, and *Ward*, 409 U.S. at 60 (interested tribunal violates due process); *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) (due process requires notice and an opportunity to be heard before deprivation).

230.    Each Defendant named in this Count is charged with specific conduct. Martin published the false UPL charge on October 17, 2025, republished it in the July 1, 2026 broad-distribution email, and drafted adopted Finding No. 21. Truscott entered the Disqualification Ruling without notice or hearing, reaffirmed it on April 7, 2026, and adopted those findings on May 21–22, 2026.

231.    Ellis issued the No-Contact Directive and characterized Plaintiff's representation as unlawful in writing. GM Ellis Law and GDHM are responsible for their principals' acts within the scope of their agency. HGSD is liable under Monell for the policies, customs, and ratifications pleaded in the Policy, Custom, and Ratification section above.

232.    Petrov completed the deprivation. The July 8, 2026 meeting was the first and only occasion on which Plaintiff could address the body empowered to act on the adopted findings, and the accusations against him—the UPL charge, the Disqualification Ruling, and the account of the Contested Hearing's collapse—were repeated to that body by the Hearing Examiner, Ellis, and Saleh, unsworn, in presentations and colloquy Petrov permitted them to renew at will. When Plaintiff asked to respond, Petrov refused: "No, you had your opportunity, sir." An opportunity to be heard that lets the accusers speak repeatedly and the accused never reply is not the meaningful opportunity, at a meaningful time and in a meaningful manner, that due process requires; as presiding officer, Petrov denied Plaintiff the only name-clearing forum available before Board action, and thereby personally participated in, and ratified, the deprivation pleaded in this Count.

233.    By publicly charging Plaintiff with a crime and altering his legal status through the Disqualification Ruling and the No-Contact Directive—without notice, hearing, or any opportunity to clear his name, and before a tribunal whose selection, compensation, and conduct are pleaded above—these Defendants deprived Plaintiff of liberty without due process of law, in violation of the Fourteenth Amendment and 42 U.S.C. § 1983. Plaintiff is therefore entitled to a

name-clearing declaration that the charge and the orders are void, an injunction against their continued enforcement, and damages.

## COUNT III — Declaratory and Injunctive Relief (28 U.S.C. §§ 2201–2202)

*(Against Defendants Turco and Truscott in their official capacities, and HGSD)*

234.    Plaintiff re-alleges and incorporates the allegations of the Parties section and of the Factual Allegations sections captioned "October 2025: Martin Accuses Plaintiff of the Unauthorized Practice of Law; The Hearing Examiner's Disqualification Ruling" through "The July 8, 2026 Board Meeting" (inclusive), together with "Injury and Damages," as if fully set forth herein. Plaintiff does not incorporate allegations relevant only to other Counts.

235.    An actual, justiciable controversy exists regarding the lawfulness of the restrictions imposed on Plaintiff. Plaintiff seeks prospective relief against Turco and Truscott in their official capacities, and against HGSD, as those with authority to enforce or rescind the restrictions.[29]

236.    The Enabling Act reserves these decisions to the Board and secures the rights the orders abridged: Section 8801.157 requires a public hearing on permit applications; Section 8801.158 requires "the board"—within 60 days of the hearing and considering "the economic impact on the applicant"—to "decide whether to issue the permit," and subsection (c)(2) mandates issuance where refusal "will result in an arbitrary taking of property or in the practical closing and elimination of a lawful business"; Section 8801.109(c)–(d) provides that a party "may appear before the board in person or by counsel, or both," including before a hearings examiner; and Section 8801.102(b) provides that the Enabling Act "prevails over any other law in conflict or inconsistent with this chapter."

---

[29]*See Ex parte Young*, 209 U.S. 123 (1908). The inquiry is "straightforward": whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). Both requirements are met: the Bar Order and the No-Contact Directive remain in force, and Plaintiff seeks only their dissolution and an injunction against future retaliation.

237.    The Disqualification Ruling issued without motion, notice, or hearing, on relief no party requested; the No-Contact Directive issued with no Rule providing for it; and both contravene Rule 7.5(c), Section 8801.109(c)–(d) of the Enabling Act, and the First and Fourteenth Amendments. Plaintiff is therefore entitled to a declaration that both are unlawful and void, and to a prospective injunction against their enforcement and against further retaliation, consistent with 42 U.S.C. § 1983 as to judicial officers. He has no adequate remedy at law.

**COUNT IV — TPIA Mandamus (Tex. Gov't Code § 552.321)**

*(Tex. Gov't Code § 552.321 — Against HGSD and Defendant Turco in his official capacity)*

238.    Plaintiff re-alleges and incorporates the allegations of the Parties section and of the Factual Allegations sections captioned "Plaintiff Begins the Public-Records Investigation," "Plaintiff Prevails Before the Attorney General But Defendants Still Refuse To Fully Comply With The Requests," "The Stonewalling Continues; Ellis Issues The No-Contact Directive," and "Defendants' July 1, 2026 Admissions," as if fully set forth herein. Plaintiff does not incorporate allegations relevant only to other Counts.

239.    Plaintiff is a requestor within the meaning of the TPIA: he submitted the Requests (on his Clients' behalf), and HGSD's own TPIA counsel addressed Plaintiff himself as the requestor throughout the correspondence. HGSD, through Turco, its officer for public information, refuses to supply public information the OAG ordered produced and other non-excepted information: native-format records with metadata, the fee worksheet conceded to exist on July 1, 2026, and the Workflow records in HGSD's own portal.

240.    Under Tex. Gov't Code § 552.321(a), a requestor may sue for a writ of mandamus compelling a governmental body to make information available where the body refuses to supply public information not excepted from disclosure. By withholding the records pleaded above for more than fourteen months—despite the OAG Ruling, four written representations of

completeness each disproved by later releases, and the admissions of July 1, 2026—HGSD violated §§ 552.221, 552.228, and 552.302 and refused to supply public information not excepted from disclosure. Plaintiff is therefore entitled to a writ compelling production of all responsive records in native format with metadata intact, and to costs and reasonable fees under § 552.323.

## COUNT V — Defamation Per Se (Texas Law)
### *(Against Defendants Martin and Ellis)*

241.    Plaintiff re-alleges and incorporates the allegations of the Parties section and of the Factual Allegations sections captioned "October 2025: Martin Accuses Plaintiff of the Unauthorized Practice of Law; The Hearing Examiner's Disqualification Ruling," "April–May 2026: The Transcript, The Closure of The Contested Hearing, And The Adopted Findings And Conclusions," "The July 8, 2026 Board Meeting," and "Injury and Damages," as if fully set forth herein. Plaintiff does not incorporate allegations relevant only to other Counts.

242.    A statement is defamatory per se when it injures a person in his profession or imputes the commission of a crime.[30] The unauthorized practice of law is both professionally ruinous to accuse and criminal in Texas.[31]

243.    This Count rests only on publications outside any judicial or quasi-judicial proceeding, to recipients with no role in one: Martin's publications to District staff and multiple firms, and her July 1, 2026 broad-distribution email accusing Plaintiff of unauthorized practice and non-cooperation—the latter contradicted by her own prior written statements.

---

[30]*See In re Lipsky*, 460 S.W.3d 579, 596 (Tex. 2015) (statements injuring a person in his profession, or imputing a crime, are defamatory per se and support presumed damages).
[31]*See* Tex. Penal Code § 38.123; Tex. Gov't Code § 81.102.

244.　Ellis characterized Plaintiff's representation as unlawful in writings circulated beyond any proceeding's participants. Such extra-judicial publicity is protected by neither the judicial-proceedings privilege nor attorney immunity.

245.　The statements were false statements of fact, made with knowledge of falsity or reckless disregard for the truth. Because they impute a crime (Tex. Penal Code § 38.123; Tex. Gov't Code § 81.102) and injure Plaintiff in his profession, they are defamatory per se, and general damages are presumed. Plaintiff is additionally entitled to the special damages set forth in the Injury and Damages section above. Because the statements were made with actual malice, Plaintiff is entitled to exemplary damages.

### COUNT VI — Tortious Interference (Texas Law)
*(Against Defendants Martin, GDHM, Ellis, and GM Ellis Law, P.C.)*

246.　Plaintiff re-alleges and incorporates the allegations of the Parties section and of the Factual Allegations sections captioned "Ellis Violates The Board's Unanimously-Passed Resolution," "Plaintiff Is Retained; The April 2025 Board Meeting," "October 2025: Martin Accuses Plaintiff of the Unauthorized Practice of Law; The Hearing Examiner's Disqualification Ruling," and "Injury and Damages," as if fully set forth herein. Plaintiff does not incorporate allegations relevant only to other Counts.

247.　Plaintiff had a valid, existing attorney-client engagement with Woodloch and Mr. Davis, known to each of these Defendants, who negotiated with Plaintiff as counsel for approximately one year.[32]

248.　These Defendants willfully and intentionally interfered with that engagement by procuring Plaintiff's removal through a false charge of unauthorized practice of law—conduct independently

---

[32]*See Prudential Ins. Co. of Am. v. Financial Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (elements of tortious interference with an existing contract).

tortious (Count V) and independently unconstitutional (Counts I–II)—and thereby also interfered with Plaintiff's prospective business relations.[33]

249.    Specifically: Martin procured the removal through the false UPL charge she initiated on October 17, 2025; Ellis, through the No-Contact Directive and his disclosure of settlement confidences to the decision-maker; and GDHM and GM Ellis Law, through their principals' acts within the scope of their agency.

250.    These Defendants were not acting within any protected scope of client representation in this respect: falsely branding opposing counsel to eliminate him from a matter serves no principal's lawful interest and was undertaken in these Defendants' own professional and financial self-interest—protecting undocumented, publicly-funded engagements from scrutiny. The conduct is not privileged and is not within the attorney-immunity doctrine.

251.    By procuring Plaintiff's removal through the false charge, these Defendants willfully interfered with an existing attorney-client engagement and with Plaintiff's prospective relations, without justification or privilege. Plaintiff is therefore entitled to the value of the lost engagement and its fees and the injuries pleaded in the Injury and Damages section above, entitling him to actual and exemplary damages.

## COUNT VII — Conspiracy (42 U.S.C. § 1983)

*(Against Defendants Turco, Jones, Truscott, Ellis, GM Ellis Law, P.C., Martin, GDHM, Saleh, Sears, Ladd, Robinson, Seaquist, and Bickerstaff Heath Delgado Acosta LLP)*

252.    Plaintiff re-alleges and incorporates the allegations of the Parties section and of the Factual Allegations sections captioned "2024: The Unauthorized Penalty and the Conflicting Violation Letters" through "The Attorneys' Pattern of Knowingly False Statements; The Texas Disciplinary

---

[33] *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) (interference with prospective relations is actionable where the conduct is independently tortious or unlawful).

Rules" (inclusive), together with "Injury and Damages" and "Policy, Custom, and Ratification," as if fully set forth herein. Plaintiff does not incorporate allegations relevant only to other Counts.

253.    Acting in concert and under color of state law, the Defendants named in this Count reached an agreement to deprive Plaintiff of rights secured by the First and Fourteenth Amendments: to punish and silence his petitioning, remove him from the representation, and conceal the records that would expose the Penalty's baselessness.

254.    These Defendants functioned, in substance, as a single closed enterprise: a public agency, its appointed examiner, and three privately retained law firms that shared an outsider's correspondence among themselves in real time, spoke for one another's clients interchangeably — Board counsel arguing the General Manager's records defense, the General Manager's counsel delivering the Board's legal updates — covered for one another's misstatements in open session, and deployed the machinery of the District against the one lawyer demanding to see its records. The enterprise's common objectives were the collection of an unadjudicated six-figure exaction, the concealment of the records that would expose its baselessness, and the elimination and discrediting of the advocate pressing for them.

255.    The agreement is evidenced by: the three-day span between Martin's accusation and Truscott's Disqualification Ruling granting relief no one requested; Ellis's role in the No-Contact Directive; Robinson's and Martin's parallel false assurances of complete production; the real-time circulation of Plaintiff's correspondence among HGSD's lawyers; Truscott's ex parte communications with the General Manager's counsel; and the uniform silence that met Plaintiff's April 15, 2026 verified declaration.

256.    The agreement's clearest window is the five-day arc of mid-October 2025: on October 14, the Hearing Examiner emailed the General Manager's counsel ex parte, excluding Plaintiff's side

(Figure 6); on October 17 — the Friday after Plaintiff's renewed records demands — Martin sent her UPL accusation to the Hearing Examiner's personal msn.com address; and on Monday, October 20, before any response was possible, the Hearing Examiner entered the Disqualification Ruling, granting relief no party had requested. Ellis, never copied on Plaintiff's September 26, 2025 inquiry to Turco, had joined that thread unbidden two days later — proof the correspondence circulated among the lawyers in real time. Three actors, five days, one result, no process.

257.    Each Defendant named in this Count committed at least one overt act in furtherance: Martin—the UPL accusation, the false completeness assurances, the drafting of the adopted findings (including Finding No. 21), and the July 1, 2026 publication. Truscott—the Disqualification Ruling, its April 7, 2026 reaffirmation, and the closure "by submission" on adopted findings. Ellis—the No-Contact Directive and the disclosure of confidential settlement communications to the decision-maker.

258.    Turco and Jones—the continued withholding of records subject to the OAG Ruling and the substitution of Jones's affidavit and never-produced worksheet in support of remand. Robinson— the serial written assurances that production was complete. Seaquist—on information and belief, participation in the records-response function with knowledge of its falsity, and silence in the face of Plaintiff's verified notice. The firm Defendants—their attorneys' acts within the scope of their agency.

259.    Sears—the April 9, 2025 motion by which the Board acted on the Penalty in Plaintiff's absence, and the July 8, 2026 examination of Ellis eliciting the assurances that HGSD's rules and state law had been followed. Saleh—the July 8, 2026 public statements that no ex parte communications ever took place and that no mailing records exist. Ladd—on information and

belief, the posting, modification, or backdating of the "Hearing Notice September 9, 2025" website entry.

260.    The private-party Defendants acted under color of law: HGSD delegated governmental functions to them, and they willfully joined state actors in the acts pleaded.[34] The intracorporate-conspiracy doctrine addresses one entity conspiring with itself;[35] this conspiracy spans a political subdivision, three separate private firms, and an independently retained examiner.

261.    Alternatively, the doctrine does not protect acts outside the scope of agency or in the actor's personal interest. Counsel acted in their own financial interest, as pleaded above; Ellis defied his client's Board directive; Truscott ran official business through personal channels. None of that is HGSD's business within any lawful agency.

262.    The agreement and overt acts pleaded above deprived Plaintiff of his *First* and *Fourteenth Amendment* rights in violation of 42 U.S.C. § 1983, rendering each conspirator jointly and severally liable.

263.    Plaintiff is therefore entitled to compensatory and punitive damages for the deprivations and injuries pleaded in the Injury and Damages section above, entitling him to compensatory damages against the Defendants named in this Count in their individual capacities, punitive damages, and the declaratory and injunctive relief sought herein.

---

[34]*See Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980) (private parties who conspire with a judge act under color of state law); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (private party engaged in joint activity with state officials is a state actor under § 1983).

[35]*See Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) (intracorporate-conspiracy doctrine applies where a single entity and its own employees are the only alleged conspirators).

**COUNT VIII — Respondeat Superior / Vicarious Liability (Texas Law)**

*(Against Defendants GDHM, GM Ellis Law, P.C., and Bickerstaff Heath Delgado Acosta LLP)*

264.    Plaintiff re-alleges and incorporates the allegations of the Parties section, the Factual Allegations sections underlying Counts V and VI, the section captioned "The Attorneys' Pattern of Knowingly False Statements; The Texas Disciplinary Rules," and "Injury and Damages," as if fully set forth herein. Plaintiff does not incorporate allegations relevant only to other Counts.

265.    At all material times, Martin and Saleh were attorneys and agents of GDHM; Ellis was the principal of GM Ellis Law; and Robinson and Seaquist were partners and agents of Bickerstaff. Each acted in the course and scope of his or her agency or employment, in furtherance of the firm's business, and each firm accepted and retained the benefits — including legal fees — of the conduct.

266.    Under Texas law, a law firm is vicariously liable for the torts its attorneys commit in the scope of their authority, agency, or employment. GDHM is therefore liable for the conduct of Martin and Saleh pleaded in Counts V and VI; GM Ellis Law is liable for the conduct of Ellis pleaded in Counts V and VI; and each firm, including Bickerstaff, is liable for its attorneys' tortious acts pleaded herein to the fullest extent the law permits.

267.    Each firm is also liable for its own institutional conduct: on April 15, 2026, Plaintiff transmitted a verified declaration documenting the misconduct alleged herein to twenty-four named attorneys at GDHM and Bickerstaff, and the Omnibus Motion — served on all counsel in November 2025 and repeatedly thereafter — sought the disqualification of the conflicted lawyers by name. No firm investigated, corrected, withdrew, or made any remedial effort; each instead continued the representations and retained their benefits.

268.    The firm Defendants are accordingly jointly and severally liable, with their respective attorneys, for the actual damages pleaded in the Injury and Damages section and for exemplary damages pursuant to Tex. Civ. Prac. & Rem. Code ch. 41.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants and:

a.  Declare, pursuant to 28 U.S.C. §§ 2201–2202, that the October 20, 2025 Disqualification Ruling and the March 30, 2026 No-Contact Directive are unlawful and void, and that the public charge that Plaintiff engaged in the unauthorized practice of law is unfounded;

b.  Preliminarily and permanently enjoin Defendants Turco and Truscott, in their official capacities, and HGSD, from enforcing the Disqualification Ruling and the No-Contact Directive against Plaintiff, consistent with 42 U.S.C. § 1983;

c.  Permanently enjoin Defendants from retaliating against Plaintiff for his protected speech and petitioning, and from imposing on Plaintiff any communication or appearance restriction not applied equally to other attorneys appearing before HGSD;

d.  Award compensatory damages against the individual Defendants in their individual capacities (as to Defendant Truscott, only to the extent immunity does not attach), including the value of Plaintiff's contemporaneously documented diverted professional time measured at his customary hourly rate, the lost engagement and its fees, injury to reputation and prospective business relations, out-of-pocket expenses, and emotional distress, in an amount to be determined at trial, but in no event less than $500,000;

e.  Award punitive damages against the individual Defendants in their individual capacities as permitted by 42 U.S.C. § 1983 and *Smith v. Wade*, 461 U.S. 30 (1983);

f.  Award exemplary damages on the state-law claims (Counts V, VI, and VIII) pursuant to Tex. Civ. Prac. & Rem. Code ch. 41, in amounts to be determined at trial;

g.   Issue a writ of mandamus under Tex. Gov't Code § 552.321 compelling HGSD and Defendant Turco to produce all responsive public information in native format with metadata intact;

h.   Award Plaintiff his costs, and attorney's fees under 42 U.S.C. § 1988 and Tex. Gov't Code § 552.323 to the fullest extent permitted by law, including in the event Plaintiff retains counsel of record;

i.   Award pre- and post-judgment interest at the maximum lawful rate; and

j.   Grant such other and further relief, at law or in equity, as the Court deems just and proper.

## VII.   JURY DEMAND

269.   Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,
/s/ **Kawa Foad**, Esq.
Florida Bar No. 1005257
Kawa Foad Law Group, P.A.
1000 Brickell Avenue, Suite 715
Miami, Florida 33131
Telephone: (561) 291-0518
Email: kfoad@kf-law.com

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I, Kawa Foad, declare under penalty of perjury that I have read the foregoing Verified Complaint and that the factual allegations contained therein are true and correct based on my own personal knowledge, except as to those matters pleaded on information and belief, and, as to those matters, I believe them to be true. My personal knowledge is grounded in my direct participation in the events described and is supported by contemporaneous documentation, correspondence, timestamped captures, and public records.

Executed on this 24st day of July 2026.

/s/Kawa Foad, Esq. Plaintiff, *pro se*