**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

KAWA FOAD, ESQ., Plaintiff, versus THE HARRIS-GALVESTON SUBSIDENCE DISTRICT, et al., Defendants.

Civil Action No. 4:26-cv-05348

**PLAINTIFF'S APPENDIX IN SUPPORT OF THE FIRST AMENDED
COMPLAINT**

(Bates-numbered APP-0001 through APP-0135)

The exhibits compiled herein are cited in the First Amended Complaint by tab and Bates range (e.g., "App. Ex. K, APP-0069–70"). The native Excel workbook excerpted at Tab N accompanies this Appendix in electronic form.

APP-0001

# INDEX OF EXHIBITS

| Tab | Description | Bates |
|-----|-------------|-------|
| A | Minutes, HGSD Regular Board Meeting, October 9, 2024 (certified minutes; Item 8.1 and executive-session motion) | APP-0003–0004 |
| B | Transcript Excerpts, October 9, 2024 Board Meeting (Woodloch matter) | APP-0005–0011 |
| C | Minutes, HGSD Regular Board Meeting, April 9, 2025 (Items 9, 10, and 12) | APP-0012–0013 |
| D | Transcript Excerpts, April 9, 2025 Board Meeting (Woodloch matter) | APP-0014–0016 |
| E | Proposed GDHM Engagement Letter, December 22, 2021 (unexecuted — signature block blank) | APP-0017–0018 |
| F | Bickerstaff Heath Delgado Acosta LLP Legal Services Agreement with HGSD, January 4, 2022 | APP-0019–0026 |
| G | Email, L. Robinson to K. Foad, November 7, 2025 (no responsive Board agendas or minutes for GM Ellis Law, Johnson Petrov, or GDHM legal-services agreements) | APP-0027–0027 |
| H | Email, K. Foad to G. Ellis, November 20, 2025 (transmitting the Omnibus Motion; inviting any objection to its propriety) | APP-0028–0028 |
| I | Verified Omnibus Motion, April 1, 2026 | APP-0029–0068 |
| J | Email, G. Ellis to K. Foad, March 30, 2026 (the No-Contact Directive) | APP-0069–0069 |
| K | Minutes, HGSD Regular Board Meeting, April 8, 2026 (Item 4 — no mention of the six-week docket-control-order statement; Petrov absent) | APP-0070–0071 |
| L | Transcript Excerpts, April 8, 2026 Board Meeting (Hearing Examiner's six-week statement at 0:05:51) | APP-0072–0074 |
| M | Master Transcript, July 8, 2026 Board Meeting (Second Edition, reviewed and corrected) | APP-0075–0134 |
| N | Excerpt, HGSD Well Database (native Excel workbook, December 2025) — Wells 3606 and 7694, with annual metered pumpage | APP-0135–0135 |

ITEM 3
November 13, 2024

**MINUTES**
**HARRIS-GALVESTON SUBSIDENCE DISTRICT**
**REGULAR MEETING OF THE BOARD OF DIRECTORS**
**October 9, 2024**
**10:00 A.M.**

MEMBERS OF THE BOARD PRESENT: Bill Alcorn, Rosa Alvarez, Susan Baird, Augustus Campbell, Chris Canonico, Pete Côté, Steve Gillett, Don Johnson, Jason Long, Craig Lovell, Katherine Mears, Lindy Murff, Alan Petrov, Shaun Theriot-Smith


MEMBERS OF THE BOARD ABSENT: Emily Anderson, Sarah Benavides, Brian Freedman, Shannon Lucas, Kyle Sears,

PRESIDING: Alan Petrov, Chairman

1.  CALL TO ORDER OF THE REGULAR BOARD MEETING AND THE PLEDGE OF ALLEGIANCE. Chairman Petrov called the regular meeting of the Board of Directors to order at 10:07 a.m. and noted the presence of a quorum. The Pledge of Allegiance was recited.

2.  ACCEPT COMMENTS FROM MEMBERS OF THE PUBLIC. Ms. Melissa Rowell, of the North Harris County Regional Water Authority, addressed the Board of Directors. Mr. Brad Davis, owner of Woodloch MHP, LLC, Well 3606, will speak during Item 8.1.

Ms. Anderson is now present.

3.  APPROVAL OF THE MINUTES OF THE REGULAR BOARD MEETING OF SEPTEMBER 11, 2024. Mr. Cote moved that the minutes of the regular meeting of September 11, 2024, be approved; it was seconded by Mr. Campbell. Chairman Petrov put the question and, after the vote, announced the motion carried. None opposed.

4.  APPROVAL OF THE MINUTES OF THE JOINT REGULATORY PLAN WORKSHOP ON SEPTEMBER 11, 2024. Mr. Lovell moved that the minutes of the workshop on September 11, 2024, be approved; it was seconded by Mr. Cote. Chairman Petrov put the question and, after the vote, announced the motion carried.

Ms. Benavides is now present.

5.  HEARING EXAMINERS REPORT. Ms. Helen Stewart Truscott presented the Hearing Examiner's Report for September 2024 and prior. Mr. Côté moved to accept the Hearing Examiner's recommendations; it was seconded by Ms. Mears. Chairman Petrov called for abstentions and hearing none, put the question, and after the vote, announced the motion carried. None opposed.

6.  EMERGENCY PERMITS. The Board considered the General Manager's action in granting emergency permits to Jaime Cardenas, HC MUD 441, Rafael Perez, Cheree Rose, STB Machine Works, W.D.L., LLC (Control Flow), and Weisinger Incorporated.

7.  GENERAL MANAGER'S REPORT. Mr. Turco submitted the General Manager's Report. (The General Manager's Report is in full in the official records of the Harris-Galveston

**Agenda Item 03 page 1**

APP-0003

Minutes 9/11/2024

Subsidence District as part of the Board's Agenda Packet for this meeting.)

Mr. Freedman is now present.

8. LEGAL & LEGISLATIVE MATTERS. Mr. Ellis updated the Board on recent litigation on groundwater issues and legislative matters.

   8.1 Consider and Possible Action on a Compromise and Settlement Counteroffer for Woodloch MHP, LLC (Well 3606). Mr. Brad Davis, of Woodloch MHP, LLC, addressed the Board regarding the well on the property, and made a compromise and settlement counteroffer.

9. EXECUTIVE SESSION. The Board went into executive session at 10:44 a.m. The Board of Directors returned from executive session at 11:39 a.m. Mr. Petrov asked if there were any motions. Mr. Campbell moved to authorize the General Manager and Staff to negotiate a payment plan with the permit holder to include an agreed lien. If the permit holder does not agree to the options, then the general counsel is authorized to seek a judgement lien. We also encourage the permit holder to seek entry into a groundwater reduction plan (GRP). It was seconded by Mr. Theriot-Smith. Chairman Petrov put the question, and after the vote, announced the motion carried. Mr. Johnson and Mr. Long opposed.

THERE BEING NO FURTHER BUSINESS TO COME BEFORE THE BOARD, THE MEETING WAS ADJOURNED AT 11:42 A.M.

BY: _____
                    Chairman

ATTEST:

_____
              Secretary

# HEARING TRANSCRIPT — EXCERPTS

**Harris-Galveston Subsidence District**

Regular Meeting of the Board of Directors

Wednesday, October 9, 2024 — 10:00 a.m.

*Woodloch-relevant portions only*

---

## HOW THIS TRANSCRIPT WAS PRODUCED

This transcript was prepared from an audio recording of the meeting (file "2024-10-09_Regular_Board_Meeting.mp3," duration 41:41). The recording was transcribed in full by machine (Apple on-device speech recognition, producing timestamped segments covering the entire recording), and the machine text of the portions transcribed below was then reviewed and edited against context for readability, obvious recognition errors, and speaker attribution. Timestamps state elapsed time in the recording and are taken directly from the machine transcription's segment times; they should be treated as accurate to within a few seconds. Only the portions of the meeting relevant to the Woodloch matter (Woodloch MHP LLC, Permit/Well No. 3606, Mr. Brad Davis) are transcribed in full; the omitted portions were reviewed in the machine transcription and are summarized in italic notes where they are skipped.

## CONVENTIONS

Square brackets are used for one purpose only: to tell the reader that the audio at that point is hard to hear — marked "[audio unclear]." Non-verbal and procedural events — for example (Ayes.), (Motion and second.) — appear in parentheses. Uncertainty about a speaker's identity is stated in words, in parentheses.

Speaker attributions rest on context (the chair's procedural role, self-identification, and the subject matter of each statement); the recording is audio-only, and attributions of unnamed questioners from the dais are given as DIRECTOR. This is not a certified transcript.

*Speaker identifications are drawn from the District's official minutes of this meeting: Chairman Alan Petrov presided; the post-executive-session motion was made by Director Augustus Campbell and seconded by Director Shaun Theriot-Smith; Directors Don Johnson and Jason Long voted in opposition. Director Kyle Sears was absent. Unnamed questioners from the dais are rendered DIRECTOR.*

**I. PUBLIC COMMENT PERIOD — MR. DAVIS DEFERS TO HIS AGENDA ITEM (recording 0:06:33)**

[0:06:33] **CHAIRMAN PETROV:** Our next speaker is Mr. Brad Davis. If you would come up and address us — or did you want to wait till we got to your agenda item?

[0:06:46] **MR. DAVIS:** I'll wait for my agenda item.

[0:06:47] **CHAIRMAN PETROV:** All right — I think he's speaking on the compromise and settlement offer. All right.

*The intervening agenda items (minutes, hearing examiner's report, emergency permits, staff reports) are not transcribed; they contain no discussion of the Woodloch matter.*

**II. COMPROMISE AND SETTLEMENT OFFER — WOODLOCH MOBILE HOME PARK (recording 0:26:41)**

[0:26:41] **CHAIRMAN PETROV:** All right, I think that then takes us to the compromise and settlement offer related to the Woodloch mobile home park. Mr. Davis, if you would come up now and, you know, let us know, you know, what you're asking and give us any information that you feel might be relevant to the board.

[0:27:03] **MR. DAVIS:** Okay. You know, thank you very much. It's kind of a first time for me, this kind of deal, so… You know, it's been an inspiration here, listening to the awards and recognition from the EPA. That's great. And we've always had a strong commitment to water conservation and all types of conservation, but I've made a couple notes here, so I'll just be brief. Thank you for allowing me here.

And we are here today — we received a letter on August 22nd regarding our water usage. And no doubt, we did exceed our permit by 2 million gallons last year. And it's my understanding such an overage would normally result in a fine of about $500. You know, we've been in full compliance for over 23 years. Water conservation's always been important to us. For historical perspective, I went back to 2000 and looked forward, and in that previous 23 years, we've saved over 48 million gallons. We've averaged more than 2 million gallons a year in savings. And I'm proud to say that in the previous four years we were over 10 million under our permit. You know, we've taken corrective action for the problems we

had last year with our 2 million overage, and we're all back on track to be another 2 million under again this year. So what we're asking the district is to consider our under-usage when considering the action today. You know, we feel strong about, you know, our commitment to keeping the water use down. We've done a good job with it.

A little about us. We service a small mobile home community of low-income residents. One of the factors for our water usage increase was due to COVID, lost jobs, and families sheltering loved ones that would otherwise be [audio unclear]. You know, we worked with people on their rents, and I'm happy to report that many of the displaced individuals have been able to get back on their feet. And, you know, thank goodness they had a place to go — that they weren't on the streets. You know, we work with our residents. Our community is poor, but they have pride, respect, and we all work together.

Now, going back to that award that y'all got: in preparation for this meeting, I did some research on water usage, and by my calculation [audio unclear — the figure spoken appears to be one trillion gallons]. I mean, to me, that's just an incredible feat. And, you know, my hat's off to you. It's just — the number, a trillion — you know, I could rarely wrap my head around it, you know, and so I did some math, and if you took — I mean, if you started walking a trillion miles, you'd go around the Earth 19,000 times. You know, it's just an incredible number — a monumental accomplishment. You know, our five-year, 10-million-gallon contribution looks small by comparison, but, you know, we're on the right side of the ledger. We have used less water regularly, and we're way, way under.

So we're just asking that you please acknowledge our contribution and accept our acknowledgement of fault. And, um, you know, we would ask that you accept the overage fee of $500, if you'll find that acceptable and reasonable. We think that that's a reasonable number, and, you know, we pledge to continue to serve the community and follow the subsidence district's rules. So, with that, if there's anything from anybody here — if not, I'll step down.

**III. BOARD QUESTIONS TO MR. DAVIS (recording 0:31:41)**

[0:31:41] **DIRECTOR:** You say you're back on track. Was there some particular event or problem that caused the large overage in the prior year? Were there pipes bursting, or was there something that went on with the system?

[0:31:58] **MR. DAVIS:** Well, I appreciate that question. I wasn't going to get into all of it, but a lot of it had to do with people moving in. We had more residents. When everybody started losing their jobs during COVID — and this is a very low-end community that we have — people started moving family members in. We had trailers that had two people that all of a sudden had 12. So that persisted for a while. And additionally, the property manager was going through some challenges with Child Protective Services, and he was going up to Conroe [audio unclear]. But those are the two primary things. We did not have a big break. And this came as a shock to me when I got this letter, because it's real important, and everybody on the team knows how important it is. And he continually told me, yeah, we got it, we got it. And so when we got this letter, I was like, what in the world? What is this? You know — I'm sorry, I made a mistake, and, you know, so that was that.

[0:33:19] **CHAIRMAN PETROV:** Any other questions from board members?

[0:33:22] **DIRECTOR:** I have a question for you.

[0:33:24] **MR. DAVIS:** Yes, sir.

[0:33:24] **DIRECTOR:** Do you own these mobile homes? Are they owned by the individuals?

[0:33:28] **MR. DAVIS:** The individuals.

[0:33:29] **DIRECTOR:** Okay, because most of them are, I'm going to say, in excess of 20 years old. How long have they been residents of your particular facility?

[0:33:38] **MR. DAVIS:** Uh — the people that live in the trailers?

[0:33:41] **DIRECTOR:** Yes.

[0:33:42] **MR. DAVIS:** There's not a lot of turnover. I don't know exactly — most people have been there — I really don't know. The rent roll stays pretty much the same. I think that, for most

all — occasionally somebody will sell their trailer to a family member, but for the most part, it's the same, same [audio unclear].

[0:34:03] **DIRECTOR:** So basically, these trailers have not been moved in the last 15 to 20 years, then.

[0:34:07] **MR. DAVIS:** That's correct.

[0:34:08] **DIRECTOR:** Thank you, sir.

[0:34:11] **DIRECTOR:** For the future use, what are the plans? Are these people still moving into this residence, or are they moving out? Are they going to use the same amount? What do you think is going to happen in the future?

[0:34:29] **MR. DAVIS:** Thank you. Most of the people that moved in during the post-COVID thing have moved out. Our water usage is down below 20,000 gallons a day now. We monitor it. We read the meters every single day — our water meter. And that's why I was so shocked by this, because when my manager told me, yeah, we're right, we're right — and we weren't right. And so now we're on it. And since we received this letter, we've been reading that meter, believe it or not, every hour. You know, and we've asked residents to not use any water from 10 until 12 in the morning, so that we can [audio unclear] monitoring the usage. And, of course, another one of the things that really made a difference for us — and we kind of got away from this a little bit — is [audio unclear]. And that has helped us too. But the direct answer is: most of the people that moved in are now back working and don't live in our park anymore. We're back to the normal population that we're used to.

[0:35:46] **DIRECTOR:** Thank you.

[0:35:49] **DIRECTOR:** Where is your property?

[0:35:52] **MR. DAVIS:** In Aldine. It's generally at the Hardy Toll Road and the North Belt.

[0:36:02] **DIRECTOR:** Area Three?

[0:36:10] **CHAIRMAN PETROV:** Any other questions?

[0:36:15] **DIRECTOR:** So am I reading this right — that what we're asking them to assume and pay is $66,000?

[0:36:21] **DISTRICT STAFF (speaker identification not certain):** So, in this particular case, because the amount went over 10 million gallons — the 12.36 [million], against the 10-million-gallon permit — that puts them underneath the regulatory plan. So they pay the disincentive fee over everything above 20% of what they used. So that number's correct. Actually, that number — if credits were used — the actual number is right about $100,000 or thereabouts. The $500 that Mr. Davis is referring to is the fee for the violation of going over the permit.

[0:36:54] **DIRECTOR:** During the COVID time — I was assuming the state [audio unclear]. Was this happening one year, or four years?

[0:37:02] **DISTRICT STAFF (speaker identification not certain):** This was a permit that — I'm sorry — beginning in August of 2023. Over the course of their permit — I'd have to ask staff on how long that permit was, but it should have been only a year permit.

[0:37:17] **DIRECTOR:** The permit's been in place for some time. Every year it renews.

[0:37:21] **DISTRICT STAFF (speaker identification not certain):** Yeah, yep. That was purchased in 2007 or 2006, I think, is where that started.

[0:37:39] **CHAIRMAN PETROV:** Any other questions?

[0:37:42] **MR. DAVIS:** We'll continue to keep our water down. We're way under what we've permitted for, and we appreciate y'all being able to work with us.

[0:37:54] **CHAIRMAN PETROV:** Thank you for your comments. I think we'll have to go into an executive session to discuss what it is the board wants to do. All right, thank you.

## IV. EXECUTIVE SESSION (recording 0:38:27)

[0:38:27] **CHAIRMAN PETROV:** The time is now 10:44, on October 9, 2024, and the board of the Harris-Galveston Subsidence District will now convene in executive session [audio unclear]. Any final action, decision, or vote with regard to any matter considered in executive session will be made in open session, in accordance with [audio unclear].

*The executive session itself is not recorded. The recording captures only fragmentary room audio during the recess.*

**V. RETURN TO OPEN SESSION; MOTION ON THE WOODLOCH MATTER (recording 0:39:29)**

[0:39:29] **CHAIRMAN PETROV:** All right. The time is now 11:39, and we are back in open session, having discussed the issue of the Woodloch mobile home park with our attorney. I'll ask: is there any motion from the board?

[0:39:54] **DIRECTOR:** I'll make a motion. I move to authorize the general manager and staff to negotiate a payment plan with the permit holder, including an agreed lien. If the permit holder does not agree to the options, then the general counsel is authorized to seek a judgment lien. We also encourage the permit holder to seek entry into a groundwater reduction plan and hope that staff and the permit holder can enter [audio unclear].

[0:40:24] **DIRECTOR:** I'll second that.

[0:40:26] **CHAIRMAN PETROV:** We have a motion and a second. Is there any discussion required?

[0:40:32] **DIRECTOR:** Well, I just want to say, I appreciate what Augie is proposing. It's very difficult for me to go that route, simply because I think we don't have a good solution — I think we have a very kind of run-in [audio unclear]. So probably I will take a principled position and just say: I don't like any of it. But I do appreciate that that was a good effort to try and work with the property owner and come up with a compromise solution [audio unclear].

[0:41:09] **CHAIRMAN PETROV:** All right. Any other discussion needed? Then I'll call for the vote. All in favor, please say aye. (Ayes.) Any opposed to the motion? [audio unclear] The motion carries. All right, thank you.

[0:41:30] **CHAIRMAN PETROV:** And I believe that concludes our regular agenda today. That meeting is adjourned.

<div align="center">

**— END OF EXCERPTED TRANSCRIPT —**

</div>

ITEM 4
May 14, 2025

**MINUTES**
**HARRIS-GALVESTON SUBSIDENCE DISTRICT**
**REGULAR MEETING OF THE BOARD OF DIRECTORS**
**April 9, 2025**
**10:00 A.M.**

MEMBERS OF THE BOARD PRESENT: Bill Alcorn, Susan Baird, Sarah Benavides, Chris Canonico, Pete Côté, Brian Freedman, Steve Gillett, Don Johnson, Jason Long, Alan Petrov, Kyle Sears, Shaun Smith

MEMBERS OF THE BOARD ABSENT: Rosa Alvarez, Emily Anderson, Shannon Lucas, Katherine Mears, Lindy Murff

PRESIDING:  Alan Petrov, Chairman

1.  CALL TO ORDER OF THE REGULAR BOARD MEETING AND THE PLEDGE OF ALLEGIANCE. Chairman Petrov called the regular meeting of the Board of Directors to order at 10:05 a.m. and noted the presence of a quorum. The Pledge of Allegiance was recited.

2.  ACCEPT COMMENTS FROM MEMBERS OF THE PUBLIC. None.

3.  ADMINISTER THE OATH OF OFFICE TO BOARD MEMBERS. There were no newly appointed directors present to whom the oath needed to be administered, due to prior commitments.

4.  APPROVAL OF THE MINUTES OF THE REGULAR BOARD MEETING OF MARCH 12, 2025. Mr. Cote moved that the minutes of the regular meeting of March 12, 2025, be approved; It was seconded by Mr. Long. Ms. Benavides abstained. Chairman Petrov put the question and, after the vote, announced the motion carried. None opposed.

5.  HEARING EXAMINERS REPORT. Ms. Helen Stewart Truscott presented the Hearing Examiner's Report for March 2025 and prior. Mr. Cote moved to accept the Hearing Examiner's recommendations; it was seconded by Mr. Freedman. Chairman Petrov called for abstentions. There were no abstentions. Chairman Petrov put the question, and after the vote, announced the motion carried. None opposed.

6.  EMERGENCY PERMITS. The Board considered the General Manager's action in granting emergency permits to Environmental Design, Deano Merrigan, Esequiel Villarreal, Jose Zavala.

Mr. Murff is now present.

7.  CONSIDER A RESOLUTION APPROVING A CONTRACT WITH *W PUBLIC AFFAIRS*, GERTIE WILSON, TO ASSIST THE DISTRICT WITH LEGISLATIVE AFFAIRS FOR THE PERIOD ENDING DECEMBER 31, 2025. Mr. Turco stated that in order to maintain the consistency and continuity of the District's current legislative affairs team, a vendor change is necessary for the contracting of legislative affairs services. The change in vendor will not result in an overlap of the contracts or an increase in the cost of legislative affairs costs. Nor will an amendment to the 2025 budget be necessary. After discussion by the Board, Mr. Smith moved that the contract with *W Public Affairs*, Gertie Wilson, be approved; It was seconded by Mr. Alcorn. Chairman Petrov put the question and, after the vote, announced the motion carried. None opposed. (This resolution is in full in the official records of the Harris-Galveston Subsidence District being Resolution No. 2025-1128.)

8.  GENERAL MANAGER'S REPORT. Mr. Turco submitted the General Manager's Report. (The General Manager's Report is in full in the official records of the Harris-Galveston Subsidence District as part of the Board's Agenda Packet for this meeting.)

Ms. Alvarez is now present

**Agenda Item 04 page 1**

APP-0012

Minutes 4/9/2025

9.  LEGAL & LEGISLATIVE MATTERS. Ms. Natasha Martin of Graves Daugherty updated the Board on recent litigation on groundwater issues and legislative matters.

10. CONSIDER AND POSSIBLE ACTION ON A COMPROMISE AND SETTLEMENT COUNTEROFFER, WELL NO. 3606 – WOODLOCH MHP, LLC, BRAD DAVIS. No permittee or permittee representative is present. Chairman Petrov received a message from Staff that the attorney for Mr. Brad Davis, Kawa Foad, had called the District office requesting a continuance for his client. The Board decided to take up the matter in executive session.

11. CONSIDER AND POSSIBLE ACTION ON A COMPROMISE AND SETTLEMENT COUNTEROFFER, WELL No. 4710 – SURATI, NEIL. Chairman Petrov invited Mr. Neil Surati to address the Board regarding a counteroffer.

12. EXECUTIVE SESSION. The Board went into executive session at 10:50 a.m. The Board of Directors returned from executive session at 11:19 a.m.

Mr. Petrov asked if there were any motions regarding Item 10, Woodloch MHP, LLC, Well No. 3606. Mr. Sears made a motion that the request for continuance be denied, that the counteroffer be rejected, and that the District proceed according to Rule No. 9.3 of the District Rules. It was seconded by Mr. Long. Chairman Petrov put the question, and after the vote, announced the motion carried. None opposed.

Mr. Petrov asked if there were any motions on Item 11, Neil Surati, Well No. 4710. Mr. Sears made a motion to take no action and for the District to proceed according to the District Rules. It was seconded by Ms. Baird. Chairman Petrov put the question, and after the vote, announced the motion carried. None opposed.

THERE BEING NO FURTHER BUSINESS TO COME BEFORE THE BOARD, THE MEETING WAS ADJOURNED AT 11:21 A.M.

BY: _____
Chairman

ATTEST:

_____
Secretary

Agenda Item 04 page 2

APP-0013

# HEARING TRANSCRIPT — EXCERPTS

**Harris-Galveston Subsidence District**

Regular Meeting of the Board of Directors

Wednesday, April 9, 2025 — 10:00 a.m.

*Woodloch-relevant portions only*

---

## HOW THIS TRANSCRIPT WAS PRODUCED

This transcript was prepared from an audio recording of the meeting (file "2025-04-09-Regular-Board-Meeting.mp3," duration 47:58). The recording was transcribed in full by machine (Apple on-device speech recognition, producing timestamped segments covering the entire recording), and the machine text of the portions transcribed below was then reviewed and edited against context for readability, obvious recognition errors, and speaker attribution. Timestamps state elapsed time in the recording and are taken directly from the machine transcription's segment times; they should be treated as accurate to within a few seconds.

Only the portions of the meeting relevant to the Woodloch matter (Woodloch MHP LLC, Permit/Well No. 3606, Mr. Brad Davis) are transcribed in full; the omitted portions were reviewed in the machine transcription and are summarized in italic notes where they are skipped.

## CONVENTIONS

Square brackets are used for one purpose only: to tell the reader that the audio at that point is hard to hear — marked "[audio unclear]." Non-verbal and procedural events — for example (Ayes.), (Motion and second.) — appear in parentheses. Uncertainty about a speaker's identity is stated in words, in parentheses.

Speaker attributions rest on context (the chair's procedural role, self-identification, and the subject matter of each statement); the recording is audio-only, and attributions of unnamed questioners from the dais are given as DIRECTOR. This is not a certified transcript.

*Speaker identifications are drawn from the District's official minutes of this meeting: Chairman Alan Petrov presided; the motion to deny the continuance, reject the counteroffer, and proceed under Rule 9.3 was made by Director Kyle Sears and seconded by Director Jason Long; the minutes record that the motion carried with none opposed.*

**I. COMPROMISE-AND-SETTLEMENT ITEMS CALLED; NO APPEARANCE FOR WOODLOCH (recording 0:23:10)**

[0:23:10] **CHAIRMAN PETROV:** That takes us to the next two items, which are compromise and settlement offers. I guess what we should do is, perhaps, if people are here [audio unclear] — do we have anybody here for the first one, the Woodloch mobile home park?

[0:23:39] **SPEAKER NOT IDENTIFIED:** I don't think so.

[0:23:43] **CHAIRMAN PETROV:** Okay. All right, then, um… Mr. Serati — would you come up at this time, and let us know what it is that you are asking of the board.

*The intervening presentation and discussion (Mr. Nil Surati, Red Wolf Golf Resort, a separate compromise-and-settlement item) is not transcribed; it contains no discussion of the Woodloch matter.*

**II. ITEM TEN — WOODLOCH; CONTINUANCE REQUESTED BY COUNSEL; BOARD PROCEEDS TO EXECUTIVE SESSION (recording 0:44:06)**

[0:44:06] **CHAIRMAN PETROV:** All right, so, um — on item 10 on our agenda, regarding the Woodloch mobile home park: apparently the attorney for that matter has called in and asked that we continue that matter — I guess, till next month.

[0:44:32] **SPEAKER NOT IDENTIFIED:** That's correct, yes.

[0:44:33] **CHAIRMAN PETROV:** Is there any objection amongst the board members if we continue that matter?

[0:44:38] **DIRECTOR:** We're all here. Why wouldn't we at least discuss it? I mean, we can take no action, but you can certainly discuss it in executive session.

[0:44:48] **CHAIRMAN PETROV:** Okay. All right. We'll leave any decision on that until after executive session. Then at this time, I'll take us into executive session, and we can discuss both items 10 and 11.

**III. EXECUTIVE SESSION (recording 0:45:07)**

[0:45:07] **CHAIRMAN PETROV:** The board of directors of the Harris-Galveston Subsidence District will now meet in closed executive session to consult with an attorney [audio unclear].

Any final action, decision, or vote with regard to any matter considered in executive session will be made in open session, in accordance with [audio unclear].

*The executive session itself is not recorded.*

### IV. RETURN TO OPEN SESSION; CONTINUANCE DENIED, COUNTEROFFER REJECTED (recording 0:46:05)

[0:46:05] **CHAIRMAN PETROV:** All right — the time by our wall clock is now 11:19 a.m., and I'll declare us back into open session, concerning agenda item ten: consideration and possible action on a compromise and settlement offer with respect to Woodloch mobile home park. Do we have a motion?

[0:46:29] **DIRECTOR SEARS:** We do have a motion. I move that we deny the request for a continuance, that we reject the counteroffer, and that we proceed according to Rule 9.3 of the district [audio unclear].

[0:46:41] **DIRECTOR LONG:** Second.

[0:46:42] **CHAIRMAN PETROV:** We have a motion and a second. Any further discussion?

[0:46:46] **DIRECTOR:** That is for the guy that was a no-show?

[0:46:49] **SPEAKER NOT IDENTIFIED:** Yes, correct.

[0:46:52] **CHAIRMAN PETROV:** All right — I'll call for the vote. All in favor? (Ayes.) Any opposed? Motion carries.

*Item 11 (a compromise-and-settlement counteroffer regarding well number 4710, a different permittee) followed; the board took no action and directed the district to proceed according to its rules. The meeting adjourned at approximately 0:47:48.*

### — END OF EXCERPTED TRANSCRIPT —



**GRAVES DOUGHERTY HEARON & MOODY**

William Christian
Board Certified, Civil Appellate Law
Texas Board of Legal Specialization

512.480.5704
512.480.5804 (fax)
wchristian@gdhm.com

MAILING ADDRESS:
P.O. Box 98
Austin, TX  7876-99987

December 22, 2021

Mr. Michael J. Turco, General Manager
Harris-Galveston Subsidence District
1660 West Bay Area Blvd
Friendswood, TX 77546-2640

   Re: Representation of Harris-Galveston Subsidence District

This engagement letter, if accepted by you, will serve as the agreement by which Graves, Dougherty, Hearon & Moody, a Professional Corporation ("GDHM") will represent the Harris-Galveston Subsidence District ("the District") in connection with the District's responses to public-information requests. The terms of this engagement letter shall also apply to any additional representation or legal service that GDHM may agree to provide to the District in the absence of a future engagement letter. The District agrees to pay GDHM fees for its services and reimbursement for its expenses in this representation as described below.

**Fees.** GDHM will charge fees for services based on hourly rates. I will be the GDHM attorney primarily responsible for this engagement. My hourly rate is $495 per hour.

**Expenses.** In addition to fees, GDHM will charge for reimbursement of expenses it incurs in this representation. For disbursements of $500 or more, GDHM may request that the supplier of the goods or services bill the District directly, and the District agrees promptly to pay amounts billed.

**Billing.** GDHM will keep records of its time and expenses, and will send a statement each month, or at such other frequency as may be convenient, showing fees for work done during the previous period, plus reimbursable expenses that were paid during the previous period. The District agrees to make payment promptly following receipt of each statement by means of checks or drafts payable to "Graves, Dougherty, Hearon & Moody, P.C." If any statement remains unpaid for more than 30 days GDHM may, consistent with ethical obligations and applicable judicial requirements, cease performing services until satisfactory arrangements for payment have been made.

**Conflicts.** We have reviewed our client/matter information against the information provided by Greg Ellis, and to the best of our present knowledge, we are aware of no actual or potential conflict in GDHM proceeding with this representation. This engagement restricts GDHM's future ability to take a position adverse to the District in a related legal matter. GDHM represents a broad base of clients in a wide variety of legal matters. As a result, it is possible that in a future

APP-0017

Mr. Turco
December 22, 2021
Page 2

legal matter unrelated to this engagement, the District could be in a position adverse to another GDHM client. The District agrees that GDHM may represent other clients whose interests are adverse to the District, including in litigation, business negotiations, transactions or other legal matters, provided such other representation (i) is not substantially related to GDHM's representation of the District in this engagement and (ii) would not result in GDHM's use, on behalf of another client, of any confidential information or data concerning the District which is made available to GDHM during this engagement.

**Entire agreement.** This engagement letter contains the entire agreement between the District and GDHM regarding this representation, and supersedes all previous agreements and understandings, if any, whether oral or written, regarding this representation. In agreeing to this engagement, the District agrees that it is not relying on any promise, statement, or representation by GDHM that is not contained in this letter.

**Acceptance.** To confirm your agreement to these terms of GDHM's representation, please sign the enclosed copy of this letter and return it to us. If this letter does not accurately describe the terms of this engagement and the services that you believe GDHM has agreed to provide, please notify me immediately. Also, if you do not understand anything in this letter, or you want more information or clarification, please contact me before you sign this letter.

**Termination.** The District may terminate this engagement by written notice at any time. GDHM reserves the right to withdraw from this engagement, subject to our ethical obligations and applicable judicial requirements. Otherwise, this engagement will terminate upon the completion of the legal services described above.

Please contact me promptly if you have any questions about this letter or any other aspect of GDHM's engagement in this matter. I look forward to working with you.

Sincerely,

GRAVES, DOUGHERTY, HEARON & MOODY
A Professional Corporation

By: _William Christian_

William Christian

AGREED:

_____

Michael J. Turco, General Manager
Harris-Galveston Subsidence District

APP-0018

# Bickerstaff Heath Delgado Acosta LLP

3711 S. MoPac Expy., Building 1, Suite 300, Austin, Texas 78746

## ENGAGEMENT AGREEMENT

This agreement sets forth the standard terms of our engagement as your attorneys. Unless modified in writing by mutual agreement, these terms will be an integral part of our agreement with you. Therefore, we ask that you review this agreement carefully and contact us promptly if you have any questions. Please retain this agreement in your file.

<u>Identity of Client.</u> We will be representing the interests of the Harris Galveston Subsidence District.

<u>Attorneys</u>. Bickerstaff Heath Delgado Acosta LLP is engaged by you as your attorneys, and I, William D. Dugat, III and Gunnar Seaquist, will be the partners who will coordinate and supervise the services we perform on your behalf. We routinely delegate selected responsibilities to other persons in our Firm when, because of special expertise, time availability or other reasons, they are in a better position to carry them out. In addition, we will try, where feasible and appropriate, to delegate tasks to persons who can properly perform them at the least cost to you. I anticipate that other attorneys from our firm including Bob Heath, Gunnar Seaquist, Kimberly Kelly and Lori Robinson will work on this matter.

<u>The Scope of Our Work</u>. You should have a clear understanding of the legal services we will provide. We will provide services related only to matters as to which we have been specifically engaged. Although in the future we may from time to time be employed on other matters, our present relationship is limited to representing the above-named client in the matters described in Exhibit A. We will at all times act on your behalf to the best of our ability. Any expressions on our part concerning the outcome of your legal matters are expressions of our best professional judgment, but are not guarantees. Such opinions are necessarily limited by our knowledge of the facts and are based on the state of the law at the time they are expressed. We cannot guarantee the success of any given matter, but we will strive to represent your interests professionally and efficiently.

<u>Fees for Legal Services</u>. Our charges for professional services are customarily based on the time devoted to the matter, the novelty and difficulty of the questions presented, the requisite experience, reputation and skill required to deal with those questions, time limitations imposed by the circumstances, and the amount involved and the results obtained. Unless otherwise indicated in writing, our fees for legal services are determined on the basis of the hourly rates of the respective lawyers and other timekeepers who perform the services. These rates vary depending on the expertise and experience of the individual. We adjust these rates annually, increasing them to reflect experience, expertise, and current economic conditions. We will notify you in writing if this fee structure is modified. The initial agreed billing rates for attorneys and other timekeepers engaged on your work are attached as Exhibit B.

<u>Other Charges</u>. All out-of-pocket expenses (such as copying charges, travel expenses, messenger expenses, filing and other court costs, and the like) incurred by us in connection with our representation of you will be billed to you as a separate item on your statement. A description of the most common expenses is included as Exhibit C and agreed to as part of this agreement.

<u>Billing Procedures and Terms of Payment</u>. Our billing period begins on the 16th of the month and ends on the

APP-0019

15th of the following month. We will render periodic invoices to you for legal services and expenses. We usually mail these periodic invoices on or before the last day of the month following the latest date covered in the statement. Each invoice is due upon receipt, must be paid in U.S. Dollars, and is considered delinquent if not paid in full within 30 days of its stated date. Payment must be made to the Firm at 3711 S. MoPac Expressway, Building One, Suite 300, Austin, Texas, 78746. We will include all information reasonably requested by you on all invoices and will reference any purchase order number provided by you. Payment and interest, if any, will comply with the Prompt Payment Act (Texas Government Code Chapter 2251), if applicable, for any final invoices. If you have any question or disagreement about any invoice that we submit to you for payment, please contact me at your earliest convenience so that we can resolve any problems without delay. Typically, such questions or disagreements can be resolved to the satisfaction of both sides with little inconvenience or formality.

Termination of Services. You have the right at any time to terminate our employment upon written notice to us, and if you do we will immediately cease to render additional services. We reserve the right to discontinue work on pending matters or terminate our attorney-client relationship with you at any time that payment of your account becomes delinquent, subject to Court approval if necessary. In the event that you fail to follow our advice and counsel, or otherwise fail to cooperate reasonably with us, we reserve the right to withdraw from representing you upon short notice, regardless of the status of your matter. No termination, whether by you or by us, will relieve you of the obligation to pay fees and expenses incurred prior to such termination.

Retention of Documents. Although we generally attempt to retain for a reasonable time copies of most documents in the possession of this Firm related to the matter(s) described in Exhibit A, we are not obligated to do so indefinitely, and we hereby expressly disclaim any responsibility or liability for failure to do so. We generally attempt to furnish copies of all documents and significant correspondence to you at the time they are created or received, and you agree to retain all originals and copies of documents you desire among your own files for future reference. This document serves as notice to you that we will destroy such materials in accordance with the Firm's record retention policy, which may be amended from time to time and a copy of which will be provided at your request. It is our Firm's policy to destroy all copies, whether in paper or electronic form, of materials in connection with the representation seven (7) years after the completion of our work relating to this engagement or the completion of a particular project under this engagement, unless and to the extent an exception recognized in our document retention policy or other legal requirement applies to some or all of the subject materials and requires retention for a longer period of time. The Firm also reserves the discretion to retain its records of pertinent documents relating to its ongoing representation of a client, e.g. in a general counsel capacity. If you would like to obtain copies of materials in the Firm's possession related to this matter prior to the scheduled destruction of the materials, please notify the Firm. Because you will have been furnished with copies of all relevant materials contained in our files during the course of the active phase of our representation, if you later ask us to retrieve and deliver materials contained in a file that has been closed, you agree that we will be entitled to be paid a reasonable charge for the cost of retrieving the file, and identifying, reproducing, and delivering the requested materials to you.

Fee Estimates. We are often requested to estimate the amount of fees and costs likely to be incurred in connection with a particular matter. Our attorneys do their best to estimate fees and expenses for particular matters when asked to do so. However, an estimate is just that, and the fees and expenses required are ultimately a function of many conditions over which we have little or no control, especially in litigation or negotiation situations where the extent of necessary legal services may depend to a significant degree upon the tactics of the opposition. Unless otherwise agreed in writing with respect to a specific matter, all estimates made by us will be subject to your agreement and understanding that such

estimates do not constitute maximum or fixed-fee quotations and that the ultimate cost is frequently more or less than the amount estimated.

Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas, United States of America, without giving effect to its choice of laws provisions. Venue of any case or controversy arising under or pursuant to this Agreement will be exclusively in Travis County, Texas, United States of America.

Standards of Professionalism and Attorney Complaint Information. Pursuant to rules promulgated by the Texas Supreme Court and the State Bar of Texas, we hereby advise you that the State Bar of Texas investigates and prosecutes complaints of professional misconduct against attorneys licensed in Texas. Information on the grievance procedures is available from the State Bar of Texas, and any questions you have about the disciplinary process should be addressed to the Office of the General Counsel of the State Bar of Texas, which you may call toll free at 1-800-932-1900.

Questions. If you have any questions from time to time about any aspect of our arrangements, please feel free to raise those questions. We want to proceed in our work for you with your clear and satisfactory understanding about every aspect of our billing and payment policies; and we encourage an open and frank discussion of any or all of the matters addressed in this agreement.

Acceptance of Terms. If this arrangement is acceptable to you and the District, please sign the enclosed duplicate original of this agreement and return it and the required retainer to us at your earliest convenience. We truly appreciate the opportunity to be of service to you and look forward to working with you in a mutually beneficial relationship.

**AGREED TO AND ACCEPTED**

HARRIS GALVESTON
SUBSIDENCE DISTRICT

By: _____
Michael Turco, General Manager

Date: 12/29/2021

cc:  Billing Department

BICKERSTAFF HEATH DELGADO ACOSTA LLP

By: _____
William D. Dugat, III

Date: ~~December 7, 2021~~
January 4, 2022

**Exhibit A — Scope of Services**
Bickerstaff Heath Delgado Acosta LLP

While we agree that in the future we may from time to time be employed on other matters, this agreement provides that our relationship is limited to representing and counseling you in connection with the following:

- In connection with assistance in responding to requests under the Public Information Act.

- Other legal services assigned or requested, only if the scope of which is confirmed by you in writing at the time of assignment

Other legal services not assigned or requested, and confirmed in writing, are specifically not within the scope of our representation.

**Exhibit B — Billing Rates**
Bickerstaff Heath Delgado Acosta LLP

| TIMEKEEPER | 2021 BILLING RATE |
|---|---|
| Arnold, Philip | $330 |
| Caputo, Cobby | $415 |
| Caroom, Doug | $425 |
| Cheney, Denise | $400 |
| Dugat, Bill | $385 |
| Falk, Syd | $440 |
| Gonzalez, Vanessa | $370 |
| Heath, Bob | $480 |
| Katz, Joshua | $355 |
| Kimbrough, Chuck | $325 |
| Maxwell, Susan | $370 |
| Mendez, David | $425 |
| Mendez, Manuel | $425 |
| Rogers, Emily | $370 |
| Russell, Claudia | $370 |
| Seaquist, Gunnar | $355 |
| Than, Catherine | $370 |
| Weller, Steven | $370 |
| | |
| Kelley, Kimberly | $225 |
| Miller, Gregory | $305 |
| Robinson, Lori | $300 |
| | |
| Delgado, Hector | $425 |
| | |
| Legal Assistants/Specialists | $190 |
| McCall, Sherry | $240 |

APP-0023

**Exhibit C—Client Costs Advanced**
Bickerstaff Heath Delgado Acosta LLP

The firm incurs expenses on behalf of clients only when required by the legal needs of the clients. Some cases or matters require extensive use of outside copy facilities, and other cases may not be so paper-intensive. Standard services handled within the firm are not charged, and client specific expenses are billed to the client needing those services. An explanation of the billing structure is as follows:

Not Charged

> Secretarial and word processing time, routine postage, file setup, file storage, local or ordinary long distance charges, fax charges, and computerized legal research data charges.

Delivery Services

> Outside delivery services are used for pickup and delivery of documents to the client as well as to courts, agencies, and opposing parties. Outside delivery fees are charged to the client at the rate charged to the firm. Overnight delivery services are also charged at the rate charged to the firm. Firm Office Services Department personnel may provide delivery service in urgent situations and charges for such in-house service will not exceed the charge that would be made by an outside service in a similar situation.

Postage

> Our postal equipment calculates exact U.S. postage for all sizes and weights of posted material. The rate charged for postage is the same as the amount affixed to the material that is mailed. We will not charge clients for postage on routine correspondence; however, the cost of large-volume mail, certified mail, or other additional mail services will be charged to the client.

Copies and Prints

> Our standard rate for black and white copies and prints made by firm personnel is $0.15 per page. Color copies and prints are charged at a standard rate of $0.55 per page. These charges cover paper, equipment costs, and other supplies. If savings can be realized within the required time frame by sending copy jobs to subcontractors, the firm uses only qualified legal services copiers and the cost charged to the client is the same as the amount billed to the firm.

Phone Charges

> Only charges for conference calls or international calls are charged, and charges are billed at the same amount billed to the firm by the outside provider.

Travel

> Attorney and other timekeeper time spent traveling on behalf of a client is billed to the client. Hotel, meals, local transportation, and similar expenses are charged based on receipts and travel expense forms submitted by the attorney. Documentation is available to the client if requested.

Maps

> Maps produced in conjunction with a project will be billed at $50 for each 34 x 44 inch

APP-0024

map and $20 for each smaller map, plus cost (time fees) for preparation.

## Other Expenses

Expenses incurred with outside providers in connection with the client's legal services will be paid by the client directly to the outside provider unless specifically arranged in advance. If the firm agrees to pay outside providers, the cost charged to the client is the same as the amount billed to the firm. Examples of such charges include: court reporter fees, filing fees, newspaper charges for publication notices, expert witness fees, consultants and other similar expenses.

**Exhibit D—Verification Required by Texas Government Code Chapter 2271**
Bickerstaff Heath Delgado Acosta LLP

By signing below, Bickerstaff Heath Delgado Acosta LLP hereby verifies the following:

1.   The Firm does not boycott Israel; and
2.   The Firm will not boycott Israel during the term of this Engagement Agreement.

SIGNED BY:       *William D Dugat III*

William D. Dugat, III
~~December 7, 2021~~
January 4, 2022

This Verification is incorporated and made a part of the Engagement Agreement between the Bickerstaff Heath Delgado Acosta LLP and the Harris Galveston Subsidence District.

APP-0026

**Electronic mail from Lori J. Robinson (Bickerstaff) to Kawa Foad, Esq. — November 7, 2025 (reproduced from the original)**

**From:** Lori Robinson <LRobinson@bickerstaff.com>
**To:** kfoad@kf-law.com
**Date:** November 7, 2025, 3:40 p.m. (CT)
**Subject:** HGSD Request for Information

Dear Mr. Foad,

In the link below, please find information that HGSD believes is responsive to the remaining items you have requested.

https://bickerstaff.sharefile.com/public/share/web-s49f774e799c64a079c8844b8b2463f49

Please note that some of the information you requested was not included in your initial request received in May 2025. For example, in your initial request you asked for, "Any records concerning communications that either you, personally, or any other HGSD party may have had with attorneys." HGSD sought clarification on this portion of your request and did not receive a response. Thus, HGSD was not able to identify any responsive records without clarification. You then modified this request to the following: "All written communication by and between HGSD staff concerning Mr. Davis and/or Woodloch MHP."

As a courtesy, HGSD is providing this information. However, going forward, you must direct future requests for information under the Texas Public Information Act to HGSD's designated email address for such requests: pia@subsidence.org. A request will not be considered received unless it is submitted to this email address.

Additionally, there was no information responsive to a portion of your request, including the following:

• Board meeting agenda(s) containing information regarding legal services agreement(s), including amendment(s) thereto, executed with GM Ellis Law

• Board meeting minutes containing information regarding legal services agreement(s), including amendment(s) thereto, executed with GM Ellis Law

• Board meeting agenda(s) containing information regarding legal services agreement(s), including amendment(s) thereto, executed with Johnson Petrov LLP, if any***

• Board meeting minutes containing information regarding legal services agreement(s), including amendments thereto, executed with Johnnson Petrov LLP, if any***

• Board meeting agenda(s) containing information regarding legal services agreements, including amendment(s) thereto, executed with Graves, Dougherty Hearon & Moody ("GDHM")

• Board meeting minutes containing information regarding legal services agreements, including amendments thereto, executed with GDHM

For your reference, HGSD Board meetings and agendas are available to the public at the following link: Meeting and Hearing Information - Harris Galveston Subsidence District (https://hgsubsidence.org/about/meetings/)

Sincerely,

Lori J. Robinson | Partner | Bickerstaff Heath Delgado Acosta LLP
Two Barton Skyway | 1601 S. MoPac Expy | Suite C400 | Austin, TX | 78746

**Electronic mail from Kawa Foad, Esq. to Gregory M. Ellis — November 20, 2025, attaching the Omnibus Motion (reproduced from the original)**

**From:** Kawa Foad <kfoad@kf-law.com>
**To:** greg@gmellis.law
**Date:** November 20, 2025, 9:22 a.m. (CT)
**Subject:** Re: Follow-Up To Email Sent Moments Ago
**Attachment:** Omnibus Motion .pdf

Hi Mr. Ellis:

I am following up here, and I am submitting an omnibus motion relating to Mr. Davis and his permits, especially the one pertaining to Woodloch. Please see attached.

It is my intention to submit the same to all interested parties at the end of business today, but I wanted to give you an opportunity to review first, as I maintain we can resolve this amicably.

Also, please advise if there is any rule, policy, etc, that would make the submission hereof improper, and on what grounds. My intention is to share it in the other email thread (the one with Ms. Robinson, and others relating to the request for information).

Let me know if you want to discuss further.

Cordially,

Kawa Foad, Esq.

[Attachment: "Omnibus Motion .pdf"]

[The email below appears in the same thread:]

On Mon, Nov 17, 2025 at 7:47 PM Kawa Foad <kfoad@kf-law.com> wrote:

Hi Greg: Never heard back from you. When is the earliest you can hop on a quick call (no more than 5-10 minutes). I would like to touch base before I send out another email in the other email chain/thread. I think it would serve all very well if I got to discuss things with you first. I am available now if you have time. Otherwise, early tomorrow morning works for me as well.

# BEFORE THE BOARD OF DIRECTORS OF
# THE HARRIS-GALVESTON SUBSIDENCE DISTRICT

| | |
|---|---|
| **WOODLOCH MHP LLC,** | § |
| | § |
| *PETITIONER*, | § |
| | § |
| V. | § |
| | § |
| | § |
| **THE HARRIS-GALVESTON SUBSIDENCE** | § |
| **DISTRICT,** | § |
| | § |
| *RESPONDENT.* | § |

## PETITIONER'S EMERGENCY OMNIBUS MOTION FOR RELIEF

COMES NOW Mr. Bradley Dab, individually, and on behalf petitioner Woodloch MHP LLC ("***Petitioner***" or "***Woodloch***"), by and through undersigned counsel (the "***Undersigned***"), pursuant to governing constitutional law and other applicable authorities, [1] respectfully submits this Emergency Omnibus Motion for Relief (collectively, this "***Motion***") in the above-styled cause (this "***Contested Hearing***"). This Motion arises from verified material facts involving, primarily, the following adversarial parties:

i.   The Harris–Galveston Subsidence District (the "***District***" or "***HGSD***");
ii.  HGSD's General Manager, Michael Turco ("***Turco***" or the "***General Manager***");
iii. HGSD's Director of Enforcement, Dylan Jones ("***Jones***");
iv.  HGSD's Hearing Examiner, Helen Stewart Truscott, Esq. ("***Truscott***" or the "***Hearing Examiner***");
v.   HGSD's retained outside general counsel representing the board of directors of HGSD (the "***Board***") in this Contested Hearing, Gregory M. Ellis, Esq. ("***Ellis***")
vi.  Outside counsel retained by HGSD *specifically* representing Turco in this Contested Hearing, Natasha Martin, Esq. ("***Martin***" or "***Turco's Counsel***")

---

[1] The procedural rules governing the above-styled cause (this "***Contested Hearing***") are incorporated herein by reference (each, a "***Rule***," and jointly the "***Rules***"). *See* https://hgsubsidence.org/wp-content/uploads/2023/10/2023-HGSD-Rules-Amended-10-11-2023.pdf.

vii.   Outside counsel retained by HGSD specifically scoping the representation any request for records and/or information sought via the Texas Public Information Act ("*TPIA*"), Lori Robinson, Esq.**,** ("*Robinson*"); and

viii.   two directors of HGSD's Board, Kyle Sears, Esq. ("*Sears*") and Alan Petrov, Esq. ("*Petrov*").

As more fully set forth below, Petitioner moves both Petrov and Sears along with all other current directors on HGSD's board (collectively, the "*Board*") to urgently issue an order that makes and grants, respectively, the following declarations, and remedies relating to the aforementioned parties and the underlying facts and events, such as HGSD's public hearing held on October 7, 2025 (the "*October Public Hearing*"), that form part this Contested Hearing:

### Declarations

**A.**   The General Manager did **not** mail to Petitioner a hearing notice regarding the October Hearing at least five business days prior as **expressly** required under Rule 7.2(a) and in clear violation thereof;

**B.**   Petitioner was therefore not obligated to appear at the October Public Hearing; and

**C.**   The Hearing Examiner's electronic mail communication sent to Martin on October 14, 2025, which did not include the Petitioner nor its counsel, constituted disqualifying *Ex Parte* communication in violation of Rule 7.5(k); along with the following:

### Remedies

**A.**   Disqualify Truscott, and reassign this Contested Hearing to a truly neutral hearing examiner due to her undeniable bias, and incurable offenses;

**B.**   Order Truscott, Turco and Martin to *immediately* disclose, and provide all records relating to, any other *Ex Parte* communication relating to this Contested Hearing, and provide affidavits establishing they have fully complied therewith;

**C.**   Vacate or strike both Turco's and Truscott's arbitrary, and capricious decisions and/or *void ab initio* rulings—in particular the legally-deficient order dated October 20, 2025 by Truscott that unwarrantedly seeks to prevent the undersigned from representing Petitioner;

**D.**   Allow the undersigned to represent Petitioner in this Contested Hearing without limitations or contingencies; and

**E.**   Grant such other relief fair, and equitable under these circumstances.

In support of the above-described relief requested via this Motion, Petitioner, by and through and/or together with Mr. Bradley Davis who is the founder and has been the sole member of Woodloch at all times ("*Mr. Davis*"), states the following:

## PRELIMINARY STATEMENT

The General Manager along with the Hearing Examiner have grossly violated Petitioner's guaranteed rights enshrined in the Constitutions of United Stated as well as the State of Texas. More pointedly, Turco and Truscott, via countless *ultra vires* acts, have arbitrarily-and-capriciously denied Petitioner of constitutionally-protected *Due Process*, and *Equal Protection* rights. The inexcusable offenses violative of Petitioner's rights render all of the Hearing Examiner's, including some of the General Manager's, decisions, rulings, act, orders, etc. in question *void ab initio*, and therefore unenforceable nullities that never carried any legal effect. Even more worrisome, the Hearing Examiner and the General Manager appear to have no intention of ceasing or refraining from continued, and deliberate violations of neither Petitioner's nor Mr. Davis's protected rights, and remedies.

The way the Rules are written suggest the Hearing Examiner will be objective in a contested hearing but that is misleading at best as Truscott is inherently conflicted, and therefore incurably biased. First, a party involved in a contested hearing, like Petitioner here, has no say in appointing a hearing examiner. Here, Petitioner had to simply accept Truscott being the Hearing Examiner who, quite astonishingly, appears to not even be fully familiar with the Rules, or, even worse, Texas law for that matter, as discussed below. Second, Truscott appears to have been the District's hearing examiner for at least ten years or so now, and was likely appointed by Turco. Indeed, Truscott has been, and will be compensated in her role as a hearing examiner by the

District, and the same applies in this Contested Hearing. In other words, any and all services rendered by the Hearing Examiner in this Contested Bearing will be paid for by the respondent; costs that will likely be reviewed, and approved by Turco who likely appointed her and with whom she has a conflicting relationship requiring her immediate disqualification. This undeniable conflict-of-interest undoubtedly has created an unavoidable bias towards HGSD and Turco to the detriment of Petitioner, which the record already reflects

Further, among a plethora of other equally-compelling reasons that each, in and of themselves, warrants Truscott's immediate disqualification from this Contested Hearing, one stands out: The Hearing Examiner's indefensible, and disqualifying *Ex Parte* communications with Martin on October 14, 2025 recently unearthed by Petitioner. The irrefutable proof presented below shows Truscott contacting Martin via electronic mail regarding matters relating to this Contested Hearing **without** copying Petitioner or Mr. Davis—nor the Undersigned who was designated as a party to this Contested Hearing by Truscott, herself. This was more than just a transgression by the Hearing Examiner; it was an inexcusable, and therefore disqualifying, offense in violation of Rule 7.5(k), which prohibits *Ex Parte* communications by a hearing examiner. As such, the only reasonable, fair and curation here—capable of rectifying this grave serious issue that has already permeated the entirety of this Contested Hearing—is disqualifying Truscott, and assigning a new hearing examiner that should, at the very least, certify not have been involved in any HGSD-matter previously. Any Board decision to the contrary would be insufficient, and leave Petitioner with no choice but to address things much more forcefully, and resolutely (more on this further below).

Moreover, the few named culpable parties' actionable misconduct briefly discussed herein is only the tip of the proverbial iceberg. To this end, newly-added directors to the Board are likely

not familiar with this Contested Hearing nor the background facts leading to it (collectively, the "*Dispute*"). For reference, the critical events giving rise to this Dispute occurred or developed around end of August, 2024, when HGSD unjustifiably fined Petitioner $106,901 (the "*Fine*") for allegedly having exceeded its groundwater withdrawal limit under the well permit issued by HGSD (the "*Permit*").[2] Given the brazenness of the lawbreaking schemes on the part of Jones, Turco, Petrov, and Sears, to name a few among the many other HGSD-associated culprits, which, by the way, they relentlessly continue to engage in, Petitioner is seriously considering to finally involve regulatory bodies, including, but certainly not limited to, the OAG. Considering that is *precisely* what Robinson did as part of the monthslong, and still-ongoing stonewalling preventing Petitioner from gaining access to vital records asked for via the Requests to adequately mount legal arguments in this Contested Hearing or the Dispute more generally, it would not be unreasonable nor unwarranted of Petitioner to take this drastic action.

To remove all doubt, Mr. Davis's patience, and, quite frankly, the undersigned's, too, is completely exhausted at this point: *Enough is enough.* Continued schemes, stonewalling efforts, blatant cheating, clandestine gimmicks, etc., Petitioner will not be tolerated but instead be dealt with resolve, and urgency. That said, Petitioner wants be clear it still is willing to amicably resolve the Dispute (which includes this Contested Hearing). As the record reflects, Petitioner has never been, nor will it now begin to be, unreasonable, and willing to engage in honest settlement discussions. But, again, to be clear: Any continued misconduct or unfair treatment will not just leave Petitioner with no choice but to involve the OAG (and likely other law enforcement bodies with jurisdiction over this Dispute as well), it will also result litigation in federal court being

---

[2] The amount of the Fine was later reduced to $66,513.

commenced.[3] To this end, Mr. Davis wants to make things excruciatingly clear: **Every** additional individual party that becomes culpable from this point on—i.e., parties other than Sears, Petrov, Turco, Truscott, Robinson, etc. that contribute to more damages to the enormous harm Petitioner and Mr. Davis have already suffered, which is ongoing and accruing—will be named as a defendant, *personally*. It is time for **everyone**—and not just Mr. Davis—to start writing checks to pay for attorneys on their own dime instead of using the District's resources that Mr. Davis has significantly contributed to for over two decades now without ever complaining—at least not until the Dispute began that is mostly, if not entirely, due to the many indefensible, and actionable *ultra vires* acts on the part of relevant HGSD parties.

In light of the foregoing, Petitioner, along with Mr. Davis, moves for the justified relief sought herein pursuant to many meritorious legal arguments presented further below that the Board simply can not ignore, disregard nor evade. Stated differently, in a more blunt fashion: If the Board denies any of the relief sought here, it would result in a yet another ***gross miscarriage of justice*** that forces Petitioner to take action in a much more resolute, and urgent manner, which includes involving regulatory bodies like the OAG and filing suit in federal court.

## I.    LEGAL STANDARD

### A.  Constitutional Law

---

[3] Ellis along with Petrov and Spears—all practicing attorneys—are more than welcome to explain to the other members of Board federal jurisdiction lies whenever the central issue or issues implicate federal law, ***unless***, of course, they decline to do so, and instead recommend hiring *yet another* outside counsel to explain this simple concept. Petitioner mentions this important point in the event anyone gullibly believes a federal court would not such an action on jurisdictional grounds—or Board members enjoy full immunity for *any and all* decisions made or actions undertaken relating to this Dispute because since the US "Constitution, and the Laws…made in Pursuance thereof…shall be the supreme Law of the Land; and…every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." *U.S. CONST. ART. IV. § 2*; *see also Marbury v. Madison*, 5 U.S. 137 (1803) (holding that any act or "law repugnant of the Constitution is void" because the Constitution is "the supreme law of the land").

"No State…shall…deprive any person of life, liberty, or property, without due process of law…." *U.S. CONST. AMEND. XIV, § 1.* In addition, States may not "deny to any person within its jurisdiction the equal protection of the laws." *Id.* The aforementioned clauses of the Constitution—*Due Process*, and *Equal Protection*—mandate State actors, including government bodies or special districts such as HGSD, to provide all persons—corporate entities and natural persons alike—a reasonable, and meaningful opportunity to be heard in an impartial manner in any proceeding relating to or affecting their properties, and/or substantive rights, etc. *Id.* This naturally includes the right to be informed in a timely manner, and what the issues of any matter are or relate to. *See generally, e.g., Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314–15 (1950) (finding that notice must be reasonably calculated to inform parties whose rights are at risk and give them an opportunity to respond, and that notice by publication is insufficient if the names and addresses of parties are known); *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (holding that before rights are terminated, affected parties must be noticed of the reasons therefor and afforded a fair, and meaning opportunity to gather evidence, confront adverse witnesses and present legal arguments).

Additionally, findings, decisions, etc. made or taken by conflicted decision-makers, such as those with pecuniary interests relating to the matter they are tasked with adjudicating, is a clear violation the affected party's or parties' *Due Process* rights being violated. *See generally Ward v. Vill. of Monroeville*, 409 U.S. 57, 61–62 (1972) (due process violated where adjudicator had institutional interest in outcome); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (decision-maker with pecuniary stake cannot sit).

## B. The Rules

Formulated by the District itself, the Rules also provide parties with basic *Due Process,* and *Equal Protection*. Rule 7.2(a), for instance, strips Turco of any discretion, instead subjecting

him to express obligations, such as *actually* mailing out hearing notices whenever a party's permit is at issue or may impacted by a Board ruling, etc. *See* id. (expressly stating the General Manager "shall" mail out notices, and must do so "at least five business days prior to a hearing"). Therefore, any failure to do so, which is exactly what happened here, would be violative of parties' *Due Process*, and *Equal Protection* rights, and therefore render any decision, ruling, order, etc. flowing therefrom void as a matter of law.

## II.    MATERIAL FACTS, AND INCORPORATED MEMORANDUM OF LAW

### Introduction

1.    In violation of all notions of fairness, honesty and, very importantly, the right to *Due Process,* and *Equal Protection* clauses of the U.S. Constitution*,* the District has been unfairly targeting Mr. Davis in a mob-like shakedown ever since the Dispute began.

2.    Assuming *arguendo* Petitioner withdrew more groundwater than allowed to under the Permit (which, to be clear, is specifically denied), HGSD's offered terms, and conditions—demands, really—to resolve the Dispute are entirely exorbitant, and carried out in the utmost extortionate manner:

> To settle the violations, Woodloch MHP LLC must:
> 1. pay the permit fee for the overage amount;
> 2. accept $66,513.00 as a voluntary lien on the Woodloch property for the Disincentive Fee portion of the settlement offer; and
> 3. purchase and refund to HGSD 3.71 million gallons of "B" credits, which can be purchased from third parties.

*See* paragraph 32, *infra* (electronic mail from Ellis to the Undersigned.

3.    It is important to keep in mind crucial background context: Mr. Davis  has been an exemplary permittee for over two decades now as he has consistently withdrawn much less groundwater than allowed under not just the Permit at issue, but two more permits (collectively with the Permit, the "***Permits***") that HGSD has issued to two entities, which were also solely

founded and have been owned by Mr. Davis alone at all times: Mesquite MHP, LLC and Miller MHP, LLC, *respectively*.

4.      Woodloch along with Mesquite and Miller (jointly, the "***Companies***") are closely-clustered; within a few miles of one another and all located in the District's Regulatory Area No. Three. The Companies each operate respectively-owned mobile home parks where (i) hundreds of low-income tenants reside in mobile home units, and (ii) the only source of water for many miles around is groundwater withdrawn from a total of four HSDG-permitted wells (Woodloch has two wells and other entities one each).

### Select *Ultra Vires* Acts Leading Up To This Contested Hearing[4]

5.      As the below excerpt shows from the April Meeting's publicly available meeting agenda, the Dispute was scheduled to be addressed at the Board's regular meeting scheduled for April 9, 2025 (the "***April Meeting***"):

> Groundwater Issues and Legislative Issues.
>
> 10  Consider and Possible Action on a Compromise and Settlement Counteroffer, Well No. 3606 - Woodloch MHP, LLC, Brad Davis.

*Retrieved* on October 24, 2025, from https://hgsubsidence.org/wp-content/uploads/2025/04/00_Agenda-FINAL-1.pdf (the "***April Meeting Agenda***").

6.      For around thirty days or so prior to April Meeting taking place, however, the Undersigned attempted to gather records, and other information needed in order to engage in what he foolishly believed would be honest, and fair dealings with HGSD staff in order to resolve the Dispute amicably.

---

[4] In the interest of brevity, only a select few instances of the many, and egregious unlawful decisions, actions, etc. taken by HGSD and associated parties against, and damaging, Petitioner and Mr. Davis, which have also harmed his two other two entities (i.e., Mesquite and Miller) as he has been forced to spend a considerable amount of time on this Dispute when it could have been spent on business operations. On this note, a much more detailed discussion in papers nearly finalized—and intended to be submitted to the OAG should this Dispute remain unresolved either in part or whole—outlines in a far greater detail the many instances of actionable misconduct.

7.    However, the Undersigned's efforts were either completely ignored or stonewalled by the relevant parties (HGSD Jones in particular, and Turco, Ellis and Martin to varying degrees).

8.    For instance, it was not until the day before the April Meeting took place (i.e., April 8, 2025), that Jones, via electronic mail (copying therewith Ellis), sent a confusing worksheet that purportedly justified the Penalty without a general, meaningful explanation (much less any description regarding the abbreviated terms, and what they actually meant):





D. Jones

**VIOLATION WORK SHEET**

3/1/23 - 7/31/24

| | | | | |
|---|---|---|---|---|
| | | **80/20** | | |
| **Permittee** | **Woodloch MHP LLC** | **Permitted** | | 10 |
| **Well No(s).** | 3606 & 7694 | **Pumped** | | 12.34 |
| **Reg. Area** | 3 | **Purchased** | | 0 |
| **NO. of Wells in a Major Violation State** | 2 | | | |
| **NO. of Wells in a Minor Violation State** | 0 | **Reuse, Irrigation** | | 0 |
| **Size of Well(s)** | 4 & 5 | **TWD** | | 12.34 |
| | | **Minus Credits (30 % allowed** | | 0 |
| | | | **Additional A's** | 0 |
| | | | **Additional B's** | 0 |
| | | **GRA** | 0 | |
| | | 30% | 3.702 | |
| | | 20% | 2.468 | |
| | | 10% | 1.234 | |
| | | **Paid $0 DF** | | 0 |
| | | **Vio/DF/MG** | | 9.872 |

| | Old Rate | MGY | New Rate | |
|---|---|---|---|---|
| **Number of Annual Report Violations** | | 0 | | |
| **Overpumpage Rate of 20** | $50.00 | 0 | | |
| **Dis Fee Portion 80 Percent** | Dis Fee | 9.872 | | |
| **Permit Fee Not Paid on Dis Vio** | $17.00 | 10 | | |
| **Area 1 or 2 no SW available rate** | | 0 | | |
| **Agricultural Rate** | | 10 | | |
| **Standard Permit Fee Rate** | | 26 | | |
| **Unpermitted Pumpage** | | 0 | | |
| **Years in Violation** | | 1 | | |

| | | |
|---|---|---|
| **Regular Permit Fee Rate** | 2.34 MG Over | 61.00 |
| **Small Well Unpermitted Rate of $26** | | 0.00 |
| **Disincentive Fee Rate 10.78** | | 106420 |
| **Overpumpage Permit Fees x 39** | | 0 |
| **No SW Available Rate & < 10MG** | | 0.00 |
| **Applications** | | 170 |
| **Agricultural Rate** | | |
| **Annual Report Violations** | | 0 |
| **Drilling Violation** | | 0 |
| **Well Violation - Major** | | 250 |
| **Well Violation - Minor** | | 0 |
| **Total** | | 106901 |

9.     Five minutes later, Ellis, likely alerted by the undersigned's reply to Jones, sent a separate electronic mail (with Martin copied therewith), informing the Undersigned he would not appear at the April Meeting due to a conflict but that Martin would appear instead, in his absence:



**Gregory M. Ellis** <greg@gmellis.law>                Tue, Apr 8, 2025 at 1:15 PM
To: Kawa Foad <kfoad@kf-law.com>, "Natasha J. Martin" <NMartin@gdhm.com>
Cc: "Cathy L. Ribble" <clribble@gmellis.law>, "Stacey D. Curran" <sdcurran@gmellis.law>

I have a conflict and must be in Austin tomorrow morning during the HGSD Board meeting. Natasha Martin (copied) will be at the Board meeting in my place. I have briefed her on the issues relating to Woodloch MHP and the District's settlement offers.

Greg

---

Gregory M. Ellis
GM Ellis Law Firm PC
2104 Midway Court
League City, TX 77573

10.     About an hour later, at 2:08pm, Martin replied by stating she looked "forward to meeting [us] all" at the April Meeting, which, again, was scheduled for the following day, and also requested to be contacted "if anything" came up that same day (i.e., before the April Meeting started):



[Quoted text hidden]

**Natasha J. Martin** <NMartin@gdhm.com>                Tue, Apr 8, 2025 at 2:08 PM
To: Kawa Foad <kfoad@kf-law.com>, "Gregory M. Ellis" <greg@gmellis.law>
Cc: "Cathy L. Ribble" <clribble@gmellis.law>, "Stacey D. Curran" <sdcurran@gmellis.law>

Thanks, Greg.

Looking forward to meeting you all.  Let me know if anything comes up today.

Thank you,

Natasha J. Martin | Attorney

Direct: (512) 480-5639 | Fax: (512) 536-9939

401 Congress Avenue, Suite 2700, Austin, Texas 78701

GRAVES
DOUGHERTY
HEARON &
MOODY
75 YEARS OF SERVICE

www.gdhm.com | Bio | LinkedIn

APP-0040

11.     Having no reason to believe a fellow attorney—i.e., Martin who has taken the Oath of Attorney[5] and is a member of the Texas Bar Association and therefore subject to strict ethical obligations requiring her to always be forthright and act with integrity in interactions with not just courts but **all** parties—would act in a clandestine or unethical manner, the Undersigned replied to Martin's communication in good faith in an effort to discuss the Dispute, and the Penalty in particular, before the April Meeting commenced:

Kawa Foad <kfoad@kf-law.com>                                    Tue, Apr 8, 2025 at 4:18 PM
To: "Natasha J. Martin" <NMartin@gdhm.com>
Cc: "Gregory M. Ellis" <greg@gmellis.law>, "Cathy L. Ribble" <clribble@gmellis.law>, "Stacey D. Curran"
<sdcurran@gmellis.law>

Hi Ms. Martin:

It's a pleasure to make your acquaintance. I would like to discuss this matter before the hearing tomorrow if your schedule permits. Please provide times.

Thank you.

Cordially,

Kawa Foad, Esq.

*Privileged and/or Confidential.*

12.     However, despite Martin being the one to initiated contact with the Undersigned and asking to contact her with anything related to the on the day before the April Meeting, Martin ignored the Undersigned's reply by never bothering to respond *at all*.

13.     Instead, clearly contradicting Martin's request to be contacted with anything related to the Dispute and the Penalty prior to the April Meeting having begun, all the Undersigned ever received from Martin did not even come from Martin herself, as it was an auto-reply making clear Martin

---

[5] Texas's Oath of Attorney states the following: "I, [name], **do solemnly swear that I will support the Constitutions of the United States, and of this State**; **that I will honestly demean myself in the practice of law**; that I will discharge my duties to my clients to the best of my ability; and, **that I will conduct myself with integrity and civility in dealing and communicating** with the court and **all parties**. So help me God." (Emphasis supplied).

would be out of the office until April 10, 2025 (which was the day after the April Meeting was supposed to take place):



### The April Meeting:
### Numerous, And Blatant Violations of The Right To Due Process, And Equal Protection

14.    The District's publicly-available meeting agendas—many of which the Undersigned has diligently reviewed in support of the arguments made herein—all make clear the Board **may** not take any action on any issue, matter or topic brought up during a meeting if that particular issue, matter or topic is not included on a particular meeting's agenda.

15.    Instead, just like the April Meeting Agenda at issue here states, all agendas establish that "[i]nquiries regarding matters not listed on the Agenda may be referred to Staff for research and possible future action," as the below screenshot taken from the April Meeting Agenda shows:

> The Board of Directors welcomes comments from the public. Those wishing to speak must sign in. Speakers may speak on any topic, whether on the agenda or not. The Board of Directors cannot act upon, discuss issues raised, or make any decisions at this time. Speakers must observe a three-minute time limit. Inquiries regarding matters not listed on the Agenda may be referred to Staff for research and possible future action.

*Id.*

16.    Additionally, as can be heard from the audio recording of the April Meeting, the meeting begins with the Board reciting the *Pledge of Allegiance*, which provides the following: "I pledge

allegiance to my Flag and the Republic for which it stands, one nation, indivisible, with liberty and **justice for all.**" *Id.* (audio recording accessed on October 25, 2025; emphasis supplied).[6]

17.     Importantly, the Undersigned had made it clear to Ellis on numerous occasions that he was based in Florida (and, *in fact*, out of the country during a discussion held via videoconferencing), and therefore nowhere near HGSD's offices located in Friendswood, Texas.

18.     Not once did the Undersign state anything that could be construed as him suggesting he would appear in person at the April Meeting during the videoconference with Ellis, the few phone calls he had Jones or any of the electronic mail communications by and between them regarding the Dispute.

19.     As such, any reasonably prudent government employee or agent acting on behalf of a government body that understands, and appreciates parties' Constitutional rights—unlike the HGSD parties involved here—would have informed the Board the Undersigned would appear remotely at the April Meeting.

20.     Or, alternatively, they would **not** actively prevent a party's authorized representative from appearing before a government body even if the appearance is remote—*especially* when the party's rights or interest are at issue, and any absence by the party or its representative may result in adverse consequences as it would be a clear violation of the *Due Process*, and *Equal Protection* rights and remedies guaranteed by the U.S. Constitution.

21.     Yet, that is *precisely* what Jones did: He refused to relay the to the Board the Undersigned's request to appear remotely, and would not advance, on Petitioner's behalf, a necessitated *ore tenus* motion the Undersigned made during the brief phone call the Undersigned had with Jones on the day of the April Meeting.

---

[6] Petitioner emphasizes the words "justice for all" because the Board has made a mockery of those sacred words as the indisputable facts, and legal arguments presented further below in this Motion firmly establish.

22.    Instead, Jones, with a complete indifference—and in a blatant violation of the protections, and rights afforded to Petitioner and Mr. Davis under the *Fourteenth Amendment* to the US Constitution—simply hung up the phone call. *See id.*, supra (guaranteeing affected parties a fair, and meaningful opportunity to be heard); *cf. the Pledge of Allegiance*, supra (specifically including the words "justice for all" that were **hypocritically** recited by the Board at beginning of the April Meeting); *Goldberg* U.S. 254  (SCOTUS making it clear any issued by a government actor notice must be reasonably calculated to inform parties whose rights are at risk what the issues are,  and what decisions might be taken in order to give them an honest, and fair opportunity to respond); *compare with Mullane* 339 U.S. 306 ("**Notice by publication…insufficient if the names and addresses of the parties are known**.") (Emphasis added).

23.    Frustrated but not one to give up easily, the Undersigned immediately thereafter called the District's publicly-listed main telephone number, and renewed his efforts to appear remotely before the Board during the April Meeting. However, those efforts did not fare much better.

24.    Although the Undersigned was, *again*, inexplicably deprived of a fair, and reasonable opportunity to appear remotely before the Board, the HGSD staff member who took the call— unlike Jones—at least had the courtesy to forwarded the Undersigned's necessitated and fully meritorious—especially in light of Martin having deceived gaslighted a bogus offer to discuss this Dispute the day before—Petitioner's *ore tenus* motion for a continuance of the Dispute advanced during the phone call, as proven below:

> recent litigation on groundwater issues and legislative matters.
>
> 10. CONSIDER AND POSSIBLE ACTION ON A COMPROMISE AND SETTLEMENT COUNTEROFFER, WELL NO. 3606 – WOODLOCH MHP, LLC, BRAD DAVIS. No permittee or permittee representative is present. Chairman Petrov received a message from Staff that the attorney for Mr. Brad Davis, Kawa Foad, had called the District office requesting a continuance for his client. The Board decided to take up the matter in executive session.

*Id.*

25.    As can be clearly inferred from above, the Undersigned never *actually* "spoke" before the Board, and was therefore not required to "sign in" as the April Meeting Agenda required. *See* paragraph 12, *supra*.

26.    Normally, the foregoing events described in the preceding paragraphs 14 through 25 having taking place that any reasonably employee or agent of a government body with an *iota* of understanding, and respect for parties' right to *Due Process* or *Equal* under the US Constitution would result in the Board taking no action on the Woodloch matter. However, given the farcical manner in which the District and the individual HGSD parties involved here have been for well over a year now, and continue to, *quite literally*, extort Mr. Davis and, in connection therewith, broken numerous laws, it came as no surprise that Mr. Davis was again left holding the short end of the stick.

27.    Despite not one, two or three but **FOUR** lawyers being present at the April Meeting (i.e., Martin and her colleague, along with Petrov and Sears) who jointly have well over 100 yeas of legal experience, none of them (or anyone else for that matter) stopped for a moment to say, "Hey, this just does not appear to be right;  perhaps we should take a step back and see if there any extenuating circumstances instead of making harsh, and rushed decision," Petitioner, together with Mr. Davis, were deprived of their *Due Process*, and *Equal Protection* rights and remedies. Importantly, these egregious constitutional violations that occurred were not due to neglect or a failure to take action.

28.    On the contrary, every single party present on the day of the April Meeting took deliberate measures in what was nothing but a disgraceful ***gross miscarriage of justice,*** and, as such, HGSD's affirmation on the April Meeting—"[t]he Board of Directors **cannot** act upon, **discuss**, or **make**

any decisions" on matters not on the agenda, as clearly stated on the April Meeting Agenda is nothing but a farce, and fully-exposed hypocrisy. *Id.*

29.    Notably, the Board not only failed to "refer[] to HGSD staff [Petitioner's *ore tenus* motion] not listed on the [April Meeting] Agenda…for research and possible future action" but instead— through numerous *ultra vires* acts—"act[ed]," "discuss[ed]" and, ultimately, "ma[d]e decisions" on Petitioner's desperate-but-nonetheless-meritorious *ore tenus* motion, as shown below:[7]

> 10. CONSIDER AND POSSIBLE ACTION ON A COMPROMISE AND SETTLEMENT COUNTEROFFER, WELL NO. 3606 – WOODLOCH MHP, LLC, BRAD DAVIS. No permittee or permittee representative is present. Chairman Petrov received a message from Staff that the attorney for Mr. Brad Davis, Kawa Foad, had called the District office requesting a continuance for his client. The Board decided to take up the matter in executive session.
>
> 12. EXECUTIVE SESSION. The Board went into executive session at 10:50 a.m. The Board of Directors returned from executive session at 11:19 a.m.
>
> Mr. Petrov asked if there were any motions regarding Item 10, Woodloch MHP, LLC, Well No. 3606. Mr. Sears made a motion that the request for continuance be denied, that the counteroffer be rejected, and that the District proceed according to Rule No. 9.3 of the District Rules. It was seconded by Mr. Long. Chairman Petrov put the question, and after the vote, announced the motion carried. None opposed.

*Id.* (emphasis supplied); *cf. Fourteenth Amendment*, supra; *cf. Mullane*, supra; *Goldberg,* supra.

30.    Speaking of the willful disregard for the US Constitution, the Rules and just general hypocrisy, it is worthwhile to point out that the Board member who put forth the egregiously unconstitutional motion described in the preceding paragraph (i.e., Sears), publicly touts himself as an ethical attorney whose practice is focused on *Bible*-based dispute resolution solutions:

---

[7] On the audio recording of the April Meeting (also publicly-available on HGSD's website), Petrov can be heard asking whether any on the Board objects to Petitioner's *ore tenus* motion for a continuance submitted by the undersigned through an HGSD's staff member after the undersigned was prevented from appearing remotely to which another, unidentified person asks why the Board can not address the motion since the Board is convened, and also, very importantly states, that no action needs to be necessarily taken. *Id.*



*Retrieved* on October 24, 2025 from https://www.hispeacemaker.com/.[8]

## **Most Recent Events**

31.　On September 26, 2025, the undersigned contacted Turco (with Jones and Petrov copied) after having noted more foul play in the form of suspect entries made by HGSD staff on Petitioner's online account maintained on the District's online portal (the "***Portal***"):



---

[8] In the event things remain unresolved and the Dispute ends up being litigated in Federal court, the Undersigned wants to make it clear Sears's name will be at the very top on the caption of the Complaint filed that will be submitted to the United States District Court for the Northern District of Texas.

32.     The Undersigned asked the above-noted questions for obvious reasons: Petitioner was unaware what the "Hearing Notice" referred to as it never received the same, and therefore did not know the intended/designated recipient.

33.     Also, and very importantly, there was no way for Petitioner to verify whether Turco had *actually* mailed out the notice as it pertained to the Permit, which Rule 7.2(a) expressly requires him to do at least five business days in advance. *See* id.

34.     Later that same day, Turco responded by notably (i) failing to answer the undersigned's third question—"What 'Recommendations' were 'Reviewed'?"—and (ii) attaching to the electronic mail the hearing notice, which apparently was a hearing notice for the District's public hearing held on September 9, 2025 (the "***Notice***"), as shown below:



35.     Rather than complying with the stringent requirements of Rule 7.2(a), which requires the General Manager to mail the Notice to Petitioner at least five days before the upcoming October 7, 2025 public hearing (the "***October Public Hearing***"), Turco impermissibly attempted to notice Petitioner through the electronic mail presented above. *Id.*; *cf.* Rule 7.2(a) (requiring notices pertaining to hearings on permit matters to be mailed out at least five business days before the hearing); *the Fourteenth Amendment,* supra (again, guaranteeing parties a fair, and meaningful

opportunity to be heard); *cf. the Pledge of Allegiance*, supra (again, specifically including the words "justice for all" that were **<u>hypocritically</u>** recited by the Board at beginning of the April Meeting); *Goldberg* U.S. 254  (once again, SCOTUS making it clear any issued by a government actor notice must be reasonably calculated to inform parties whose rights are at risk what the issues are,  and what decisions might be taken in order to give them an honest, and fair opportunity to respond); *Mullane* 339 U.S. 306 ("**Notice by publication…insufficient if the names and addresses of the parties are known**.") (Emphasis added).

36.    Further, although the Notice was dated August 26, 2025, which is the date it was allegedly sent to Petitioner, incorruptible metadata suggests the Notice was not even in existence at such time:



37.    Two days later (on a Sunday no less, on September 28, 2025), Ellis—whom the Undersigned had not copied on his electronic mail initially sent to Turco on September 26, 2025

(*see* paragraph 31, *supra*) as this concerned HGSD business and in no way litigation of any sorts—decided to chime in:



38.    The undersigned vigorously refuted any suggestion of impropriety, naturally, which is being left out in the interest of brevity.

39.    However, on or around September 30, 2025, as more proof of the undeniable mischief, the undersigned visited HGSD's website and noted the following with respect to public hearing agendas:

40.   As is evident from the last screenshot above, conspicuously missing is a meeting agenda

for the September 9, 2025, public hearing (the "*September 9 Public Hearing Agenda*").[9]

41.   As a result of the foregoing—especially not having received the Notice and therefore never

having been made aware —the undersigned asked for records evidencing regarding delivery of the

Notice to Petitioner:

---

[9] As discussed further below, because, rather "mysteriously", the September 9 Agenda all of a sudden appeared on HGSD's website but only **after** the undersigned had questioned the clear lack thereof first.



42. To this date—and in a blatant violation—no such proof (i.e., mailing records) have been produced by Turco, Martin, Robinson or any other HGSD-associated party.

43. On October 6, 2025, the day before the October Public Hearing, in addition to issues relating to the substantial records still not produced by Turco nor Robinson in breach of TPIA's express requirements, Petitioner made it clear they would not appear at the following day's hearing (especially since Petitioner had not been properly noticed of the October Public Hearing):



44.     Less than two hours later, in what can only be described as gaslighting, or, equally improper, a concerted effort to deceive, Ellis suggested Petitioner had been duly noticed of the September Public Hearing **but** without providing any proof thereof, and that Turco had, as a "courtesy," continued the Permit matter to be heard during the October Public Hearing (while at the same time never making it clear whether Turco had properly noticed Petitioner to appear at the October Public Hearing in compliance with Rule 7.2(a)):



**Greg Ellis**                                                    Oct 6, 2025, 4:45 PM   ☆  ↰  ⋮
to me, gseaquist, bdugat, Michael, Natasha, Lori  ▾

The September hearing was properly noticed. As a courtesy, the General Manager requested that the matter be continued to the October hearing. In one of your many October 3rd emails, you stated the following:

" . . . we will not be appearing at the October 7 hearing and this is not just because of the statutory failure to provide us with the required notice but because Mr. Ellis has already made it clear we are being ruled against. What is the point of showing up to a hearing if the decision has already been made?"

This was in response to my email of September 28, in which I said, "The hearing will determine if there are any contestable issues with issuing an operating permit to Woodloch MHP LLC. As you know, the staff contends the permit should not be renewed because of the outstanding violation. This hearing is an opportunity for Woodloch MHP LLC to request a contested case hearing on the permit application."

If you do not appear at the hearing or request a contested case hearing before that hearing's record is closed, the Hearing Examiner will make a recommendation to the Board based on the information presented at the hearing. It appears you do not understand Texas administrative procedures or the clear meaning of my statement. Nowhere did I say this matter was decided. You and your client have an opportunity to request a contested case hearing. The consequence of failing to do so will be a decision on the existing record. I don't know what that decision will be because I am not the Hearing Examiner. Furthermore, the Hearing Examiner's recommendation will then still require a Board vote; the Board (and only the Board) gets to decide this matter.

You have not requested a continuance, filed any information with the Hearing Examiner, or otherwise conducted in any manner the steps required to respond to the Notice of Hearing. Maybe you work in jurisdictions where the attorneys get to "notice" tribunals of their intended absence, but that is not how it works in Texas.

You have the District Rules. I recommend that you follow them.

Greg

---

45.    Just a few hours later, the Undersigned responded to Ellis's unwarranted diatribe (with Martin, Turco, Robinson and others copied) by firmly establishing just how far Turco (and undoubtedly other HGSD parties as well) are willing to—through reprehensible *ultra vires* acts—break the law, and deprive Petitioner and Mr. Davis of their constitutional rights by including the below screenshot which makes clear that either Turco or someone under the direction of Turco or Ellis had planted evidence in the form of the previously-missing September 9 Public Hearing Agenda, as discussed in paragraph 39 above:[10]

---

[10] Petitioner became suspicious when Ellis tried to suggest Petitioner had been properly noticed, which is why the Undersigned immediately checked HGSD's website and noticed the information on HGSD's website had been manipulated because someone had clearly planted evidence to try to refute Petitioner's argument that it had not been properly noticed of the September Public Hearing.

## 2025 HEARING NOTICES

Hearing Notice October 7, 2025
Hearing Notice September 9, 2025
Hearing Notice August 12, 2025
Hearing Notice July 8, 2025
Hearing Notice June 10, 2025
Hearing Notice May 13, 2025
Annual Groundwater Hearing April 29, 2025
Hearing Notice April 8, 2025
Hearing Notice March 11, 2025
Hearing Notice February 11, 2025
Hearing Notice January 7, 2025

**The October Hearing**

46.    At 7:30am on October 7, 2025, Petitioner—as advised by Ellis—moved for a continuance

relating to this Dispute on the October Public Hearing, and did so via electronic mail sent to Martin:



**Kawa Foad** <kfoad@kf-law.com>                                    Oct 7, 2025, 7:30 AM    ☆    ↩    ⋮
to hstlaw, Brad, Greg, gseaquist, bdugat, Natasha, Lori, Michael ▾

Mr. Ellis:

I appreciate you putting in work way past normal business hours, and I apologize for not responding sooner. I am currently immersed in numerous matters that are quite tricky to say the least, and not as responsive as I normally am. Nonetheless, and again, thanks for pulling through.

That being said, I understand certain formalities are required. In furtherance of the request (or motion) for continuance I had submitted yesterday, I again renew our efforts here in a more amicable, and proper manner.

<u>**Motion for Continuance**</u>
Ms. Martin, could you please inform your client, the General Manager of the District, that I am motioning for relief in the form of a necessitated continuance on behalf of Woodloch MHP LLC and its permit that is being addressed today at the hearing-- especially in light of what has transpired over the last few days? Mr. Ellis courteously informed us, he is willing to engage the Board with us for potential settlement discussions. As I had stated previously, I sincerely believe a one-hour conference to be held remotely/electronically will do us wonders, and get the job done. I have no interest in having this linger on, and therefore propose we find a mutually-agreeable time this week to engage in a settlement conference.

Please let me know Mr. Turco's position with respect to our motion at your earliest convenience, Ms. Martin.

Lastly, in the interest of full disclosure and fairness and except for the ultimate decision-making body (i.e., the Board), I am cc'ing Ms. Truscott on this thread again.

Thanks much.
•••
•••
...

47.     Although never having noticed Petitioner of the October Public Hearing as expressly required under Rule 7.2(a), which mandates a written notice stating the time, place, and nature of the hearing to be mailed out at least five business days in advance, Turco still—arbitrarily, and capriciously—indefensibly denied the Petitioner's motion for a continuance without providing any reason or explanation for his decision. *See Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) (holding that "agency action to be set aside if arbitrary, capricious, [or] an abuse of discretion").

48.     Making matters worse, Martin contacted the Undersigned inform that the Hearing Examiner was demanding an appearance by telephone at the October Public Hearing.

49.     Hesitantly, the Undersigned complied but made clear to the Hearing Examiner that proceeding with the hearing was improper.

50. Rather than continuing Petitioner's appearance at the October Public Hearing or not taking any substantive action on the matter, the Hearing Examiner decided to proceeded by, *inter alia*, entertaining brazenly frivolous arguments raised by Turco's Counsel.

51. For instance, Martin maliciously argued the Undersigned was ignorant of the Rules without providing any proof or basis for her hollow argument. Moments later, *however*, when the Undersigned invoked the Rules by making it clear to the Hearing Examiner that Turco had never bothered to mail out the pertinent hearing notice at least five business day before October Public Hearing as contemplated under the Rules, Martin brazenly flip-flopped her earlier stance because now apparently adhering to the Rules was not so important, and, by extension, should not apply to HGSD nor her client, Turco.

52. Specifically, Martin frivolously argued that because the Undersigned had been made aware of the October Public Hearing since Turco had continued the matter via electronic mail, and referenced the October Public Hearing in said communication.

53. As such, Martin appeared to suggest, Petitioner had been noticed of the October Public Hearing simply because Turco informed the Undersigned—in an electronic mail communication that in no way, shape or form satisfied the strict requirements under Rule 7.2(a)—of the October Public Hearing. This hollow argument—especially the audacious manner in which Martin attempted to mislead the Hearing Examiner that the express Rule 7.2(a) should be disregarded— would undoubtedly lead to harsh sanctions before any court of law.

54. Making matters worse, the Hearing Examiner—rather refusing to entertain Martin's unfounded argument—started asking the Undersigned questions reeking of bias, such as when the Undersigned had become aware of Turco's electronic mail communication regarding the October

Public Hearing, which, once again, never satisfied the strict notice requirements found under Rule 7.2(a) regarding HGSD hearings pertaining to permit matters.

55.    Very importantly, during the October Public Hearing—where the Undersigned did not have the benefit of seeing any interaction between Martin and Truscott as he was appearing by phone—the Undersigned also informed the Hearing Examiner that Petitioner could not properly mount its legal arguments, affirmative defenses, etc. as HGSD—by and through Robinson, in particular—had engaged in a monthslong, and still-ongoing stonewalling campaign in response to the Requests, which, to this very day, remain largely unsatisfied in clear violation of the TPIA.

56.    In response, Martin suggested to the Hearing Examiner Robinson having complied with the Requests, and that this particular issue was unrelated to this Contested Hearing.

57.    In doing so, Martin made two verifiable lies to the Hearing Examiner in a clear effort to mislead for the benefit of Turco and HGSD, and to the detriment of Petitioner and Mr. Davis.

58.    First, it is unequivocally clear Robinson—including several other parties involved, such as Turco and Robinson's two colleagues from the same law firm where they (all three of them) are partners—are in willful, and calculated breach of the TPIA, which constitute felony offenses, because of their provable refusal to comply with the Requests.[11] This is something Martin was, or at the very least should have been well aware of, since had been copied on electronic mail communications regarding the same.

59.    Second, Martin also lied when she attempted to mislead the Hearing Examiner by suggesting the information or records asked for pursuant to the Requests had no bearing on this Contested Hearing. Petitioner so states because it is highly likely there would be no contested hearing at all had the information or records asked for via the Requests been released or produced

---

[11] The undeniable felony offenses committed along with a host of other issues are discussed in greater detail in the accompanying document—titled "Complaint, And Memorandum of Law"—being submitted herewith.

since it undoubtedly would have—and still will—reveal the egregiousness of the culpable parties who surely would have thought twice before trying to rip off Petitioner or Mr. Davis again.

60.     Before concluding the October Public Hearing, Truscott declared the decision of whether or not to renew the Permit as contested dispute, which therefore triggers specific provisions under the Rules, and also directed Martin and the Undersigned to meet and confer in order to discuss, and hopefully present to her an agreed-upon scheduling order governing this Contested Hearing.

61.     Importantly, at no point in time—before or during—with respect to this Contested Hearing, including for several immediate days upon the conclusion thereof, was there every any discussion, objection raised or argument presented regarding issues with the Undersigned representing Petitioner and/or Mr. Davis (since the Undersigned is barred in Florida but not Texas).

62.     Thereafter, as the Undersigned recently learned, at 12.12pm on October 14, 2025, the Hearing Examiner engaged in disqualifying *Ex Parte* communication by sending the below electronic mail pertaining to this Contested Hearing **exclusively** to Martin (as the highlighted portion makes clear):

**From:** Helen Truscott <hstlaw@msn.com>
**Sent:** Tuesday, October 14, 2025 12:12 PM
**To:** Natasha J. Martin <NMartin@gdhm.com>
**Subject:** Harris-Galveston Subsidence District Permit No. 3606, Woodloch MHPLLC

Kawa S. Foad
KF Law
1000 Brickell Ave. Ste 715
Miami, FL 33131-3047

Natasha J. Martin
GRAVES DOUGHERTY HEARON & MOODY, P.C.
401 Congress Ave., Suite 2700
Austin, Texas 78701-3744

Greetings,

On October 7, 2025, during the Public Hearing on the above referenced permit, the attorneys agreed to provide a prospective date for a pre-hearing conference. One or more prehearing conferences will be held in accordance with Rule 7.5(a) to (1) formulate and simplify issues; (2) determine the necessity or desirability of amending the application or other pleadings; (3) determine the possibility of making admissions or stipulations; (4) approving the Docket Control Order and scheduling discovery; (5) identification of and specification of the number of witnesses; (6) the filing and exchange of prepared testimony and exhibits; and (7) the procedure at the hearing. The initial prehearing conference to establish the issues to be contested and adopt the Docket Control Orde and may be held in person or remotely.

Please provide me with the date that you are requesting.

Thank you.

Helen Stewat Truscott
Hearing Examiner
Harris-Galveston Subsidence District
281.433.1584
hstlaw@msn.con

*See* id.; ***compare with*** Rule 7.5(k), which states as follows:

> **Ex Parte Communications**: The Hearings Examiner **may not communicate, directly or indirectly,** in connection with any issue of fact or law with any agency, person, party, or their representatives, **except on notice and opportunity for all parties to participate**.

*Id.* (emphasis added).

63.    As verbatim text of Rule 7.5(k) shown above makes clear: "The Hearing Examiner may not" engage in *ex parte* communications "**directly or indirectly**". *Id.* (emphasis added).

64.    As can be further established from Truscott's *Ex Parte* communication to Martin, the Hearing Examiner **clearly** identified, and designated the Undersigned as Petitioner's counsel of record, and listed the Undersigned's Florida address (thereby making it clear Truscott was fully aware the Undersigned was non-resident of Texas and therefore likely not licensed to practice law in Texas, which, again, he had previously made clear on numerous occasions to other interested parties in this Contested Hearing, such as Turco and Ellis, for instance).

65.      Undoubtedly, Truscott's *Ex Parte* communication gave Martin a substantial advantage to the detriment of Petitioner. For instance, Truscott did **not** state consider the designation of parties as a topic or issue needing to be addressed at the prehearing conference, which the pertinent Rule lists as the very first item (i.e., designation of parties):

> **Rule 7.5  Contested Permit Hearings Procedures:**
>
> a.  **Prehearing Conference:**  A prehearing conference may be held to consider any matter which may expedite the hearing or otherwise facilitate the hearing process.
>
>   1.  **Matters Considered:**  Matters which may be considered at a prehearing conference include, but are not limited to: (1) the designation of parties; (2) the formulation and simplification of issues; (3) the necessity or desirability of amending applications or other pleadings; (4) the possibility of making admissions or stipulations; (5) the scheduling of discovery; (6) the identification of and specification of the number of witnesses; (7) the filing and exchange of prepared testimony and exhibits; and (8) the procedure at the hearing.

*Retrieved* on October 27, 2025 from HGSD's website (emphasis supplied).

66.      Thereafter, on October 17, 2025, because Martin had stated to the Undersigned during an earlier phone call that the Undersigned was prohibited from representing Petitioner (and therefore Mr. Davis as well) due to him not being licensed in Texas irrespective of the fact this Contested Hearing is an administrative proceeding and not litigation in a court of law, the Undersigned sought to rectify this non-issue that later was completely blown out of proportion by the Hearing Examiner:



67.     Less than two hours thereafter, Martin—previously having taken significant time to provide the Undersigned with the proposed scheduling order for this Contested Hearing—hurriedly responded with the following unsupported arguments, seeking to prevent Petitioner from having its choice of counsel to represent it:





Relevant citations are copied below.

Texas Government Code
Sec. 81.101. DEFINITION. ==(a) In this chapter the "practice of law" means the preparation of a pleading or other document incident to an action or special proceeding or the management of the action or proceeding on behalf of a client before a judge in court as well as a service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge,== such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined.
(b) The definition in this section is not exclusive and does not deprive the judicial branch of the power and authority under both this chapter and the adjudicated cases to determine whether other services and acts not enumerated may constitute the practice of law.
(c) In this chapter, the "practice of law" does not include the design, creation, publication, distribution, display, or sale, including publication, distribution, display, or sale by means of an Internet web site, of written materials, books, forms, computer software, or similar products if the products clearly and conspicuously state that the products are not a substitute for the advice of an attorney. This subsection does not authorize the use of the products or similar media in violation of Chapter 83 and does not affect the applicability or enforceability of that chapter.

Added by Acts 1987, 70th Leg., ch. 148, Sec. 3.01, eff. Sept. 1, 1987. Amended by Acts 1999, 76th Leg., ch. 799, Sec. 1, eff. June 18, 1999.


Sec. 81.102. STATE BAR MEMBERSHIP REQUIRED. (a) ==Except as provided by Subsection (b), a person may not practice law in this state unless the person is a member of the state bar.==
(b) The supreme court may promulgate rules prescribing the procedure for limited practice of law by:
(1) attorneys licensed in another jurisdiction;
(2) bona fide law students; and
(3) unlicensed graduate students who are attending or have attended a law school approved by the supreme court.

Thank you,

**Natasha J. Martin |** Attorney
Direct: (512) 480-5639 **|** Fax: (512) 536-9939
401 Congress Avenue, Suite 2700, Austin, Texas 78701

68.    Assuming *arguendo* Martin had been correct in her flawed arguments, which notably were not backed up by any relevant rulings/case law, law review articles, or opinions issued by the OAG, Martin **never** asked Truscott to prohibit the Undersigned from representing Petitioner (or Mr. Davis for that matter) *altogether*.

69.    Yet that is *exactly* what Truscott declared in a *void ab initio* order issued without allowing the Undersigned to respond, much less holding a hearing on the same:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

| | | |
|---|---|---|
| IN RE: APPLICATION TO RENEW PERMIT NO. 3606 BY WOODLOCH MHP LLC FOR GROUNDWATER WITHDRAWAL IN HARRIS COUNTY, TEXAS | §<br>§<br>§<br>§<br>§<br>§ | BEFORE THE<br><br>HARRIS-GALVESTON<br><br>SUBSIDENCE DISTRICT |

### REPRESENTATION IN CONTESTED PERMIT HEARINGS
### HARRIS-GALVESTON SUBSIDENCE DISTRICT

In response to the question of whether or not Kawa Foad, Esq. shall be allowed to represent the permittee in this contested permit hearing, I will follow state law precedent and not allow the representation.

Harris-Galveston Subsidence District Rule 7.3 (c) 3 provides in part that "any interested person may appear in person or may be represented by counsel, engineer, or other representative, provided the representative is fully authorized to speak and act for the principal". This rule allows individuals other than licensed Texas attorneys to represent the applicants in informal or technical proceedings, not proceedings that require preparation of pleadings, discovery, cross-examinations, legal advice, or otherwise practice law in a contested hearing.

Texas law limits who may represent a party in a contested evidentiary hearing which qualifies as the "practice of law." Specifically, the District's hearing procedures are subject to Texas unauthorized practice of law restrictions under the Texas Government Code section 81.101. Texas Special District Local Laws Code Chapter 8801 nor the District Rules explicitly authorize nonlawyer representation in a contested hearing.

The applicant may represent himself or retain an attorney licensed to practice in the state of Texas to represent him in this proceeding.

Signed this 20th day of October 2025.

Helen Stewart Truscott
Hearing Examiner

### The Many Fatal Defects of The Hearing Examiner's Void Ab Initio Order

70.    First, Truscott incorrectly referenced Rule 7.3(c), which falls under "General Procedures" under the Rules, when it comes to representation of affected parties appearing in lieu of the party itself. *See* id.

71.    However, representation of parties in contested proceedings, such as this Contested Hearing, the Rule is 7.5(c) governs:

> **Designation of Parties:** Parties to the hearing shall be designated on the first day of hearing or at such other time as the Hearings Examiner determines. The General Manager and any person specifically named in a matter are automatically designated parties. Persons other than the General Manager or a person specifically named must, in order to be admitted as a party, appear at the proceeding in person or by representative and seek to be designated. After parties are designated, no other person may be admitted as a party unless, in the judgment of the Hearings Examiner, there exists good cause and the hearing will not be unreasonably delayed

*Id.*

72.    Nowhere is it stated in Rule 7.5(c) that counsel to a party must submit *pro hac vice* papers being filed or obtain local counsel in contested hearings before HGSD or a contested hearing examiner.

73.    Second, Truscott stated she would "follow **state law precedent** and **not** allow the representation." (emphasis supplied). However, she completely fails to include **any** guiding or even persuasive case ruling, order, opinion—not even an opinion or ruling provided by the OAG relevant to this particular issue—to support her unfounded claims because that is what "precedent" *actually* means: A decision by an adjudicative body. *See* https://thelawdictionary.org/ (explaining that *precedent* means "[a]n adjudged case or decision of a court of justice, considered as furnishing an example or authority for an identical or similar case afterwards arising or a similar question of law.")

74.    On the foregoing note and to the Petitioner's best knowledge and information, no Texas court has ever held that only Texas-licensed attorneys may appear before a government body or hearing examiner as part of a contested hearing.

75.    Therefore, the Hearing Examiner's blank reference to "state law precedent" is not only an unsupported assertion but an "arbitrary, and capricious" that is void as a matter of law. *See Loper*

*Bright* Enterprises, supra ("agency action to be set aside if arbitrary, capricious, [or] an abuse of discretion")

76.    On the contrary, Texas law requires administrative officers to identify the legal authority for their decisions. *See* Tex. Gov't Code § 2001.141(b) (requiring "findings of fact and conclusions of law separately stated"); *cf.* HGSD Rule 7.5(l). Therefore, the order is void as a matter of law.

77.    Moreover, as mentioned above, Truscott never even allowed Petitioner, Mr. Davis or the Undersigned an opportunity to respond—neither via papers or through a hearing—to Martin's arguments, which at best were extremely weak because they, just like the void order issued by Truscott, failed to include any on-point case law or opinion. *Id.*

78.    Adding more incurable defects to the ruling, the Hearing Examiner's also claimed the following:

   a.    "Texas law limits who may represent a party in a contested evidentiary hearing,"
   b.    "the District's hearing procedures are subject to unauthorized-practice-of-law restrictions under Gov't Code § 81.101,"
   c.    "Chapter 8801 nor the District Rules explicitly authorize non-lawyer representation," and
   d.    "the applicant may represent himself or retain a Texas-licensed attorney."

79.    However, none of the above improper conclusions of law or findings of purported facts are substantiated because:

   a.    Section 81.101 merely defines the practice of law but does not bar out-of-state attorneys from appearing in administrative proceedings unless a statute so requires, and there is no statute or case opinion extending § 81.101 to local special districts such as HGSD.
   b.    Neither Chapter 8801 nor any HGSD rule imports § 81.101 or subjects District hearings to its restrictions. Importantly, when the Legislature intends to apply unlicensed-practice-of-law limitations to a special district like HGSD, it does so expressly, which it is not the case here.
   c.    Rule 7.3(c) affirmatively permits representation "by counsel, engineer, or other representative." Meanwhile, Rule 7.5(c) governs contested hearings and contains no licensure restriction *whatsoever*, and, as such, what is not prohibited is permitted. *See Railroad Comm'n v. ARCO Oil & Gas Co.*, 876 S.W.2d 473, 481 (Tex. App.—Austin 1994).

d. Finally, assuming *arguendo* Truscott was correct this Contested Hearing involved practice of law, her declaration that Mr. Davis .who is not an attorney, allowing to represent Woodloch is a fallacy since entities can not be represented by non-lawyers.

## CONCLUSION

As firmly established, the Hearing Examiner along with HGSD—acting by and through Turco together with Martin, who appears to be personally representing him—have subjected Petitioner to "arbitrary, and capricious" decisions that **must** be set aside as they are void as a matter of law. *See Loper Bright* Enterprises, supra ("agency action to be set aside if arbitrary, capricious, [or] an abuse of discretion"). Bluntly stated, the Hearing Examiner's—as well as Turco's—blatant disregard for applicable laws, rules, and extenuating circumstances, such as clear errors caused by themselves, render this Contested Hearing a farce from the get-go, and the Board must therefore grant the relief sought, as provided again below. Because it is abundantly clear that neither Turco nor the Hearing Examiner have any respect for Petitioner's constitutionally-protected rights under both the US and Texas Constitutions—or the law, in general. Lastly, as mentioned initially, Mr. Davis wants to emphasize the Dispute can be resolved amicably—which would moot this Contested Hearing—via fair, and honest interactions. All that is needed is simply reaching out.

## RELIEF REQUESTED

**WHEREFORE,** Petitioner respectfully requests the Board—in order to avoid costly, and protracted litigation—to issue an order, making and granting, respectively, the following declarations, and remedies:

### Declarations

A. The General Manager did **not** mail to Petitioner a hearing notice regarding the October Hearing at least five business days prior as **expressly** required under Rule 7.2(a) and in clear violation thereof;
B. Petitioner was therefore not obligated to appear at the October Public Hearing; and

**C.** The Hearing Examiner's electronic mail communication sent to Martin on October 14, 2025, which did not include the Petitioner nor its counsel, constituted disqualifying *Ex Parte* communication in violation of Rule 7.5(k); along with the following:

## **Remedies**

**A.** Disqualify Truscott, and reassign this Contested Hearing to a truly naeutral hearing examiner due to her undeniable bias, and incurable offenses;

**B.** Order Truscott, Turco and Martin to ***immediately*** disclose, and provide all records relating to, any other *Ex Parte* communication relating to this Contested Hearing, and provide affidavits establishing they have fully complied therewith;

**C.** Vacate or strike both Turco's and Truscott's arbitrary, and capricious decisions and/or *void ab initio* rulings—in particular the legally-deficient order dated October 20, 2025 by Truscott that unwarrantedly seeks to prevent the undersigned from representing Petitioner;

**D.** Allow the undersigned to represent Petitioner in this Contested Hearing without limitations or contingencies; and

**E.** Grant such other relief fair, and equitable under these circumstances.


Respectfully submitted by,

Kawa Foad, Esq.

*Counsel to Petitioner and Mr. Davis*

**Electronic mail from Gregory M. Ellis to Kawa Foad, Esq. — March 30, 2026 (the "No-Contact Directive") (reproduced from the original)**

**From:** Greg Ellis <greg@gmellis.law>
**To:** kfoad@kf-law.com
**Cc:** rgeesing@subsidence.org; hstlaw@msn.com; NMartin@gdhm.com; HTruscott@subsidence.org; VOsegueda@subsidence.org; DJones@subsidence.org; Brad Davis
**Date:** March 30, 2026, 5:18 p.m. (CT)
**Subject:** RE: Scheduled Status Hearing - Woodloch MHP LLC

Mr. Foad:

Judge Truscott made it clear that you cannot represent any client before the Harris-Galveston Subsidence District without first obtaining local counsel or permission via a pro hac vice motion. Neither has occurred. Please do not contact the District or any person associated with the Woodloch MHP LLC contested case hearing except through local counsel.

Greg

Gregory M. Ellis
GM Ellis Law Firm PC
2104 Midway Court
League City, TX 77573

Phone: (713) 705-4861
<mailto:Greg@GMEllis.law> Greg@GMEllis.law

Neither this email nor any attachment constitutes a binding agreement, including representation or any other form of engagement. Nothing in this email or any attachment is an agreement under Texas Rule of Civil Procedure 11 unless it includes the exact phrase: "This email constitutes a binding agreement" or "This document constitutes a binding agreement."

This message and any attached documents contain information from the law office of Gregory M. Ellis that is confidential and privileged or may include attorney work product. That information is intended only for the use of the addressee named above. If you are not the intended recipient, any disclosure, copying, or distribution of this email or attached documents, or taking any action in reliance on this message's contents or attachments is strictly prohibited and may be unlawful. If you have received this message in error, please (1) immediately notify me by reply email; (2) do not review, copy, save, forward, or print this email or any of its attachments; and (3) immediately delete and destroy this email, its attachments and all copies thereof. The unintended transmission does not constitute a waiver of the attorney-client privilege or any other privilege.

[Quoted prior correspondence omitted.]

ITEM 4
May 13, 2026

## MINUTES
## HARRIS-GALVESTON SUBSIDENCE DISTRICT
## REGULAR MEETING OF THE BOARD OF DIRECTORS
## APRIL 8, 2026
## 10:00 A.M.

MEMBERS OF THE BOARD PRESENT: Bill Alcorn, Patricia Alvarez, Emily Anderson, Sarah Benavides, John Bowen, Chris Canonico, Pete Côté, Brian Freedman, Don Johnson, Jason Long, Kyle Sears, Shaun Smith

MEMBERS OF THE BOARD ABSENT: Rosa Alvarez, Susan Baird, Steve Gillett, Katherine Mears, Gricelda Medrano, Alan Petrov

PRESIDING: Pete Cote, Secretary

1. CALL TO ORDER OF THE REGULAR BOARD MEETING AND THE PLEDGE OF ALLEGIANCE. Secretary Cote called the regular meeting of the Board of Directors to order at 10:07 a.m. and noted the presence of a quorum. The Pledge of Allegiance was recited.

2. ACCEPT COMMENTS FROM MEMBERS OF THE PUBLIC. Ms. Melissa Rowell of the North Harris County Regional Water Authority addressed the Board.

3. APPROVAL OF THE MINUTES OF THE REGULAR BOARD MEETING OF MARCH 11, 2026. Mr. Bowen moved that the minutes of the regular meeting of March 11, 2026, be approved; It was seconded by Ms. Anderson. Secretary Cote put the question and, after the vote, announced the motion carried. None opposed.

4. HEARING EXAMINERS REPORT. Judge Helen Stewart Truscott presented the Hearing Examiner's Report for March 2026 and prior. Mr. Long moved to accept the recommendations presented in the Hearing Examiner's report; it was seconded by Mr. Alcorn. Secretary Cote called for abstentions. Mr. Freedman abstained from HC Pct 4/Burnett Bayland Park (Well 17119) and City of Houston (Well 1015). Secretary Cote put the question, and after the vote, announced the motion carried. None opposed.

5. EMERGENCY PERMITS. The Board considered the General Manager's action in granting an emergency permit to James B. Griepp, HW SW Phase 1, L.L.C., Hyde Park Development, J&S Water Wells, and Karun Mathew. Director Alcorn stated for the record that he disagreed with the approval of the emergency well requested by HW SW Phase 1, L.L.C. due to it being for a lake in a subdivision and the danger to the young residents.

Ms. R. Alvarez is now present.

6. RECOMMENDATION FROM THE FINANCE COMMITTEE REGARDING ACCEPTANCE OF THE INDEPENDENT ANNUAL FINANCIAL AUDIT FOR THE FISCAL YEAR ENDING DECEMBER 31, 2025. Mr. Turco stated that at the last Board meeting, Mr. Newcomb provided the Board with the annual budget report which provides the budgeted vs. actuals. Daniel Newcomb, Director of Finance & Administration, stated that there were no changes to the annual budget report from last month to this month and introduced the audit partner. Mr. Patrick Simmons, CPA, with Whitley Penn, L.L.P., presented an overview of the 2025 Annual Financial Report audit process, and provided the Board of Directors with a copy of the report and the independent audit opinion letter. Mr. Freedman moved to accept the 2025

**Agenda Item 04 page 1**

Minutes 4/8/2026

Annual Financial Report and audit; it was seconded by Ms. Anderson. Secretary Cote put the question and, after the vote, announced the motion carried. None opposed.

7. GENERAL MANAGER'S REPORT. Mr. Turco submitted the General Manager's Report. (The General Manager's Report is in full in the official records of the Harris-Galveston Subsidence District as part of the Board's Agenda Packet for this meeting.)

8. LEGAL & LEGISLATIVE MATTERS. Mr. Greg Ellis, General Counsel, updated the Board on recent litigation on groundwater issues and legislative matters.

9. EXECUTIVE SESSION. None.

THERE BEING NO FURTHER BUSINESS TO COME BEFORE THE BOARD, THE MEETING WAS ADJOURNED AT 10:55 A.M.

BY: _____
                    Chairman

ATTEST:

_____
        Secretary

# HEARING TRANSCRIPT — EXCERPTS

**Harris-Galveston Subsidence District**

Regular Meeting of the Board of Directors

Wednesday, April 8, 2026 — 10:00 a.m.

*Woodloch-relevant portions only*

## HOW THIS TRANSCRIPT WAS PRODUCED

This transcript was prepared from an audio recording of the meeting (file "2026-04-08-Regular-Board-Meeting.mp3," duration 48:03). The recording was transcribed in full by machine (Apple on-device speech recognition, producing timestamped segments covering the entire recording), and the machine text of the portions transcribed below was then reviewed and edited against context for readability, obvious recognition errors, and speaker attribution. Timestamps state elapsed time in the recording and are taken directly from the machine transcription's segment times; they should be treated as accurate to within a few seconds.

Only the portions of the meeting relevant to the Woodloch matter (Woodloch MHP LLC, Permit/Well No. 3606, Mr. Brad Davis) are transcribed in full; the omitted portions were reviewed in the machine transcription and are summarized in italic notes where they are skipped.

## CONVENTIONS

Square brackets are used for one purpose only: to tell the reader that the audio at that point is hard to hear — marked "[audio unclear]." Non-verbal and procedural events — for example (Ayes.), (Motion and second.) — appear in parentheses. Uncertainty about a speaker's identity is stated in words, in parentheses.

Speaker attributions rest on context (the chair's procedural role, self-identification, and the subject matter of each statement); the recording is audio-only, and attributions of unnamed questioners from the dais are given as DIRECTOR. This is not a certified transcript.

*Per the District's official minutes of this meeting, Chairman Alan Petrov was ABSENT; Secretary Pete Côté presided. Directors present included Don Johnson and Kyle Sears. Statements from the chair in this transcript are accordingly attributed to Secretary Côté.*

## I. CALL TO ORDER (recording 0:00:03)

[0:00:03] **SECRETARY CÔTÉ, PRESIDING:** Good morning. It's now 10:05. I'd like to call to order the meeting of the Harris-Galveston Subsidence District. It is April 8. Welcome, everyone. Our first order of business — we've just called to order — we're going to rise for the Pledge of Allegiance.

*The pledge, the public comment period (a comment by Melissa Rowell on regulatory-plan scheduling, unrelated to Woodloch), and the approval of the March 11, 2026 minutes are not transcribed; they contain no discussion of the Woodloch matter.*

**II. ITEM FOUR — HEARING EXAMINER'S REPORT, INCLUDING THE WOODLOCH STATUS REPORT (recording 0:03:31)**

[0:03:31] **SECRETARY CÔTÉ, PRESIDING:** Fourth item on the agenda: to receive our hearing examiner's report, and consider granting, denying, or amending applications for water well permits [audio unclear].

[0:03:45] **HEARING EXAMINER TRUSCOTT:** Good morning, Chair, board members. We have prepared and submitted the recommendations for those persons who've made requests for permits for [wells], or there have been requests for modifications or cancellations of current permits, for the March public hearing. We make the recommendations as they are in the report and would accept any questions that you have concerning any of those recommendations.

[0:04:14] **SECRETARY CÔTÉ, PRESIDING:** First of all, do we have a motion to approve?

[0:04:19] **DIRECTOR:** So moved.

[0:04:20] **SECRETARY CÔTÉ, PRESIDING:** Do I have a second? (Second.) Are there any more questions?

[0:04:33] **DIRECTOR:** For anybody that needs to — I need to recuse from two: Harris County Precinct 4, Permit 118607, and then City of Houston, Permit 118080. Note the conflict.

[0:04:52] **SECRETARY CÔTÉ, PRESIDING:** Okay. Okay, hang on. Hang on. How many members do we have up here right now?

[0:05:04] **DIRECTOR:** Eleven.

[0:05:05] **SECRETARY CÔTÉ, PRESIDING:** Okay. That's what I was doing — counting, to make sure [audio unclear]. Mr. Mullins was counting, so — all those in favor of passing the

motion — and all of us must vote, except for [audio unclear] — only on those two. All those in favor of the motion, please say aye. (Ayes.) Opposed? I think we squeak by. Thank you.

[0:05:40] **HEARING EXAMINER TRUSCOTT:** We had a status conference on the renewal application for Woodloch. The permit number is not coming to my mind —

[0:05:48] **SPEAKER NOT IDENTIFIED:** 3606.

[0:05:51] **HEARING EXAMINER TRUSCOTT:** Basically, it has been reset for the parties to actually submit a proposed docket control order, with an actual date for the permit hearing, within the next six weeks.

[0:06:04] **SECRETARY CÔTÉ, PRESIDING:** Thank you. Item number five is to consider emergency permits reviewed by the general manager.

*The remainder of the meeting — emergency permits, staff reports, and the general counsel's report on groundwater litigation and legislation — is not transcribed; it contains no further discussion of the Woodloch matter.*

**III. CLOSE OF MEETING — NO EXECUTIVE SESSION HELD (recording 0:47:38)**

[0:47:38] **MR. ELLIS:** I'll be happy to answer any questions. Board members?

[0:47:46] **SPEAKER NOT IDENTIFIED:** 10:55.

[0:47:48] **SPEAKER NOT IDENTIFIED:** 10:53.

[0:47:53] **SECRETARY CÔTÉ, PRESIDING:** All right, we have an executive session — no [audio unclear] session today. Okay, since we have exhausted the agenda as posted, we are now adjourned.

*Transcriber's note: The posted agenda apparently included an executive session item, but the recording reflects the chair stating that no session would be held ('no [audio unclear] session today') before adjourning. The recording contains no executive session, ends at adjournment (0:48:03), and contains no appearance by attorney Natasha Martin and no discussion of remote-appearance arrangements. If an executive session or related discussion occurred on April 8, 2026, it is not captured in this audio file.*

**— END OF EXCERPTED TRANSCRIPT —**

# MASTER TRANSCRIPT

**Harris-Galveston Subsidence District**

Regular Meeting of the Board of Directors

Wednesday, July 8, 2026 — 10:00 a.m.

*SECOND EDITION — reviewed and corrected by Kawa Foad, Esq.*

**HOW THIS TRANSCRIPT WAS PRODUCED**

This master transcript consolidates and supersedes all prior transcript files for this meeting. This second edition incorporates a line-by-line review and correction by Kawa Foad, Esq., who was present at the meeting; his corrections — principally speaker identifications, the division of speaking turns, and the wording of exchanges he witnessed firsthand — are incorporated throughout. The transcript was prepared from three public sources:

1. The District's official audio recording of the meeting, posted on its public website at https://hgsubsidence.org/wp-content/uploads/2026/07/2026-07-08-RBM.mp3 (2:16:20). The recording covers the open session on a single continuous clock: the call to order occurs at approximately 0:00:17, the Board recesses into executive session at approximately 1:59:00, and the recording resumes immediately with the Board's return to open session at approximately 1:59:05 (announced time 12:36 p.m.), continuing through adjournment. The executive session itself is not recorded. All timestamps in this transcript are keyed to this recording.

2. The publicly posted YouTube video recordings of the meeting, in two parts, and their automatically generated captions, from which the text was first assembled. Part One (call to order through recess into executive session): https://www.youtube.com/watch?v=8R6H82YurXw. Part Two (return from executive session through adjournment): https://www.youtube.com/watch?v=tslnQrK5BOk.

3. An independent machine transcription of the District's posted recording (Apple on-device speech recognition, producing 1,532 timestamped segments), used both to cross-check the caption-derived text and to fix each speaking turn's timestamp.

Timestamps state elapsed time in the District's posted recording identified in item 1, on its single continuous clock covering both parts of the open session. Each speaking turn was individually matched to the recording through the machine transcription described in item 3 and assigned the time at which it occurs; the small number of turns that could not be matched individually (chiefly brief interjections) carry times interpolated between their matched neighbors and are labeled "approx." Timestamps should be treated as accurate to within a few seconds, and "approx." entries to within the interval between their neighbors.

**CONVENTIONS USED IN THIS EDITION**

Square brackets are used for one purpose only: to tell the reader that the audio at that point is hard to hear. A passage the transcriber could not confidently make out is marked "[audio unclear]." Brackets are not used for any other purpose in this edition; earlier editions' bracketed reconstructions and editorial notes have been resolved into plain text or removed.

Where a word or passage was dropped or garbled by the machine sources but the spoken words are established by the corroborating audio, by context, or by the reviewer's firsthand recollection, the words appear as ordinary unbracketed text; material judgments of that kind are itemized in the Editor's Log below.

Non-verbal and procedural events — for example (Ayes.), (Motion and second.) — appear in parentheses. Uncertainty about a speaker's identity or a proper name is stated in words, in parentheses — for example, "(speaker identification not certain)" or "(surname phonetic, per the audio)" — never by symbols.

This is not a certified transcript. Speaker attributions and wording rest on the sources and review described above, not on a certified court reporter's record.

**MEASURED ACCURACY**

The following figures are computed measurements, not estimates. They quantify (a) how the timestamps were fixed and (b) how far the independent machine transcription of the District's

posted recording corroborates the text. They measure consistency between sources — not certified accuracy against the spoken record, which only a certified court reporter could provide.

Timestamps (291 speaking turns): 97% (283 turns) are directly matched to the District's posted recording and are accurate to within a few seconds; 3% (8 turns, chiefly brief interjections) carry interpolated times labeled "approx.," accurate to within the interval between their matched neighbors.

Text corroboration (word-token comparison of each of the 291 turns against the independent machine transcription of the District's posted recording): 96% of turns are strongly corroborated by the machine source; 3% are partially corroborated; 2% show low machine corroboration, chiefly passages where speakers were away from microphones. Low-corroboration passages rest on the caption source and the reviewer's corrections.

Hard-to-hear passages: 40 points in the transcript are expressly flagged "[audio unclear]." Any passage carrying that flag should be checked against the recording directly before quotation.

**APPEARANCES**

**Presiding:** Chairman Alan P. Petrov.

**Board of Directors:** Bill Alcorn; Patricia Alvarez; Rosa Alvarez, P.E.; Emily Anderson, P.E.; Sarah Benavides, P.E.; John Bowen; Chris Canonico, P.E.; Brian D. Freedman; Steve Gillett; Don Johnson; Jason Long; Katherine Mears, P.E.; Gricelda Medrano; Kyle Sears; Shaun Smith, P.E. (roster per the District's board directory). Questions from the dais are attributed by name where the reviewer identified the speaker (Directors Sears, Johnson, Anderson, and Bowen among them) and are labeled DIRECTOR where attribution is not reliable.

**For the District:** General Manager Michael Turco; Hearing Examiner Helen Truscott; Gregory Ellis, counsel to the Board; Bobby Saleh of Graves, Dougherty, Hearon & Moody, counsel for the General Manager.

**For the permittee:** Brad Davis (Woodloch MHP LLC).

**On his own behalf:** Kawa Foad, Esq., who appeared and addressed the Board in his individual capacity — not on behalf of the permittee — and declared his statement to be made under penalty of perjury; his was the only sworn statement at the meeting.

**Public speakers:** Melissa Rowell; Danny Ferguson; Joyce Searcy (surname phonetic, per the audio); Anna Rosas; William Ford (surname per the audio).

## EDITOR'S LOG — MATERIAL CORRECTIONS MADE IN THIS MASTER

1.  Well/permit number. The Woodloch well number, rendered "366" and "36[6?]" in the captions, is corrected throughout to 3606, consistent with the Hearing Examiner's Recommendation (Permit No. 3606, May 12, 2026).

2.  "2026 budget." At [0:01:37], the caption fragment "our6" is resolved to "our 2026 budget"; the audio records the words "shown inside of our 2026".

3.  The $36,000 exchange. At [0:56:44]–[0:56:49], the audio confirms the exchange: "Okay, I thought that they offered to pay $36,000." — "Yes." The caption had left the answer fragmentary.

4.  Payment-plan figures. At [0:59:35], the audio confirms "the $36,000, over 36 months"; the caption's "$17,000" is an artifact, the surrounding discussion concerning the approximately $107,000 total.

5.  Penalty total. The $106,901 figure in the Hearing Examiner's recommendation is confirmed at three separate points in the audio.

6.  Speaker names. "Joyce"'s surname, captioned "Cersei," is rendered Searcy (phonetic, per the audio). "William"'s surname, absent from the captions, is rendered Ford per the audio ("My name's William Ford"). The Board roster is added from the District's directory.

7.  "September 31, 2025." Both machine sources record this nonexistent date as spoken in the Hearing Examiner's presentation; the transcript renders the permit term as stated, with July 31, 2025 understood as the intended date.

8.  Timestamp keying. All timestamps are keyed to the District's official posted recording (source item 1) by individually matching each speaking turn to a machine transcription of that recording; interpolated entries are labeled "approx." Earlier working editions used the YouTube caption clock, which was found to diverge materially from recorded audio; those editions are superseded.

9.  Characterization of Mr. Foad's July 8 appearance. Section X is titled to reflect that Mr. Foad appeared and spoke on his own behalf, in his individual capacity, and gave his statement under penalty of perjury; he did not appear on behalf of the permittee. The Appearances section states the same.

10.  Reviewer's corrections (this edition). Mr. Foad's line-by-line review corrected speaker attributions previously labeled DIRECTOR (identifying, among others, Chairman Petrov, Director Sears, Director Johnson, Director Anderson, and Director Bowen as questioners in the exchanges with Mr. Ellis and Mr. Saleh); divided several composite turns between their actual speakers (including exchanges previously merged between Mr. Ellis and Director Sears, and between Chairman Petrov and General Manager Turco); and corrected wording in passages he witnessed firsthand (for example, Mr. Ellis's references to "pro hac vice" admission, to the Graves firm as counsel for the General Manager, and to the range of statutory penalties for unpermitted operation).

11.  Bracket convention (this edition). All bracketed reconstructions and editorial notes in earlier editions have been resolved into plain text, moved to this log, or removed; square brackets now appear only as "[audio unclear]," flagging hard-to-hear audio. Non-verbal events appear in parentheses.

## PART ONE — CALL TO ORDER THROUGH RECESS INTO EXECUTIVE SESSION

### I. CALL TO ORDER AND PLEDGE (recording 0:00:18)

[0:00:18] **CHAIRMAN PETROV:** Welcome to the regular meeting of the board of directors of the Harris-Galveston Subsidence District. Today is Wednesday, July 8th, 2026, and it's just after 10 a.m. in the morning. Thank you all for being here. Seeing that we have a quorum, I'll call the meeting to order, and please join me.

[0:00:44] **ALL:** I pledge allegiance to the flag of the United States of America, and to the republic for which it stands, one nation under God, indivisible, with liberty and justice for all.

### II. PUBLIC HEARING — PROPOSED INCREASE TO REGULAR PERMIT FEE (recording 0:01:17)

[0:01:17] **CHAIRMAN PETROV:** Item two on our agenda is the public hearing on the proposed increase to the regular permit fee. At this time, I'll call that particular public hearing to order and we will accept comments. (addressing General Manager Turco) Do you have anything?

[0:01:37] **GENERAL MANAGER TURCO:** Yeah, just to remind everybody: so the public hearing today is to accept comments on the proposal to change the regular permit fee from $26 per million gallons to $28 per million gallons. This was a change that was included inside, or shown inside of, our 2026 budget.

[0:01:56] **CHAIRMAN PETROV:** All right. And we have one person who has signed up to speak in our public hearing. Melissa, this will be your opportunity to address the board.

[0:02:16] **MS. ROWELL:** Hi, I'm Melissa. Good morning, Chairman Petrov, directors, and Mr. Turco. Regarding the proposed permit fee increase, my question is not whether the Subsidence District needs resources to operate. My question is how the overall cost burden is evaluated. I recognize the regular permit fee increase itself is relatively small, increasing from $26 to $28 per million gallons of permitted groundwater allocation. For many smaller well owners, that increase alone may not be significant. However, my broader question is about the cumulative cost of

regulation, including permit fees, pumpage fees, compliance costs, disincentive fees, infrastructure requirements — and whether those costs are producing measurable reductions in groundwater usage and subsidence. Permit holders are required to forecast their future water needs. If they request additional allocation, there are associated costs with that. But if they underestimate future demand due to unexpected circumstances, they can face significant financial consequences for exceeding their permit. How does the District balance encouraging conservation while also recognizing real-world changes that may impact water demand? Many groundwater users are already paying significant costs associated with compliance, conversion, infrastructure, and surface water projects. I would like to understand what specific increases are driving the proposed increase. What alternatives were considered? How does the District evaluate the cumulative financial impact of regulations, fees, and conversion costs on ratepayers and businesses? I previously submitted a PIA request asking for information on total revenue collected from permit fees, pumpage fees, and disincentive fees. The estimated charge to complete that information was $360. I understand there are costs associated with producing records, but can basic information, such as revenue collected from these fees, be readily available to the public without requiring a formal records request? It's important for the public to understand the total revenue being collected and how those funds directly support the mission of reducing subsidence. As we discuss conversion, we have to remember affordability. Long-term compliance requires solutions that are both environmentally responsible and financially sustainable. Thank you.

[0:04:43] **CHAIRMAN PETROV:** Thank you very much. Melissa is the only person who signed up for the public hearing. At this time I'll ask: should anybody else wish to speak regarding this matter, this is your opportunity to do so. [audio unclear]

[0:05:14] **DIRECTOR:** Just for the sake of — would you say something? We just heard a lot of questions, and you're limited in what you will respond to right now. Kind of explain that for anybody that is unfamiliar. [audio unclear]

[0:05:35] **CHAIRMAN PETROV:** Well, simply put: according to the Open Meetings Act, the board can only discuss items that are particular to the agenda, and we can't have a debate and have an interaction with people at a public hearing. We receive comments and questions, as we have, and we are free to take those under advisement and research issues as we see fit. We're not making a decision on this particular item — it is not on the agenda today for decision — but we'll come back at the following meeting and actually discuss and take action at that time.

[0:06:25] **CHAIRMAN PETROV:** All right, seeing nobody else is interested in speaking on that particular matter, I'll move on then and close that public hearing, and go to item four on our agenda, to accept comments from members of the public. This portion is to accept comments more of a general nature. And Mel, you signed up again.

### III. GENERAL PUBLIC COMMENT (recording 0:07:19)

[0:07:19] **MS. ROWELL:** I'm Melissa. Hello again. I'm speaking regarding this meeting's item 6.1. I remember when Mr. Davis, or Woodloch, spoke to the board in the fall of 2024 —

[0:07:31] **CHAIRMAN PETROV:** Ma'am, we'll — we'll give you another opportunity when that comes up, or you can speak now.

[0:07:36] **MS. ROWELL:** It's okay, I'll speak now. Okay, I'll start over. I'm Melissa Rowell. Hello again, board. Regarding item 6.1: I remember when Mr. Davis with Woodloch spoke to the board in the fall of 2024, when he was here to address exceeding the permitted amount by two million gallons. And I went back and listened to the recording. At that meeting, Mr. Davis stated that Woodloch had been in compliance for over 23 years and that water conservation has been important to them, and in those 23 years they have pumped about 48 million gallons less than what was permitted. 48 million gallons less. He explained some of the circumstances that impacted the community during that period, including COVID-19-related challenges, lost jobs, and changes in household occupancy within this affordable housing community. He also stated that for the current permit year they were on track to be up to the permitted amount, and he pledged to continue serving the community while following the District's rules. When I listened

to his comments, Mr. Davis was respectful to the board and complimentary of the District's work. I obviously do not have all the information considered by the hearing examiner, but I encourage the board, when reviewing renewal applications such as this one, to consider the entire picture. Compliance is important, and annual permit limits are part of the District's rules. However, I hope the District also considers compliance history, corrective actions, proportionality, and the ultimate goal of reducing subsidence. I understand the District previously evaluated a multi-year permitting concept, so my question is whether that type of approach should be reconsidered when evaluating long-term compliance history and actual aquifer impacts. The aquifer does not know calendar years. It responds to cumulative groundwater withdrawals over time. I understand impacts from overpumping cannot simply be undone, but long-term pumping history still provides important context. While annual limits and rules are necessary for enforcement, actual aquifer impact is based on groundwater withdrawals over many years. When compliance has already been restored, how does the District determine what level of enforcement is necessary to protect the aquifer, versus imposing financial burdens that could affect continued service? And finally, because item 6.1 involves a residential water supply for an affordable housing community, I hope the board considers the impact of any decision not just on the permit holder, but on the families who depend on that water every day. If a renewal permit is denied for communities such as this, what happens next to ensure those families continue to have reliable water service? Thank you.

[0:10:22] **CHAIRMAN PETROV:** Thank you. I don't have anybody else signed up for general public comments, but again, this is the opportunity for general comments, and we would invite anybody who is interested in addressing the board with respect to general comments to take the opportunity at this time.

### IV. APPROVAL OF MINUTES (recording 0:10:53)

[0:10:53] **CHAIRMAN PETROV:** All right. And that takes us to agenda item five, approval of the minutes of the regular board meeting held on June 10th, 2026.

[0:10:57] **DIRECTOR:** Move approval.

[0:11:04] **CHAIRMAN PETROV:** I have a motion and a second to approve our minutes of our regular board meeting from last month. Any discussion necessary on those? Hearing none, I'll call for the vote. All in favor of approving our regular board meeting minutes from June 10th, 2026, please say aye. (Ayes.) Any opposed? Motion carries.

### V. ITEM SIX — HEARING REPORT; PERMIT APPLICATIONS HEARD IN JUNE 2026 AND PRIOR (recording 0:11:36)

[0:11:36] **CHAIRMAN PETROV:** That takes us to item six, to receive our hearing report and consider granting or denying applications for water well permits heard in June 2026 and prior.

[0:11:51] **DIRECTOR:** So, are we going to take up the full report first and then focus on the Woodloch, or are we taking them all up together?

[0:12:00] **CHAIRMAN PETROV:** We're doing the report and then we'll take up Woodloch.

[0:12:09] **HEARING EXAMINER TRUSCOTT:** All right. Good morning. We are making final recommendations for the persons who made applications for permits for water wells that were heard during the June public hearing. We do have three revised recommendations. Those are revised to the extent that [audio unclear] does not make a recommendation. However, we do request that the board issue permits on these three revised recommendations. All three are in Regulatory Area Number Three. They all are renewals. The first one is Efren Atilera, Jr. — A-T-I-L-E-R-A — who has lease well number 8422. It is currently permitted for 100,000 gallons. The recommendation is that the board reissue a permit for the same amount. The well serves a machine shop located on [audio unclear] in Houston, Texas.

> Then we have [audio unclear], first name spelled S-A-L-O, who has lease well number 9036, also in Area Three. It is a renewal application; the current permit is a five-year permit, one million gallons a year. This recommendation is for a one-year permit, as the applicant did not request a five-year permit at this time. It will be for the same amount of a million gallons for that one. The well serves a steel fabrication facility, and, as stated, it is the same amount that

was previously granted, now for a one-year term. I'm sorry — I said that backwards. It's actually for one million gallons each.

Then we have [audio unclear], also in Area 3, well number 6534. This one's a renewal for one year at the same permitted amount. It serves a business [audio unclear]. Are there questions concerning these three?

[0:15:03] **CHAIRMAN PETROV:** Any questions from board members? (None.)

[0:15:11] **HEARING EXAMINER TRUSCOTT:** That concludes my presentation on the recommendations for the new applicants, and then we'll take the presentation as far as the Woodloch matter. [audio unclear]

[0:15:27] **CHAIRMAN PETROV:** Do we have any — any questions on the report? (None.) Then why don't we get a motion on the report, that would exclude the Woodloch matter. (Motion and second.) Any discussion needed? Any board members need to abstain? (None.) All in favor of approving the recommendations as presented, please say aye. (Ayes.) Motion carries.

## VI. THE WOODLOCH MATTER — HEARING EXAMINER'S RECOMMENDATION (recording 0:16:12)

[0:16:12] **CHAIRMAN PETROV:** All right. And then let's go into the Woodloch matter.

[0:16:18] **HEARING EXAMINER TRUSCOTT:** Okay. Woodloch MHP LLC has lease well number 3606. It is in Regulatory Area Three. The well had a previous permit for the term of August 1, 2024 through July 31, 2025. The applicant submitted a renewal request for that permit on August 1, 2025. It was set for hearing for the public hearing in September. The renewal was not heard at that hearing because the permit holder, Mr. Davis, did not — did not believe that he had received sufficient notice of that hearing, so it was scheduled for the October public hearing. It appears that Mr. Davis appeared at the public hearing for October through counsel, and it appeared at that time there were contested issues. There was no agreement between the parties — the permittee and the District — as far as renewing the permit. Therefore, I declared that it was a contested hearing, and the case was reset for the parties to agree on information as far as a docket control type schedule of how we would proceed with the contested matter.

We were not able to come up with an agreement as far as proceeding with a contested hearing, and the parties did not reach an agreement on a date. It appeared that they were continuing to discuss — as in most cases, where there are any type of investigations or disagreements between a permittee and the District, the parties continue to try to discuss and make agreements. That did not happen. It was not happening. So I requested a status hearing — a status conference — for the parties to appear and let me know how we're going to proceed: if we're going to proceed with the contested hearing, or if it was going to be referred back to the board.

We did not make any leeway, make any progress, at that conference. So we basically agreed that we would reset it for the parties to come up with the necessary dates for the contested hearing. On the same day, or sometime thereafter, the District — the General Manager for the District — filed a request that the public hearing be closed — the contested hearing be closed — and that my proposal — that my proposal for decision be made based upon the General Manager's proposed findings of fact and conclusions of law. Actually — apparently that day it was placed on the record, and I did not consider it that day. Subsequently, I gave notice to both parties that I would be considering the proposal for — the proposal for decision, and asked that they respond if there were any objections to it. I subsequently agreed with and approved the General Manager's proposed findings of fact and conclusions of law. [audio unclear] No decisions — no issues — were resolved in the contested hearing — the contested hearing — because we actually never had a contested hearing. It was subsequently closed, because we did not receive — there was no one offering any schedules, and no one actually wanting to proceed at that time.

Therefore, my recommendation is that the permit renewal for well number 3606 be denied; that the permit holder — based upon the documents that are in the District's records, based on the sworn facts from the District officers — owes $106,901 in penalties to the District; and that the permit holder pay the penalties before the permit for well number 3606 is renewed. There being no evidentiary hearing that was held on my part, this recommendation is based

solely on the record of the District — solely upon the applications that were submitted and any reports that were made by the District staff. Attached to the recommendation is the General Manager's proposed findings of fact and conclusions of law. Would you like me to read those?

[0:21:20] **CHAIRMAN PETROV:** Directors have copies. [audio unclear]

[0:21:26] **HEARING EXAMINER TRUSCOTT:** So basically the — the recommendation adopted what the District proposed: the recommendation is that the permit be denied while the outstanding penalties remain unpaid. [audio unclear]

[0:21:41] **CHAIRMAN PETROV:** Why don't you go back —

[0:22:00] **GENERAL MANAGER TURCO:** We shouldn't be able — do we have to make it bigger? (Discussion of displaying the document on screen.)

[0:22:12] **HEARING EXAMINER TRUSCOTT:** Is that better? How about that?

[0:22:22] **HEARING EXAMINER TRUSCOTT:** Okay. Skipping down to the District's proposed findings of fact and conclusions. You want me to read them? Okay.

"The Harris-Galveston Subsidence District issued a permit for well number 366 for Woodloch MHP LLC on August 9th, 2002. The well is located in the District at 29.85855, negative 95.3683, in Harris County, Texas. Under the permit, the permit holder is limited to an annual production of groundwater of 10 million gallons. During a record review, the District determined that the permit holder had exceeded the annual allocation of 10 million gallons for the period beginning August 1, 2023 and ending on July 31st, 2024, the well producing 12.34 million gallons of groundwater in violation of the District's Rule 5.3. The violation resulted in a disincentive fee owed to the District totaling $106,901. On August 22nd, 2024, the District provided a compliance and settlement offer to the permit holder in an attempt to achieve compliance as regards the violation. The District prepared a potential — the District prepared a potential B-credit offer in an attempt to resolve the violation. The District recommended that the permit holder apply up to 3.71 million gallons in B-credits (figure as heard; uncertain) to reduce the violation amount to $66,994, in a second attempt to

achieve compliance. The permit holder's offer of 2025 was an offer to settle the violation by paying $36,000 over a 36-month period, an amount significantly below both the assessment and the B-credit offer.

"On August 1, 2025, the permit holder applied to renew the permit, which had expired on July 31st, 2025. The District scheduled the violation and permit renewal request for the September 9th, 2025 public hearing agenda. On August 26, 2025, notice was mailed to the address on file, provided by regular mail more than 15 days before the September 9, 2025 hearing, as required by Rule 7.2. Notice was also published in the Houston Business Journal, though not required under Rule 7.2A for this matter. The permit holder did not appear at the public hearing on September 9th; therefore, the District postponed consideration of the renewal request and violation, and continued the matter to the October 7, 2025 public hearing. Additional notice of the October 7, 2025 public hearing was not required for an item continued to a later date at the September 9th public hearing. On September 26th, in an abundance of caution, the General Manager provided the permit holder notice of the date, time, and location and purpose of the continued public hearing by email.

"At the October 7th public hearing, the hearing examiner announced the proceeding was designated a contested case proceeding, and directed the General Manager and the permit holder to confer on discovery and a procedural schedule. On October 16, 2025, counsel for the General Manager attempted to confer with counsel for the permit holder on a procedural schedule but was unable to reach agreement. On October 17, counsel for the General Manager objected to the — to counsel for the permit holder appearing, as unauthorized — not licensed to practice in the State of Texas — and on that matter the hearing examiner ruled that counsel was not permitted to proceed. Following the October 20, 2025 order, counsel continued to make appearances with the permit holder. [audio unclear] The permit holder has not obtained local counsel, or counsel authorized to practice law in the State of Texas, and has not prosecuted the contested case. The permit holder — the permit holder has not paid

the outstanding penalty or entered an agreement with the District. The permit holder has not [audio unclear].

"This matter is governed by Texas Special District Local Laws Code Chapter 8801. The permit holder produced groundwater in excess of the authorized amount from well 366, in violation of District Rule 5.4 and Texas Special District Local Laws Code Section 8801. [audio unclear], and Rule 5.4; and operated the well with a permit expired, in violation of District Rule 5.28 and Texas Special District Local Laws Code Section 8801.155 and Rule 5.28, until the violations are resolved. Note the permit holder's compliance with the current renewal requirements of Rule 6.06 is not at issue. Under Texas Special District Local Laws Code Section 8801.15: the District's board may condition the issuance of a permit on resolution of a violation of this chapter or any rule of the District [audio unclear], and under this rule may require the applicant to pay the assessed amounts or take other action."

So, as I stated, these were the proposals from the District. After not being able to proceed with the contested hearing — no evidence was presented to me as far as any violation, or whether the permit should be or not be issued — so this recommendation is based solely on the General Manager's proposed findings.

## VII. BOARD QUESTIONS TO THE HEARING EXAMINER (recording 0:29:36)

[0:29:36] **CHAIRMAN PETROV:** So basically you're saying they didn't appear and present any evidence.

[0:29:41] **HEARING EXAMINER TRUSCOTT:** Well — right. Well, they appeared. However, no evidence was — was presented. There was a request for — well, it wasn't — the statement was that they were not able to proceed because they had not received the additional information that they had requested. However, no information had been requested through the contested hearing, because we had not set a date. As far as my receiving the request for any discovery or any motions, or a deadline to respond to any discovery — so, yes, we did not proceed, because apparently they were not going to contest.

I — I declared it a contested hearing because at the public hearing it was basically confusion. Nobody was in agreement to anything. So, in order to resolve those issues, I said — well, I actually opened the contested case and requested that the parties get together and work out a schedule as to when they wanted to appear, what dates they wanted to have in place.

[0:30:50] **CHAIRMAN PETROV:** Once you have a contested hearing, it kicks into more of a trial process?

[0:30:55] **HEARING EXAMINER TRUSCOTT:** Correct.

[0:30:56] **CHAIRMAN PETROV:** And would that be like going to court and saying, "this should be dismissed because I haven't gotten any information," even before you've done any discovery? But you do have an opportunity for the discovery in the contested hearing process, right?

[0:31:16] **HEARING EXAMINER TRUSCOTT:** Right. You do have an opportunity. But I — before I — I did not go to that point where I was just saying, "you all did not proceed, so I'm going to close it." The District actually filed a request for a proposal for decision — [audio unclear] — subject to a request for.

[0:31:40] **CHAIRMAN PETROV:** Do you have anything else for us?

[0:31:41] **HEARING EXAMINER TRUSCOTT:** That's all I have.

**VIII. REMARKS OF GREGORY ELLIS, COUNSEL TO THE BOARD (recording 0:31:42)**

[0:31:42] **CHAIRMAN PETROV:** Then maybe I — we have several people who have signed up, and we'll give everybody an opportunity to speak. But maybe before we do that — Greg, since this process is a little different than our normal process, maybe you can walk us through the process.

[0:32:04] **MR. ELLIS:** Thank you, Mr. Chairman, members. This is, I believe, the very first contested case ever, and so I do want to provide some background: how that process works, how it's supposed to work, and where it just kind of went off the rails.

As the Chairman mentioned, the case here is essentially a trial. The parties are named after the contested-case declaration happens. The parties then present either — either present competing, or an agreed, scheduling order to the hearing examiner that says: this is the period when you're going to have discovery; that's followed by responsive motions; that will be followed by pre-filed testimony; and then finally there will be a trial date, where the hearing examiner will conduct a trial — however long that trial takes — testimony, examinations. That's followed by motions based on evidence presented at trial, which is then followed by a proposal for decision from the hearing examiner. Either side may have objections or exceptions to that proposal for decision, and that then all comes back to the board for a final decision.

This went off the rails at the scheduling point. The parties were to do a scheduling order, and instead we went into a process of — the permit holder made multiple Public Information Act requests, which they're entitled to. We went through that process. We answered those. All of that could have been done as part of discovery, as part of this contested case, but they chose to go through the Public Information Act. That's perfectly okay — they have that right — but we never got to the schedule. We never got to set the dates for discovery. We never got to set the dates for our pre-filed motions or pre-filed testimony, and so we never had the hearing. Turning to the proposal for decision — when you're ready to hear — a couple of things where I want to clarify some of the terminology. The contested case hearing is everything from the declaration of the contested case hearing through to the final board decision. That's — that's how that entire process is described. The evidentiary hearing is the hearing that is conducted following discovery, following motions, where the evidence is presented — that can be presented as pre-filed testimony, presented as live testimony, or possibly at a trial before the hearing examiner. So that evidentiary hearing never occurred, because we never got past the scheduling process. The only evidence before the hearing examiner was the evidence presented from the General Manager, and so that's where she made her proposal — based on that evidence. So that's where we are today.

And a couple of things I want to point out. The word "penalty" was used in the proposal for decision. I recommend that you remove that. I do not recommend — I do not believe that you have the authority to penalize anybody. I think you — there are various types of penalties in Texas. There are administrative penalties, which some administrative agencies have — like TCEQ, the PUC, the Railroad Commission. They simply impose a penalty: they say, you hereby owe the state $10,000, or $100,000, or $2 million — whatever — whatever penalty they choose, based on whatever their rules say. To — to get to an administrative penalty, you have to follow very strict rules in the Administrative Procedure Act governing how that penalty is determined and set. There are also civil penalties. Civil penalties are set by a judge following a trial. There's obviously also criminal penalties — there are certain things that can happen that cause criminal penalties. For example, there are criminal penalties that might attach to a violation of the Open Meetings Act. That's a totally separate matter, handled by the criminal courts. You — you do not have the ability to impose a civil penalty. What we have always done is we have always said: here is your settlement offer. In this case, it's $106,000-plus. And that settlement offer is going to be based on the amount that should have been paid had the permit been issued for the amount that was actually pumped. So you're paying exactly what anybody else would pay if they were given permission ahead of time to pump that amount of water. So, in fact, it's not in any way, shape, or form a penalty. It's the fee that would be — would have been imposed had you applied for that amount of water. So that settlement offer is simply that. We could not settle it. That left us with an open violation. Now, how do you handle open violations? The way is: we go to court. Now, in this case, we haven't gone to court yet. We have a policy that to get to the filing of a lawsuit — when we — when we sue, it will be for civil penalties in the amount of up — between $50 and $5,000 per day for each violation — excuse me, for each day of violation. And it's up to the district court judge to determine what those penalties will be.

I remember the case with — we had one case — we had a case where there was a violation that went on for multiple years. They had multiple problems with trying to get the — the —

the lawsuit prosecuted. It took — we were in the lawsuit with them for probably about four years. The civil penalty for that case would have been around $500,000, and that's because it was a violation that went on for multiple years, multiple wells/levels, and that would have been the minimum penalty in that case — at $50 a day, that's a pretty substantial amount, plus whatever the attorney's fees were. This board settled that for a $50,000 payment, based mainly on the difficulty the attorney had trying to get through — through that litigation. Another matter came up: we had a utility that had a leak in their system. Apparently the leak was underneath a tree. They had a very healthy tree — the leak grew the tree — but they couldn't find it, because the tree was sucking up all the water and wasn't creating, you know, a nuisance any place else. They had a hard time finding that leak. They did end up exceeding their permit, and exceeding their total amount past what would be the threshold. That utility came before us and was trying to negotiate a settlement. We did eventually negotiate a settlement. Then they did do B-credits — their total amount of the disincentive fees would have been about $170,000, and between the B-credits and monthly payments, they paid that — that full amount.

So this is not anything — anything different. We're not treating the Woodloch company any differently than we have any other person that has been in violation by exceeding their permit — but also exceeding the disincentive amount. Again, had that permit come up for renewal in the middle of that time, we would not have renewed that permit, based on the fact that they had an outstanding violation — which is why they used a settlement — that settlement process.

So this is the very procedure that we have gone through with every other permittee, every other circumstance.

There are different ways that you can set rules, different ways to issue permits. You do — you do issue multi-year permits to some people. We only issue multi-year permits to the large ones. We also only have multi-year permits for a period of time. But those five-year permits — three, four, five year permits — are still at one-year amounts. You have never

allowed people to — to save up water for some future date. There are districts out there that do — for example, the Lone Star? Coastal Bend? groundwater district [audio unclear] issues true three-year permits. They say: here's your — here's your three-year permit; this is how much you get to pump during the — the next three years; we don't care if you pump it all in the first year, or you pump it all in the third year, or you pump one-third of your permit for each of the three years — this is your total amount; we're going to judge what you've done at the end of that three-year period. That's led to some problems, because some people burn through all their water in the first two years and then come and ask for an amendment to try and get some more water in the third year. That has led to issues and problems. So — and when we're modeling this — and Mike can go into more detail on this — but when we're modeling this, we model it based on what the annual demand is going to be for the multiple years of the model. And in order to achieve that, this board has always held everybody to a one-year amount. And you know, not — not pumping this year does not make pumping more next year not have an effect somehow. Pumping more in one year — that's going to have an impact on somebody else — that additional — excuse me — public [audio unclear]. That's why the board's never done that. That's a policy question. That would be a rule-making question. That would be a prospective decision you would have to make for future permits. It doesn't affect anything that happens on this particular permit.

I also want to point out that I — we have never advocated or suggested that this was intentional, that we have a bad actor here. I don't think that's the case. There was a mistake that was made. Certainly, somebody who was supposed to be paying attention to how much was being pumped wasn't paying attention. They did not apply for an amendment ahead of time to address the overpumpage that was occurring. That's a mistake. We get that kind of mistake all the time. We have a number of these settlements coming forward. Typically, we renew the permit. In fact, we did so here: we renewed their permit with the outstanding violation the first year, with a condition on that permit that the violation be settled in order to be able to have that permit. We worked on that settlement for over a year, until it came up

again — now it has come up for renewal again. The General Manager has taken a position, before the hearing examiner, that the permit should not be renewed because they still have failed to settle that prior violation. That's where we are today.

So what — what are your options here today? Your options are: one, you can vote to approve, or not — or disapprove, or whatever you want — with the proposal for decision you received from the hearing examiner. You can change that proposal for decision as you see fit — again, I'm going to recommend a few changes to you, mostly in the wording. And you can also, if you choose, continue this matter to next month — and it might be a good idea to do that, just to work our way through what — what changes we need to make in the proposal for decision's procedural findings. And you can also remand it back to the hearing examiner. If you do that, I would suggest it be conditioned upon immediate receipt from the — the applicant of a proposed scheduling order, so you know it will actually proceed — with the process of going through the process of the hearing, discovery, motions.

The last issue of controversy is the question of who is allowed to be an authorized representative. The District's rules specifically state that a person can — can be there on their own, or they can have an authorized representative. This board has always taken the position that "authorized representative" means two different things. One, it has to be somebody that the applicant, or land owner, or well owner authorized — stated, "I want this person to represent me" — that's kind of obvious. But two, it has to be somebody who is authorized under Texas law to represent people in the administrative proceeding. Now, Texas — I'm not sure how unique this is — Texas does have a provision that allows professional engineers licensed in the State of Texas to go and represent clients in the administrative proceedings. They're not making, necessarily, legal arguments, but they are making arguments based on the — the engineering or the science base around that. That frequently happens at TCEQ — you have waste discharge permits, you have air permits — they frequently have professional engineers who take on that work. We also, obviously, allow for licensed attorneys —

meaning attorneys licensed in the State of Texas — making legal arguments, to present that argument to — to the hearing examiner.

So, part of the proposal for decision that I would like to fix — I think we need to address that argument. The argument's made that the state bar rules allow any person licensed in any state to represent their clients before Texas tribunals. I — that's not how I read that rule. I believe that rule is designed to allow attorneys who are working remotely to do so — that if they happen to work for a company that has business in multiple states, including Texas, they can continue to advise that client on matters that — that affect their work in Texas, without having to get licensed in Texas. But it doesn't allow them to appear before tribunals, before courts, before administrative agencies, or anybody else, to make legal arguments in the State of Texas. I think that — the other part of that is that if there's somebody licensed in Illinois who lives in Texas and wants to continue to practice Illinois law from Texas, they're allowed to do that as well. So I think that's basically trying to — the rule change was basically trying to address remote work by attorneys who are licensed in other states, to let them continue to do that work. It was never intended — nor do I believe, do the state's rules allow — anybody to come before any tribunal and represent — as in, as a lawyer, in making legal argument before that tribunal. And one of the decisions that was made here is that the Woodloch's counsel that they hired is licensed — as far as I know, is licensed — in the State of Florida, and is not licensed in the State of Texas, would not be allowed to continue making legal arguments before this tribunal. And it was recommended to the Woodloch company hire local counsel, or have their Florida attorney obtain pro hac vice authority to represent people in Texas. There's a procedure you can follow to get that — that authorization. And none of that — none of that happened. So we still don't have legal counsel representing, as far as I know, the applicant.

So those are — those are your options. At this point, I think we need to hear from the applicant. I think we need to hear from the applicant. We need to hear from attorney for the General Manager, Mr. Bobby Saleh who is here — for the General Manager from the Graves

Moody law firm. And I do recommend, either — either following this, or at the end of this meeting, an executive session to discuss the litigation. I will be happy to answer questions.

## IX. BOARD QUESTIONS TO MR. ELLIS (recording 0:48:29)

[0:48:29] **DIRECTOR SEARS:** What is your role?

[0:48:33] **MR. ELLIS:** I am counsel to the board of directors in this matter. I don't represent any of the parties. I have tried to keep the procedure on track as much as I can, but I'm here to provide you with legal advice. And so — that's why we have separate counsel for the General Manager — because I can't advise him and advise you.

[0:48:55] **DIRECTOR SEARS:** So when do we get to ask you questions?

[0:48:57] **MR. ELLIS:** You can ask questions now or you can ask me questions in executive session. If you're — you're going to be asking about the strengths and weaknesses of our case, let's do that in the executive session.

[0:49:12] **DIRECTOR SEARS:** So you — you have — you have monitored this process on behalf of the district?

[0:49:19] **MR. ELLIS:** That's right. On behalf of the board.

[0:49:20] **DIRECTOR SEARS:** And the District rules have been followed?

[0:49:23] **MR. ELLIS:** Yes, sir.

[0:49:26] **DIRECTOR SEARS:** And state — and state law has been followed?

[0:49:27] **DIRECTOR SEARS:** To the best of my legal opinion, yes, sir.

[0:49:30] **DIRECTOR SEARS:** And this started out in a public hearing, as all these permits, including the ones that we just approved?

[0:49:38] **MR. ELLIS:** That is exactly right.

[0:49:39] **DIRECTOR SEARS:** And they no-showed — Woodloch no-showed, or they asked for a continuance — and a continuance was granted?

[0:49:46] **MR. ELLIS:** At the first public hearing, that's correct.

[0:49:49] **GENERAL MANAGER TURCO:** And the second public hearing was stayed.

[0:49:50] **MR. ELLIS:** It was continued to the next public hearing — and the District issued notice of that.

[0:49:56] **DIRECTOR SEARS:** All right. And some — somebody showed up on behalf of Woodloch — or was this over — was it virtual?

[0:49:56] **MR. ELLIS:** Yes. It was virtual.

[0:50:03] **DIRECTOR SEARS:** Okay. And then somebody showed up on behalf of the district?

[0:50:07] **MR. ELLIS:** Yes, sir.

[0:50:08] **DIRECTOR SEARS:** And then somebody showed up on behalf of the general manager?

[0:50:12] **MR. ELLIS:** Well — you say "on behalf of the district" — the General Manager is the — the entity that is one of the contested parties at every contested case hearing. So it becomes a party represented at the hearing by counsel — at that public hearing. The district — the board — was not represented in that, other than by the hearing examiner.

[0:50:36] **DIRECTOR SEARS:** All right. And so the purpose of the second public hearing was to have a discussion about process and procedure?

[0:50:43] **MR. ELLIS:** Right. Well, that hearing has to determine whether or not there's actually a contested case — whether or not — occasionally we have third parties; we have to determine whether or not that party has standing, or whether or not they have raised a contestable issue. In this case, the only parties were the General Manager and the applicant. Obviously, they both have standing. Obviously, they're both raising legal issues. So — so the party determination was made. They are named parties to that contested case proceeding.

[0:51:10] **DIRECTOR SEARS:** Okay. So at the continued public hearing — and the next public hearing — there was some discussion between the parties about what the issues were that were going to be presented to the hearing examiner. So it became quite obvious that there was little or no agreement on anything; therefore, it was a contested matter, and the hearing examiner made that determination. Is that correct?

[0:51:22] **MR. ELLIS:** That's correct.

[0:51:35] **DIRECTOR SEARS:** And so then the discussion was supposed to be a routine discussion about process and procedure; what — what day are we going to set to actually have the evidence presented, and the contest ruled upon by the hearing examiner; and then, before that, what discovery are we going to do, when are we going to do it — the normal, routine matters to those of us that practice law deal with in lawsuits, and that are normally dealt with in a contested hearing.

[0:52:05] **MR. ELLIS:** The scheduling order for the district's proceedings is almost exactly the same thing as a docket control order in a trial?

[0:52:10] **DIRECTOR SEARS:** Right. And so there was no agreement between the parties, even on a docket control order — or scheduling?

[0:52:16] **MR. ELLIS:** The — the General Manager proposed a scheduling order. There was no — there was no responsive agreement to that scheduling order.

[0:52:25] **DIRECTOR SEARS:** Okay. So, to this day, Woodloch has never submitted to the hearing examiner a proposed schedule that would govern the resolution of this matter that is contested?

[0:52:34] **MR. ELLIS:** That's correct.

[0:52:38] **MR. ELLIS:** Let me also mention, real quickly, that part of what the rules allow — and part of what that scheduling order would have done — is it would have continued the existing permit. So Woodloch would have not been in violation of operating without a permit for the pendency of this contested hearing. Because that scheduling order was never approved, there was never any temporary permit approved by the hearing examiner. The hearing examiner may approve a temporary permit for up to four months at a time while a contested case is going on, because we don't want permittees to be in violation just because they contested the general manager's recommendation. So the permit expired — I think it was at the end of August — and so they have — they now have been operated without a permit since that time.

[0:53:25] **DIRECTOR SEARS:** So did Woodloch ever submit any request for discovery to the hearing examiner?

[0:53:29] **MR. ELLIS:** We got — we received multiple Public Information Act requests, but no discovery was requested.

[0:53:35] **DIRECTOR SEARS:** So nothing was submitted to the hearing examiner. Instead, they — they exercised their legal rights to make public information act requests. Did the district provide the information that they requested, or that it was legally obligated to provide?

[0:53:50] **MR. ELLIS:** I'm saying that that's disputed. The district says yes, they did. They did request clarification with the Attorney General. They were required to do — to answer that. They — the district's position is that they presented everything the Attorney General said that they were required to present. There is still a list of things that the applicant is disputing that he never received.

[0:54:09] **DIRECTOR SEARS:** So the applicant made no request to the hearing officer or to the district to produce anything?

[0:54:14 approx.] **MR. ELLIS:** No.

[0:54:18] **DIRECTOR SEARS:** Okay. So — and then, did the applicant respond to the general manager's proposal?

[0:54:26] **MR. ELLIS:** The applicant has objected to it, but has not presented a counter set of proposal of findings of facts and conclusions of law.

[0:54:38] **DIRECTOR:** Counsel — you said earlier, I thought I heard you say, that that $106,901 was not a penalty; it was a disincentive fee.

[0:54:49] **MR. ELLIS:** That's the amount of the disincentive fee that would have been applied had they applied for that permit before pumping that amount. So that would be a settlement amount.

[0:54:59] **DIRECTOR:** Is that a — is that a penalty, or is it a fee?

[0:54:59] **MR. ELLIS:** It's a fee.

[0:55:02] **DIRECTOR:** Okay.

[0:55:06] **MR. ELLIS:** It's actually a settlement offer based on the fees that would have been paid had there not been a violation — had it been permitted for that amount.

[0:55:13] **DIRECTOR:** So it's not a penalty.

[0:55:13] **MR. ELLIS:** It's not penalty, no.

[0:55:16] **DIRECTOR:** Well, that's what the examiner said.

[0:55:18] **MR. ELLIS:** I think we need to fix that.

[0:55:21] **DIRECTOR:** Yeah. It was a little contradictory.

[0:55:23] **DIRECTOR:** What is — what was the basis of the district's counter-offer of $56,000 which, when I did my little calculator, it came up to right at half? What was the basis of that counter-offer?

[0:55:45] **GENERAL MANAGER TURCO:** So, in that particular, regulatory area, only 20% of your total water may come from groundwater, and the rest must come from alternative supply. In the case of Woodloch — sorry — so, in that particular regulatory area, groundwater may be 20% of total demand, and then the rest from alternative water supply. They had 10 million gallons of groundwater supply. So, if you — you're able to use fee credits —or water conservation credits — you can use them for 30%. So that's why you get to that 50% number: because you got 20% from the ground, and the remainder of that comes from permitted credits.

[0:56:41] **DIRECTOR:** And according to my handy-dandy little calculator, the offer from the permittee of $36,000 was almost exactly half of that —

[0:56:52] **MR. ELLIS:** That was— that was our offer to thepermittee. The permittee's last offer to us was to pay the amount that we charge for regular permit fees, with — with nothing toward the disincentive fee.

[0:57:06] **DIRECTOR:** Okay. I thought that they offered to pay $36,000.

[0:57:12 approx.] **MR. ELLIS:** Yes.

[0:57:18] **MR. ELLIS:** And — and — and none of the offers they presented to us included B credits.

[0:57:24] **DIRECTOR:** From a legal standpoint, is the permittee allowed to use an out-of-state attorney to represent them in this matter, in your opinion?

[0:57:38] **MR. ELLIS:** In my — in my opinion — and now stated — in order to present legal argument before any tribunal in Texas, whether it be this body, a district court, TCEQ, or any trial court judge, that person has to be licensed in the State of Texas.

[0:57:54] **DIRECTOR:** Okay, and how do you enforce it?

[0:57:56] **MR. ELLIS:** Well — the hearing examiner said, "we're not going to accept any argument from an attorney not licensed in the State of Texas or a person authorized the same."

[0:58:08] **DIRECTOR:** But they came to the hearings and presented themselves as representatives?

[0:58:17] **MR. ELLIS:** I'm going to say generally yes — again, because not much was happening before the hearing examiner. There wasn't a whole lot — there weren't motions or things filed with the hearing examiner from — from that attorney. There were a number of Public Information Act requests, but those are perfectly legal. You know, you can be any member of the public — we have to respond. So we answered those.

[0:58:45] **DIRECTOR SEARS:** Okay. Back — back to the $106,000 — Again, that's a number that we came up with in the same way we do with all these matters. It was the idea of trying to get people back into compliance.

[0:59:01] **MR. ELLIS:** That's correct.

[0:59:02] **DIRECTOR SEARS:** Paying what you would have paid if you'd paid it when you should have paid.

[0:59:06] **MR. ELLIS:** That's correct. Absolutely.

[0:59:08] **DIRECTOR SEARS:** How much would the B-credits cost?

[0:59:09] **MR. ELLIS:** We don't know. Those are open market.

[0:59:16] **DIRECTOR ANDERSON:** Just a clarification: so they had already owed the district money before we renewed it for the first year, and they were working on paying that down?

[0:59:23] **MR. ELLIS:** Well — they had exceeded their permit amount when we renewed their permit at the previous renewal. Look at that — the amount they had requested was less than 10

million, but the permit included the special provision requiring them to settle that violation one way or another.

[0:59:41] **DIRECTOR:** Okay.

[0:59:41] **MR. ELLIS:** Okay. There was no attempt to pay anything back.

[0:59:41] **DIRECTOR ANDERSON:** Okay. So — okay, so they never attempted. So, can you clarify, on the — the findings of fact — the item nine — the $36,000 over 36 months; was that the previous — was that —

[0:59:56] **MR. ELLIS:** That was — that was — that was an offer — my — it was an offer from the district staff to Woodloch, that we would settle the overall violation with a payment plan over 36 months. And — uhm, but they also had to do the B-credit in order to cover the remaining amount between $36,000 and $107,000, which should have been paid for the total the amount of fees due based on the water withdrawal [audio unclear].

[1:00:29] **DIRECTOR ANDERSON:** Okay, we might need to clarify that in the findings of fact.

[1:00:34] **MR. ELLIS:** That's something we — that's one of the things I needed to [audio unclear]. Okay.

[1:00:38 approx.] **DIRECTOR BOWEN:** Greg.

[1:00:42] **MR. ELLIS:** Yes, sir?

[1:00:43] **DIRECTOR BOWEN:** What happens if they're operating without a permit? What happens if…

[1:00:50] **MR. ELLIS:** We're going to have to settle that violation.

[1:00:50] **DIRECTOR BOWEN:** The clock is running on this.

[1:00:50] **MR. ELLIS:** The — the standard — the standard, standard procedure for this District; is that we settle that violation by having them pay the amount that should have been paid had the proper amount been permitted. So, you know, as long as they don't go over 10 million, that's going to be a pretty easy settlement — the normal fees are usually enough to cover the staff time and cost. If it's not settled, then at that point we're going to end up having to file a lawsuit. If the

lawsuit is filed, then we would be seeking between $50 to $5,000 per day for the days they have

been operating without a permit, plus, issue $5,000 per day for the prior violation.

[1:01:38] **MR. ELLIS:** Any questions. Okay, again, my recommendation are to hear from the

applicant and then from counsel for the general manager. And at some point we go into

Executive Session.

[1:01:51] **HEARING EXAMINER TRUSCOTT:** Thank you. Excuse me. Based on

information that I received from the district, the permit — that's what I received — based upon

the record — but I do believe that, based on — it was a counter-offer. [audio unclear]

[1:02:29] **CHAIRMAN PETROV:** All right. Well, then, our general counsel suggests we hear

from the applicant, and the attorney for the general manager.

## X. SWORN STATEMENT OF KAWA FOAD, ESQ., APPEARING ON HIS OWN BEHALF (recording 1:02:57)

[1:02:57] **MR. FOAD:** Good morning. My name is Kawa Foad, and I represent Woodloch here

— but I'm not here to present arguments. And I would like to start off by going under oath,

because, unlike everybody else here, I would actually, you know, really put myself to the test

here by, you know, stating everything under the penalty of perjury. So, therefore, I, Kawa Foad,

declare that everything that I will say from here on will be made under the penalty of perjury.

    So let's start with — number one, regarding the TPIA — the Texas Public Information Act

    requests. They have not been satisfied, and I provided a list of outstanding items that are fully

    disclosable — that the Texas — the Texas Attorney General's office had ordered to be

    produced — but are still outstanding more than a year later, in violation of the statute — a

    felony statute, actually — that's what it is. And the reason we asked for these records is

    because we are convinced — and we actually have some records that go to show — that

    Woodloch should have never been assessed the penalty. We asked for these records long

    before the contested hearing started. April 29th, I submitted a long list of items that were

    fully disclosable. And I — I submitted — and I can see that some of these items were kept

    back, you know — and in hindsight, I should have asked for — you know, it was client —

attorney-client privileged information. But, for instance, board minutes, board records — they should be public anyway, and they were withheld from us. It took us six months to get them, after having quite literally, you know, gone back and forth and bickered with the outside attorney that was retained by the district to handle this request. And — and that caused that, you know, huge delay — like, it took months to, you know, to deal with the simplest of issues. So, part of that — and the reason we asked for these records — was to know what discovery to ask for. I mean, I understand that the chairman mentioned, "well, you know, these are records you can ask for in discovery." Sure — fair enough. But as far as I know, there's also something called a pre — pre-litigation petition in Texas, where you can actually ask for discovery to see if you have a valid claim, or to see if you can raise an affirmative defense. And again, I'm not, you know, an expert in Texas law — but I know that for a fact. And that was the main reason we asked for these records — completely in compliance — you know, fully compliant — with the Texas Public Information Act. And they were withheld. And we kept reiterating: we do not know whom even, you know, we can call as witnesses, or what, you know, set of documents to ask for, until we have received these records that we are lawfully entitled to. So that's number one.

And as far as the — the assertion that we did not comply, or did not engage — I — I — I don't know how else to put this, but that is 100% factually inaccurate. And I have the receipts right here: email communications back and forth, trying to, you know, meet and confer with the counsel for the General Manager. And when I myself, quite candidly, reached out to the hearing examiner — and I wanted to make sure that there wasn't anything malicious — because counsel for the General Manager started talking about, "well, you know, I don't think you can proceed here" — and I was like, well, let's nip this in the bud right away — I myself reached out and wrote an email to the hearing examiner. About half an hour later, counsel for the General Manager filed a motion — I don't even know if it was a motion or an email — but she requested, via email, that I be kicked off, you know, and not be allowed to represent. That was on a Friday afternoon. Without my being afforded an opportunity to be heard —

much less being noticed — on Monday the hearing examiner ruled that I was not allowed to represent. And she actually provided more relief than counsel for the General Manager had asked for. I don't want to use names, but their counsel had stated, in effect, he can, you know, appear here as long as he has pro hac vice — you know, authority or permission. The hearing examiner would not have any of that. She said: "Nope, you're off. You can't represent in any way, shape, or form. The applicant" — Mr. Davis — "can represent himself," even though she concluded that these are legal matters, and that's why only a licensed attorney could represent an entity. So it was a little bit contradictory. But — and of course I tried to clarify this — but — and I submitted motions, and I also called out the fact that the hearing examiner had engaged in prohibited ex parte communication, in violation of Rule 7.5(k) of the district's rules, by reaching out to counsel for the General Manager — without a blind copy to [audio unclear] myself — and talking about the scheduling of the issues, and, you know — what is it called — the prehearing — the pre-conference — or the prehearing conference. And I found that to be very inappropriate. And of course, I made a point of that — the motions asking for disqualification, because I thought that was disqualifying enough — were never responded to, much less addressed. So these are just a couple of issues.

Now, as far as…

[1:08:05] **DIRECTOR:** Excuse me for one second, sir — can I ask a question?

[1:08:11] **MR. FOAD:** Yes, absolutely.

[1:08:12] **DIRECTOR:** So — as I got — I'm a gentleman who knows some Latin. So — pro hac vice. "PRO HAC VICE" — it means "but for this occasion."

[1:08:12] **MR. FOAD:** I understand.

[1:08:21] **DIRECTOR:** Did you apply for that?

[1:08:24] **MR. FOAD:** Well, I — I was — I reached out to the hearing examiner, and that's why —

[1:08:29] **DIRECTOR:** My question is: did you apply?

[1:08:30] **MR. FOAD:** No — no, I didn't, sir.

[1:08:32] **DIRECTOR:** That's — that's all. I appreciate it.

[1:08:35] **MR. FOAD:** I'm sorry — I'm not trying to, you know, skirt the question. I — I — I never had an opportunity. Of course I would have done so, but I was terminated without a notice or hearing, and no explanation, really. I mean, there was a ruling, but that ruling — there's no case authority; there's no, you know, nothing on point that made clear that I could not represent. Because my position the entire time was that I am allowed to, you know, represent — this is an administrative hearing; it's not a judicial one. And the second point — there's a Texas Supreme Court order — the amended bar rule 5.05 — and that's the one I believe Mr. Ellis was talking about — and I respectfully disagree with him. I think it actually gives you the right to appear without issues. And, you know, of course we can — we can agree to disagree — that's — that's — that's fine. But I was never quite heard — that was a long answer.

So I — I'm not here — again, I'm not here to litigate the matter — the merits of the case — because I'm not allowed to, apparently. But I am here to reclaim my name, because I do not take it very lightly, being accused of the unlawful practice of law. That's a crime. So — no. That never happened. I defend my position. I was open and honest about it. And the — the proposed findings of fact — that's not actually what happened, and we can prove it. We have the objections here. We submitted numerous — numerous papers, communications, proof, records. Everything we submitted never got anywhere. And it wasn't just coming from me — it was coming from Mr. Davis as well. So it's been an incredibly frustrating process, as you can probably tell. It was quite frustrating to sit there and have to listen to things that you know for a fact are not true. And I'm not here to, you know, get into, you know, argument, or bicker with anyone. But I can also not, at the same time, sit and look back, you know, when there's a bunch of innocent people that are about to lose access to their water, and I know that I have the ability and, you know, the — the wherewithal to do something about it. So, respectfully, I'm going to fight this, like, you know, as long as I can — until somebody gives me a reason, and a lawful and — and substantive answer, that says I cannot be part of this. At that point, I will respect the ruling. But until then — I'm sorry.

[1:10:50] **CHAIRMAN PETROV:** Absolutely. So — so — so, have you filed suit against the district?

[1:10:51] **MR. FOAD:** Uh — I have. That is correct, sir.

[1:10:54] **CHAIRMAN PETROV:** And what is that all about?

[1:10:55] **MR. FOAD:** That is about what transpired throughout this whole process. Because I believe — and I have strong grounds to believe — that my rights — my First Amendment and Fourteenth Amendment rights — were violated. I was deprived of those constit — constitutionally protected guarantees of, you know — to petition, to speak, to pursue my profession. And it was done under color — you know, the color of — of state law. So — and I'm not, you know — I'm not trying to be punitive here, of course. But I'm going to, at the same time, safeguard, you know, my rights, and not stand by, you know, while I'm being defamed — because, again, under no circumstances have I been dishonest or tried to deceive anyone. I was open — I mean, it's been an open book since the beginning. So, one of the — one of the forms of relief I'm asking for is a declaration to be allowed to represent. Of course, if we can, you know — if we can come to an agreement on that, I'm willing to, you know, remove that from the suit. So — I don't want to talk too much more, because I know Mr. Davis wants to speak, and of course, you know, it's all his right. But again, just for the record, to conclude: we've — it's not that we've been unreasonable. We've tried to confer. We've been denied records we're entitled to. And I tried my very best — I really, really did — but it just didn't work out. So — that's it. Thank you very much.

[1:12:16] **CHAIRMAN PETROV:** Anybody else have any questions?

[1:12:22] **CHAIRMAN PETROV:** With respect to the records question —

[1:12:26] **MR. FOAD:** Yes, sir.

[1:12:27] **CHAIRMAN PETROV:** Did you file a complaint — with the Attorney General — which is your right to do?

[1:12:37] **MR. FOAD:** So — we actually — so, we submitted the request, and then the attorney the district was retaining came in, you know — made an inquiry first, which gave them more

time, you know, to draw things out. I responded; I clarified and supplied our title to it. And then she — this attorney — submitted it to the AG for a ruling, and the AG ruled, largely siding with us. And even after that ruling, records were withheld from us. And I kept listing items — like, "this should have been produced" — and, "no, no, we're looking into it" — two months later, a production, you know — and I kept pressing and pressing. And one of the records that is missing is absolutely key here: it's that September 9th hearing — that, you know — the public hearing that we did not appear at. We did not receive any notice. And it was a very simple way for them to prove that this notice was — you know, was sent out — this notice. I asked for — we asked for mailing records, you know, postage fees, any sort of proof of payment. And the answer was: "it does not exist." And I simply don't believe that. And I think that if, you know, push comes to shove, we'll get it in discovery.

[1:13:40] **CHAIRMAN PETROV:** So that hearing was postponed —

[1:13:44] **MR. FOAD:** Well, the whole idea was — in — in the final findings of fact, it says we denied — that the hearing — and then, I'm sorry — it was continued. And therefore, because it was continued, for the public hearing on October 7th, you didn't need — you know, the district did not need to provide the required notice five days before under Rule 7.2 — 7.2. And we don't — we don't agree with that either. And I do also want to point out that the findings of fact in this report and recommendation were supposed to be sent out by certified mail. That never occurred. We don't even know what the administrative record — that was closed — what the hearing examiner's record includes. How do you even respond, when you don't — when you don't even know what you're supposed to respond to? That's been part of the problem.

[1:14:31] **MR. FOAD:** Any other questions?

[1:14:33] **DIRECTOR:** Did you say what your relationship is to the owner?

[1:14:41] **MR. FOAD:** He is a client and a friend — and he's one of the most amazing human beings I know, and I'm proud to represent him.

[1:14:46] **DIRECTOR:** So you're a friend, you're an employee, you're a —?

[1:14:50] **MR. FOAD:** I'm his attorney. I represent him in a different matter. And as we were talking, he told me about this — this issue — and I said, let me see what I can do. And I tried to negotiate, you know. It was never my intention that this — we were never going to end up here — but we never got any information we asked for. I tried to negotiate. But that's my position. You know — that's basically it.

[1:15:16] **MR. FOAD:** Thank you. I appreciate it.

[1:15:17] **CHAIRMAN PETROV:** Anybody else?

## XI. REMARKS OF BRAD DAVIS (recording 1:15:25)

[1:15:25] **CHAIRMAN PETROV:** Mr. Davis, would you like to address the board?

[1:15:31] **MR. DAVIS:** Sure. There's been a lot going on here. And I apologize — I have a little trouble talking right now. I'm supposed to have a tooth taken out, and so I'll do my best. I know there's been a lot of, uh, he-said-she-said on this thing, and that's always a difficult thing.

In answer to your question: he's my personal lawyer. And when he looked at all of this, and all this stuff started going, I was not as engaged at a real personal level. And then, when they said he couldn't appear anymore, it kind of threw me in a real bad jam, because I was behind — I had no idea what was going on. And this thing went from, "hey, you'll have your due process, and you'll have a chance to, you know, get counsel and do what you need to do" — that was on a Friday — and the following Monday I get this letter that, "well, we're going to go with the — the district's recommendations." I guess — I — I'm not a lawyer. I'm a real estate guy that's trying to do the right thing here.

I made a little list, because, as I understood it, this was — this was a contested hearing — 6.1 — I guess that's what you call it. And — and so I wanted to speak about that, and then just briefly speak about the water.

As far as this contested hearing — again, you guys know a lot more about it than I do — but what — the reason I'm here today on this contested hearing is: number one, to open the record again, and send this matter to a neutral hearing examiner that we can mutually agree

to. I have, in — in her — in her report, she said it was an uncontested or non-evidentiary proceeding — and so — we always wanted to get to the evidence, and that was something that was mentioned. One of the reasons thethis dragged out so long is because the information that we're entitled to, we've never been able to receive. And we feel strongly that that would be what we need to be able to go ahead and proceed. In fact, it's my opinion, had we had that, we would not even be here today — this would have all been resolved a long time ago. So, anyway: I'd like to open the record again, with the ability to be able to, uh, disclose records, and produce — and I'd like to have the documents produced that we're entitled to. Number three, I would like to direct the neutral hearing examiner to allow discovery under fair terms, so this matter can be decided on the merits, rather than, you know, this one-sided thing that's been going on.

And I wrote down just a couple of reasons here why — let me just read this to you, if I could. The reason I'm asking for this is: the hearing examiner did not follow the district's rules. And here's just four examples. It started out with her engaging in communication with the general manager's lawyer without my knowledge — which, they've said, is a rule — the violation of 7.5. I don't know all that. I've listened — I've read a lot of these rules, and the 8801 and all that, being involved with this thing for so long, and there are a lot of questions — no question about that. Number two: she ignored motions calling for her disqualification. We brought that up, all starting from that ex parte communication. And one of the big difficulties is never getting a response. You know, we'll — we ask for something, and we get nothing — and this is well documented. How do you — how do you deal with that? And then the same with the records: hey, we want these records, and the AG said give them to us — we still don't have them. What are we supposed to do? And this has been a very difficult, frustrating situation, and I just got gray hair over it. Number three: after asking us to prepare a scheduling order, and suggesting the next hearing would be six weeks out — after just two business days, she sent a letter saying she is prepared to accept the general manager's, you know — what do you call it —

[1:20:04] **MR. FOAD:** Findings.

[1:20:04] **MR. DAVIS:** Huh? Findings. Yeah — findings. And so it's like — wow. You know, this went from due process, and we'd be able to have a chance, to now — just shut down. So that's just a little bit about why I feel like that this contested hearing has been really not very fair, and it would be good to be able to enter evidence — and we're all prepared to do that — and we would like to get what we're entitled to, so that we can get to that.

The second thing — and I'll be real brief — is about the water. Because it's really — all this stuff back and forth, and these little words and all these things — we kind of lose focus with really why we're here. What is this thing all about? And what it's really all about is subsidence. I mean, y'all have done a great job over 50 years in moving the water — where it went from — I think, you can correct me if I'm wrong — all, um, groundwater — well water — and no surface water, and, over the period, moving to where 80% of the water now is surface water and you're only drawing 20% groundwater — which has met the goals for, uh, decreasing the, um, subsidence. So that's been great. And, you know, we're all in favor of that.

So I'd just like to say — I had — did we have that, uh — yes — handout. You know what, let me pass this around. The, um — the — the, uh, water usage — like, what is it — 800 — I think in 2024, 868 billion gallons were pumped out of the ground. 868 billion gallons. Our — our permit's for 10 million. It's like a drop in the bucket. It's nothing. Um — these numbers are so mind-boggling that I tried to break it down. So I broke it down like this: if you have $868 representing the — the water, our water usage is two cents. So, for two cents' worth of water, we're going through all these troubles, all this stuff — when, really, we — we should be getting an award for underpumping. We have been underpumping. We — we were permitted for 10 million, and over the last 25 years we've averaged 8 million. Since this has all happened, we were at seven — no, eight — just a little over eight last year, and this year we'll be around seven. So our water usage is so far under, um, what it is permitted at. And, like I said, it's so — it's such an insignifant number. I guess I would put it like this: that the

crime and the fine — how does — how do you say that? — the fine doesn't seem to equal the crime. You're driving down the highway at 55 — you're going 57, and you get 10 years in jail. That doesn't seem right. And that's kind of similar to this. I mean, here we are, trying to do the right thing. Our residents — we don't use water in the yards. We don't use water to wash cars. I mean, probably most people here have sprinkler systems — we don't even allow that. We — we keep our water so far down.

So, I guess the last thing I would say about the water is the aquifer. Um — that's what this is all about, right? To prevent subsidence — to keep as much water in the aquifer as we can. We've been doing that. Now, we were over a little bit during COVID, and the people that moved into our community — because they were thrown out of their apartments, or whatever reasons that they were there — they lost their jobs — they would have been drinking water somewhere else. So really, it didn't go up in the grand scheme of things. It might have gone up a little bit in ours, but we're down. We're under. We're always under. And we support the district. We support everything that you're doing. We believe in what they're doing. We are your strongest advocate. And I'm here to advocate for these people that are here today, because they have been — they probably use less water than we do. I'll bet you — I'd be willing to bet it — I bet you the 80 people — 80 homes in that community — 70, whatever it is — I'm going to bet they use less water than just the people here — you know, who probably have sprinklers — a different thing. So — I get frustrated and carried away. I'm not feeling good — I'm on drugs for the tooth — so I apologize for all that. I just want to thank you for allowing me to speak here today. And I would just like the board to consider everything that's going on, and try to do the right thing here with this, and renew our permit — let these people go back to drinking their water, and we will continue to be good permittees, as we have been. And so, you know — thank you. If there's anything here — I've got this — I'll pass this around. And then — did you see the other one? — that we're down, uh, so far — I mean — and we'll continue: regardless of what y'all decide today, we're going

to continue to save water, and keep the aquifer as full as we can, and do the right thing. That's what we've been doing from the start. Yes, sir?

[1:25:29] **DIRECTOR:** Do you charge your customers for water?

[1:25:31] **MR. DAVIS:** No, sir.

[1:25:32] **DIRECTOR:** Okay. Why not?

[1:25:37] **MR. DAVIS:** Uh — why don't I charge people for water? Well, first of all, let me just tell you that we do everything we can do to keep the prices down. Understand? And if we were to charge for water, it would raise all of the prices. In fact, our well operator wanted to do that at one point, and it was going to raise the prices for the community — each individual is going to have to pay considerably more. So that's the short answer.

[1:26:02] **DIRECTOR:** Okay. You charge an individual space for rent, I presume?

[1:26:07] **MR. DAVIS:** Yes.

[1:26:08] **DIRECTOR:** Okay. Why didn't you increase your space rent by $2 a month, or $12, or $5 a month, to pay — tell you what — pay the original penalty to start with? I ran a utility district. I needed money. I increased the utility rate a small amount. I got the money in a short period of time. Why didn't you do this? Spread it out over a three-year period of time — you'd have had it all paid for.

[1:26:33] **MR. DAVIS:** My permit is for, uh —

[1:26:33] **DIRECTOR:** I know what your permit is for, man. Why didn't you take the money — or the $56,000 that was offered? You got 80 spaces. Take — do it by three years. You had to pay for them. Nobody would have been unhappy. We would have been happy. You would have been happy.

[1:26:53] **MR. DAVIS:** Well, that's a good question. And — and I was told — told that — I was, early on here — when I came here, people said, "oh, just raise the rents." Just — I said: look, these people — they're struggling financially.

[1:27:04] **DIRECTOR:** I understand they're struggling financially. I live on Social Security and a small 401k. When my wife passed away, my income dropped by 40%. But my utility, my

insurance, everything else did not drop by 40%. Normally, a pack of cigarettes is probably 10 bucks. Now, how many people smoke? If you want to stop smoking — that would take care of that.

[1:27:28] **MR. DAVIS:** Yeah — I guess there's a lot of different ways to handle it. My basic position is — is that, uh, the people that live in our community — I respect them. I do the best I can to keep the rents down. Or — what — tax increases is just another thing. I mean, all of these increases come up — gas, food — to where people are having a tough time surviving. And so — and I'm — I'm sorry for your situation, and sorry for your loss. Um — we, uh — we continue to try to do the right thing by our community. And I would say that this $107,000 fine — it's not $2 a month. It wasn't — it wasn't 56. It was 66 plus B-credits, which I don't even know what that was. And Mr. Ellis had mentioned that the board, or somebody, made an offer. My offer — when I came in here to meet with Mr. Turco and Mr. Jones, Mr. Ellis attended — and, you know, I — they kind of — Mr. Ellis said, "here — write something up, do something, give us an offer." So I wrote up that offer: that I would pay a thousand a month for 36 months — which, to me, was way in excess. Because — I was starting to mention — my permit had only cost a couple hundred bucks. And that's one of the reasons why we can keep our rents to where we do. If I had to pay an extra hundred thousand every year — I mean, shoot, you know — the place would be empty. People will be moving in with each other. And this — this is something that is a very difficult thing. And, you know, I'm sorry that I don't have the money to pay. But $107,000, for somebody that's been under for so long — and for people that have been sacrificing by — by not washing — driving — you know, they start hosing off their driveway to get the dust off — we're like, "no, no, we can't do that." So, anyway — we check — we — we read our meters daily, okay? We — if we get a daily spike, we're out there trying to figure out whose toilet's leaking. That's the kind of operation — and that's how much respect we have for what y'all are doing here. Sorry I — got carried away myself.

[1:29:35] **DIRECTOR:** When you say you read the meters — you're talking about the well meter?

[1:29:38] **MR. DAVIS:** Yeah — the well meter, right.

[1:29:39] **DIRECTOR:** Individual homes are not metered?

[1:29:43] **MR. DAVIS:** We do have separate meters. We did that so that we could better monitor the usage — because with one meter, you know, who's using it? So we thought, okay — we started targeting the ones that we thought were, uh, probably the big users. So we started — we're a small operation, we hardly have money — so we do 10 at a time. We do 10 there, we do 10 there. And so I don't know exactly, but if not all, most are individually metered now.

[1:30:10] **DIRECTOR:** Okay. For our own reference: you have had them individually metered — you've gone through the process of installing them —

[1:30:17] **MR. DAVIS:** Yeah.

[1:30:17] **DIRECTOR:** — for the purposes of reducing water usage?

[1:30:19 approx.] **MR. DAVIS:** Correct.

[1:30:21] **DIRECTOR:** Thank you.

[1:30:22] **MR. DAVIS:** Yes, sir.

[1:30:22] **CHAIRMAN PETROV:** Any other questions? Yes, ma'am.

[1:30:27] **DIRECTOR:** It seems like the year 2024 was the highest of the amounts, and it seems like we actually notified you for public hearings several times. Did you get the notifications for the public hearings?

[1:30:42] **MR. DAVIS:** Um — I'm sorry, what's your question?

[1:30:44] **DIRECTOR:** I was going to — I was asking if you actually received the notifications for the public hearing back in 2025.

[1:30:56] **MR. DAVIS:** Look — I don't know. Honestly, I don't know if there even was one. I — I have no idea. Um — I do know that we're quite responsive to everything that we get. We've got two other properties, of which we continue — they're real close to that one — and we're way under our permit on those every year, too. Our record — you can look at our record. And we've always paid on time. We've never been late. We've always, uh — uh, respected all of the rules and everything. And so, if we get something, we respond. That's part of the frustration with not

getting all these records that we're asking for. It's like — man, the rules should apply to everybody. You know — why don't they apply to us?

[1:31:37] **DIRECTOR:** Mr. Davis — just to be clear: the well is currently in operation?

[1:31:41] **MR. DAVIS:** Yes, sir. Yes, it is.

[1:31:44] **DIRECTOR:** Right. Everybody in the — everybody in your compound gets water — their water — their water flows?

[1:31:49] **MR. DAVIS:** Yes. The district has done nothing to interrupt it. The district has been great to us, as far as I'm concerned.

[1:31:57] **MR. ELLIS ?:** We don't have the ability to shut the water off. All we can do is file suit. [audio unclear]

[1:32:15] **MR. DAVIS:** You know, that's another thing — is we have no alternative water source. You know, I know that, uh — I know that — that, again, credit to you guys — you've done a lot to get to where there is surface water available, uh, for — for other — for other people. I know down — I live up in Conroe, and they run those big pipes down to Caleb? or what — whatever that is — to get down there to The Woodlands — and that's all great. But we don't have that. We have one source of water. And — and we maintain — uh, you know, if a water break happens, we're on it. We appreciate you guys, and I'm not here to fight — never have been. You know, I'm just — just asking for a little help, you know — just asking you to consider, you know, doing the right thing. And it's not $2 — it would take more than a $2 raise. All right — thank you.

[1:33:14] **CHAIRMAN PETROV:** Anything else, okay? Well, thank you very much. Appreciate it.

1:32:56 Applause.

## XII. REMARKS OF COUNSEL FOR THE GENERAL MANAGER (recording 1:33:28)

[1:33:28] **CHAIRMAN PETROV:** All right, let's go ahead and hear from counsel for the General Manager.

[1:33:39] **MR. SALEH:** Good morning, Chairman and board of directors. My name is Bobby Saleh, of Graves Dougherty Hearon & Moody, a law firm in Austin, Texas. We represent the General Manager in this proceeding. I want to provide a brief overview of some of the main points in this case. First, I do want to clarify that no ex parte communications ever took place. It's a very serious allegation against our firm, so I want to make that clear.

The facts are: first, Woodloch violated the previous permit and district rules by overpumping. They applied for their renewal after the violation had already occurred, and hadn't settled that violation when they had done so. Woodloch refused to settle that violation, and instead the matter proceeded to that contested case hearing. Woodloch failed — and, now, has refused — to follow admin — the administrative procedure for a contested case, leading to the hearing examiner remanding it back to where we are here today. We could have agreed to that procedural schedule, which we sent over — and, yeah, the discovery process would have been part of that. The information that they claim they requested via the Public Information Act could have easily also been obtained via discovery. The General Manager agrees with the recommendation of the hearing examiner to deny the permit renewal for well number 3606, and we recommend the firm pay the penalties that are owed for the overpumping that occurred. The General Manager and I are here to answer any questions you may have in this matter. Thank you.

[1:35:18] **CHAIRMAN PETROV:** All right. Do we have any questions?

[1:35:22] **DIRECTOR SEARS:** I got a question. So — shed some more light on the Public Information Act requests. I realize they could have asked for discovery — same records — that were happening. So — they submitted a Public Information Act request to the district?

[1:35:40] **MR. SALEH:** Yes, sir.

[1:35:41] **DIRECTOR SEARS:** The district ended up sending that to the Attorney General's office, for the Attorney General to look at the request and determine what the district was obligated to provide. Is that right?

[1:35:52] **MR. SALEH:** That's correct. I believe the district provided some of the things that they had requested at that time, and we sent for the Attorney General's opinion. My firm was not counsel for that request — I believe the district's counsel — outside counsel — handled those requests. That said, we provided everything that they requested. Certain things the district doesn't have — we can't create things and provide them to them if they don't exist. For example, the records of things that we mail out: we mail out the notices — we don't have records of it, so there are no responsive documents. They don't like that answer. So they're saying — we're told, um — for us — they might not like that we're not producing in native form things they may be requesting; either they don't exist — because of their — formulas and spreadsheets — I know they wanted the fee calculation that Mr. Jones, uh, puts in — and some of the things they want don't exist, and we provided them in the format of their requests — that they don't like. So they're saying we didn't respond. That's really where we are.

[1:36:57] **DIRECTOR SEARS:** So, did they follow up with the Attorney General's office to complain about the response, or the non-response?

[1:37:04] **MR. SALEH:** Not to my knowledge.

1:36:42 MR. FOAD from the audience: We did.

[audio unclear]

[1:37:16] **MR. ELLIS ?:** Right — enforce your — enforce your ruling —

[1:37:21] **MR. DAVIS:** We did do that.

[1:37:22 approx.] **MR. FOAD:** Yep.

[1:37:23] **MR. ELLIS:** Right. Because this is — the outside process — [audio unclear] — under the Public Information Act: you request — you file a request; if the agency has questions about whether or not this is material that must be produced, they can go to the Attorney General and request a ruling on whether or not it has to be released. That happened. There was briefing by both sides. The Attorney General ruled; provided the ruling to the district; to my knowledge, the district followed it and released the information required to be released. The next step after that

would be to file a suit against the district for violation of the Public Information Act, claiming that they had not followed the Attorney General's ruling. That did not happen.

[1:38:23] **DIRECTOR:** Question — a question. So — the permit — have they denied that they went over the permitted amount?

[1:38:39] **MR. SALEH:** They haven't denied that they violated the permit.

[1:38:40] **DIRECTOR:** Is there any information that they requested that would show that they didn't violate the permit?

[1:38:46] **MR. SALEH:** Not that I'm aware of.

[1:38:51] **DIRECTOR SEARS:** Are they complaining about the calculation?

[1:38:53] **MR. SALEH:** I don't think so. They may not like the way it was calculated — they think that there's going to be something in the natural [audio unclear] that's discovered. But our formula is sound, and we provided, actually, the spreadsheet that Mr. Jones uses. We show the numbers, and how we calculate

[1:39:10] **DIRECTOR SEARS:** It's based on gallons pumped, and the fees associated with that.

[1:39:18] **MR. SALEH:** Yes, sir.

[1:39:18] **MR. SALEH:** Yes, sir.

[1:39:22] **DIRECTOR JOHNSON:** When did you become the general manager's attorney?

[1:39:25] **MR. SALEH:** Thank you — that's an excellent question. I don't know when my firm was retained, um, but we have an engagement letter with the district — my firm has worked for the district for many years. Um — my co-counsel, Natasha Martin, had been representing — she couldn't be here today — but she had been representing the — counsel for the general manager in this matter — I'm here for this meeting.

[1:39:50] **DIRECTOR JOHNSON:** I just didn't realize we had that relationship.

[1:40:00] **CHAIRMAN PETROV:** It's an odd situation when you get into a contested case. Because Greg is our —the board's attorney — so — and since we're — the decider, it would be inappropriate for Greg — to also be making the case at the examiner level. So you have outside counsel to handle that, and that sees that Greg can give us an independent assessment.

[1:40:33] **CHAIRMAN PETROV:** Any other questions?

[1:40:35] **MR. FOAD:** Mr. — Mr. Chairman, may I please make some clarification, um, statements?

[1:40:35] **CHAIRMAN PETROV:** No — you had your opportunity, sir.

[1:40:42] **MR. FOAD:** They are operating under an unexecuted legal services agreement. It was never signed by — never signed off.

[1:40:48] **CHAIRMAN PETROV:** Okay — thank you.

[1:40:49] **MR. FOAD:** I wanted to put that in the record.

## XIII. ADDITIONAL PUBLIC SPEAKERS (recording 1:40:52)

[1:40:52] **CHAIRMAN PETROV:** All right. We have a few other people who have signed up, and I'd like to give them an opportunity to speak. Mr. Danny Ferguson — would you like to address the board?

[1:41:14] **MR. FERGUSON:** Hello. Um — I just want to make a couple of points. Um — knowing the facts, that, um — these — these — these parks have been running about 7 million gallons under the permits —

[1:41:28] **DIRECTOR:** Can I ask you a quick question? Are you a resident?

[1:41:32] **MR. FERGUSON:** No, I'm an employee. I do maintenance.

[1:41:34 approx.] **DIRECTOR:** Okay, thank you.

[1:41:35] **MR. FERGUSON:** Yeah, no problem. So, um — they've been — been operating grossly under the permit level. So, for one year to have exceeded — during COVID times — unpredictable. Everybody understands people were doing a whole lot more washing, a whole lot more cleaning during these times. So I do find it — I ask for a little leniency here, just for that. Um — knowing that, uh — that the, uh — what do you all want to call it — a penalty — which — just verbiage right there — if it's not a fee — or is it a penalty, or is it a fee? Well, it's not a penalty. So where did this fee come in, and when — when was it established? There's a lot of miscommunication between the two sides. Um — I feel that, uh — that something could have

probably been, uh, agreed upon way sooner if there was a better communication between the two. Um — but, um — that's just my sole — my — my opinion about it. I ask that y'all vote fairly, um, towards the decision of this. And just keep in mind that, um, there are a lot of lives, and a lot of others, affected by it all. So — that's all I have.

[1:43:04] **CHAIRMAN PETROV:** Thank you very much. Then I have a Joyce Searcy (surname phonetic, per the audio). Would you like to address the board?

1:43:01 MS. JOYCE SEARCY surname uncertain: I'm just — um — first of all, during this time — and right after COVID, and before, and during — like I said, they're going to do — an extra cleaning after everything. And I do believe that we've had new managers that have had to come in and learn the system, and learn how to take the numbers, and sometimes they need a little bit of leniency. I know I took one over — I didn't get any, you know, training, you might say — but sometimes we don't know, and what we don't know shouldn't really hurt us as much as it did. Um — the people are — are working with us real good, and just — you know — if you make a mistake — and that's what this was. Everybody makes mistakes. But there are so many people that are going to have to pay for this. Because — like you said — "just raise a round a dollar or two" — what dollar or two you want to raise? Medicine for the kids? Food? You know — utilities? These people are having it [audio unclear]. We're trying real hard to keep our rent and everything low enough. Most of them came to us homeless and off the street. They don't have nothing. So — even — even if — when you go to court — that's why — when you commit a crime, first-time offenders are usually treated differently. Now, if we'd done it before, or if it was repeated, I would understand this. But it's not — and it hasn't been done since. So, in my opinion, it goes — or at least that's an argument. But please don't look at our people to get the money. They don't know. They really —

[1:45:48] **DIRECTOR:** Let me ask you a question. How long have you been living there?

[1:45:53] **MS. JOYCE:** Uh — almost 10 years.

[1:45:56] **DIRECTOR:** Has he increased your rent in the last 10 years?

[1:46:00] **MS. JOYCE:** We don't — I'm — the park asks —

[1:46:06] **DIRECTOR:** You had — you're a manager of another park?

[1:46:08] **MS. JOYCE:** The — what — my park — [audio unclear] — the other park and mine are in the same condition as this. They just — they don't have money.

[1:46:20] **DIRECTOR:** I didn't ask if they had money. I asked if you have had your rent increased in the last 10 years.

[1:46:26] **MS. JOYCE:** They have in — in his. Now, I do not — in my —

[1:46:28] **DIRECTOR:** If you've lived there 10 years, you have not had your rent increased. When you move out — if that building is worth more now than the rent was —

[1:46:41] **MS. JOYCE:** I do think — because they can't afford a raise. If they could — they probably wouldn't be living in ours, because we do everything that we can to keep our rents affordable. We like to keep people off the street.

[1:46:59] **DIRECTOR:** Do you own the trailer, or does he own the trailer?

[1:47:03] **MS. JOYCE:** No — I'm the manager. I live in the office.

[1:47:05] **DIRECTOR:** So — do you live in the office, then?

[1:47:09] **MS. JOYCE:** I — I — I do not pay rent.

[1:47:10] **DIRECTOR:** You don't pay rent?

[1:47:11 approx.] **MS. JOYCE:** No.

[1:47:12] **DIRECTOR:** What about your other people, that do not live in the office? Do they pay rent?

[1:47:18] **MS. JOYCE:** Yes. Well — wait a minute — you mean our workers?

[1:47:22] **DIRECTOR:** No. You said it has 80 — 80 spaces, or 80 trailers, there — Woodloch.

[1:47:28] **MS. JOYCE:** Uh-huh.

[1:47:29] **DIRECTOR:** And they pay rent?

[1:47:29] **MS. JOYCE:** And they pay rent.

[1:47:32] **DIRECTOR:** So — so, just out of clarity: are you an employee of Woodloch, or —?

[1:47:38] **MS. JOYCE:** I'm the manager over at the other park, but I help with Woodloch a lot.

[1:47:42] **MR. DAVIS ?:** She manages another property, and doesn't live on the Woodloch property.

[1:47:49] **MS. JOYCE:** But we're all united.

[1:47:54] **CHAIRMAN PETROV:** Appreciate — appreciate your comments. Thank you for being here.

[1:48:00] **CHAIRMAN PETROV:** Then we also have Anna Rosas.

[1:48:12] **MS. ROSAS:** My name is Anna Rosas, and yes, I am the manager of Woodloch. When we got Woodloch, there was a lot of things that were not right — that — one — the water was one of the main ones, and that's the topic that we're here for today. Uh — ever since then — we found out that we went over — right away, we got on it right away. As you can tell from the numbers and the evidence, we work constantly, very hard, to comply. I especially — like the owner said — that we got meters: that was one of the things that came out of him, to do the right thing, to comply with the state, right? So, these meters are in each individual home, and we go by the size of the family. You know, we're not going to put a meter right away on a house that has one person. So if you have a household of seven people, you're going to get a meter. So I believe we have 60 meters now, out of 80 trailers. It's very costly — not to mention, he had to hire somebody to read the meters and do the math on it. So it's not just a — just get it done like this. So this system has been working. And what happens here is: when you go over, the paper goes to the — to the general manager, and then it comes to me. My job, every day: if somebody goes over the limit, I have to go and knock on the door and let them know — you have gone over; there's consequences; there's action — to the point that we got here. Right now, I have the tenants scared out of their minds, because they know what — what we're doing right now — the owner and myself. You all have the decision to make whether we get the permit or not. I feel, after reading all the records and all that, we have complied. Like Miss Joyce just spoke — that maybe — out that one time, there was an error. We all make errors. But I can tell you that, as the manager, we will continue to work hard. I myself have been in that trailer park for 27 years. I raised my children there. They're high school graduates. And I have seen many families there,

with their kids there. It — it's not a violent park. So, a mistake was made — but, uh, we're working hard on it. And I take pride — that's — I call that my trailer park. Mr. Davis can say it's not — but that's my trailer park. When I got — when I got there, I saw things that I could do. I didn't get paid for it, but it's my community — I stepped up. I live there. I love the schools. It was a step up for me. I — I love the schools there. I took it upon myself to — let's make it better. Like I said, I've been there 27 years. I have — I have kids — there were kids that were small; now they grew up, and the parents are still there. When I told them what it was about — we got a short notice — I do have signatures. I was only able to get, like, 33 of them, of people that ask you to have mercy on them. These are older trailers. If — if — if we — if Mr. Davis does not get the permit, I can guarantee you that these people will be lost — including myself. Okay? So, whatever it takes for us to comply, we'll continue to comply, and — and hope this all works out for everyone — that this could work out. I myself — my children ask me, "when am I going to move?" That's why — if I should move — I mean, I — I — I raised you guys here. I can open my window and I can see where my child played and was raised, where they went to middle school, high school — and now they're gone. You know, my memories of — it's just not a trailer park. This is not a job. This means something to me, every day. Every day that I get up — and I'm a prayer person: I pray about everything and worry about nothing. So I'm not going to worry about this situation. But I do ask you to have mercy, and let's do the right thing. Consider that — how many people it's going to affect. And, most of all, that you would have our word that we will keep the water down. Like I said — we don't have swimming pools here. People don't have — they don't wash their cars. Everyone knows that there's a limit to everything, and you have a certain amount of water you can use — please comply. I'm only one person that goes around, and we look — but now we have other people — uh, other neighbors — that — that help, and agree that, hey, if your neighbor's wasting the water, say something, so I can go over there and tell them: please comply, because we're under state regulations. So I just ask you to please, um, give us an opportunity to work together in this community, and we'll get it done right. Thank you for your time.

[1:53:06] **CHAIRMAN PETROV:** Thank you very much. That is all I have signed up. Was there anybody else that wishes to address the board on this particular matter?

[1:53:11 approx.] **SPEAKER FROM AUDIENCE:** Yes, I'd like to.

[1:53:17] **CHAIRMAN PETROV:** Well, come on up, and, uh, tell us your name, and we'll be happy to hear you.

> 1:53:06 WILLIAM FORD surname per the audio: My name is William Ford, and I live in the community [audio unclear]. The mistake was mine. I was the caretaker who was in charge [audio unclear] during that year. I was having my own personal life struggles, as well as — [audio unclear] — I'm not here — I'm asking for leniency — during the COVID era period, you know, even our government stopped all — so, there is — there is — there is reason to think about, you know — during the COVID period, people working from home, students and children schooled at home — so the water usage at home rose drastically. That's nice to take into consideration — that period. And — [audio unclear] —

**XIV. EXECUTIVE SESSION (recording 1:54:40)**

[1:54:40] **CHAIRMAN PETROV:** That concludes, I suppose, all of our presentations. I think we're going to need to discuss this in executive session before we make any kind of decision. Do we want to conclude the remainder of our agenda first?

[1:55:26] **MR. ELLIS ?:** I guess it depends on what you're going to do. I think that most of the folks are here to hear the outcome of this particular decision. So, in this case, it might be a good idea to go into executive session now, and get that completed — then they can come back in and hear the decision you made when you return.

[1:55:57] **CHAIRMAN PETROV:** We'll proceed that way on the decision. All right. So, let's — [audio unclear] — pursuant to the district's rules —

[1:56:21] **SPEAKER FROM AUDIENCE:** Excuse me — can you repeat? We didn't hear. Sorry.

[1:56:26] **CHAIRMAN PETROV:** The board of directors of the district will now convene in

executive session. [audio unclear]

*— End of Part One. The source captions for Part One end at approximately this point, as the Board recesses into executive session. The executive session is not recorded. —*

## PART TWO — RETURN FROM EXECUTIVE SESSION THROUGH ADJOURNMENT

### XV. OPEN SESSION RESUMES; ACTION ON THE WOODLOCH MATTER (recording 1:59:03)

[1:59:03] **CHAIRMAN PETROV:** Thank you, everybody, for waiting while we had our discussion in executive session. The time is now 12:36, and I'll declare our regular board of directors meeting back in open session. We discussed the Woodloch matter, but obviously, under Texas law, we are unable to take any action in executive session — so we have not done that. But following that discussion, is there any motion that any board member would like to make?

[1:59:41] **DIRECTOR:** Yes, Mr. Chairman. I move to continue this hearing on the hearing examiner's recommendation to our regular board meeting in August, at which time we will consider a remand of this matter back to the hearing examiner, subject to having received a signed, agreed scheduling order to submit to the hearing examiner, and subject to Woodloch having retained local counsel licensed to practice law in the State of Texas, and/or an admission of its current counsel, pursuant to applicable Texas law and rules, in a pro hac vice manner.

[2:00:37] **CHAIRMAN PETROV:** All right. Do we have a second? (Second.) Is there any discussion needed on that motion? (None.) Then I'll call for the vote. All in favor of approving the motion, please say aye.

[2:00:45] **DIRECTORS:** Aye.

[2:00:56] **CHAIRMAN PETROV:** Any opposed? (None.) The motion carries.

So, I think, Mr. Davis, the — the message is that we would like to continue to work with you. We'd like to give you an opportunity to fully present your case — but we don't want to see this continue to drag on forever. So, if you will take that with the spirit with which it is offered, we would appreciate it.

[2:01:21] **MR. DAVIS:** Well, I appreciate that much — the opportunity to address the board.

[2:01:28] **CHAIRMAN PETROV:** We've finalized this matter, so we'll — we'll move on to our next agenda item. Thanks very much.

**XVI. REMAINDER OF THE AGENDA (recording 2:01:37)**

[2:01:37] **CHAIRMAN PETROV:** Item number seven is to consider ratifying emergency permits reviewed by the General Manager — this is an opportunity for board members to ask questions about the emergency permits.

[2:01:44] **DIRECTOR:** We just had one question with respect to the item — [audio unclear] — water from an already-existing well. [audio unclear]

[2:02:49] **CHAIRMAN PETROV:** All right. Any other questions? Then that takes us to item number eight, our General Manager's report.

[2:03:01] **GENERAL MANAGER TURCO:** Sure. Just a real quick summary I wanted to provide: we found out, right before the holiday, that Governor Abbott presented the Harris-Galveston Subsidence District with the Texas Environmental Excellence Award, in recognition for our efforts to preserve and protect the Texas envir— environment. So we have — we have that proclamation from the governor here, and then, after the board meeting, for those of you that want to stick around, we'll get a photo with the board members on that. And we — we've actually been — been working with KPRC. They recently included information on subsidence in their 2026 hurricane and flood survival guide. We'll actually be working with them in coming days to provide additional information on subsidence. And then the last thing I wanted to mention is that our 2026 Gulf Coast Water Conservation Symposium website's up. It's going to be held on October 22nd — you all know that — but July 10th is the last day to register as a sponsor for the symposium. So, a lot going on with that. We're looking forward to — to having that come around later on this fall. With that, I'd be happy to answer any — one more thing I do want to mention: like I mentioned last month, I've been including information about drought. I still haven't titled it "current statewide drought conditions" — we're not in a drought anymore around here, and it's been pretty wet. But I did include, for you, the 30-day percent-of-normal precipitation map — you probably haven't seen that one before. It tells a really good story about how, you know, in the Gulf Coast area — the coastal lowlands and the coastal uplands — we've

seen a lot of — lot of rainfall over the past 30 days, but still, West Texas and up in the panhandle have been fairly dry.

[2:04:49] **DIRECTOR:** Was that in the handouts or anything? What about the leak detection, though?

[2:04:52] **GENERAL MANAGER TURCO:** I was informed by one of our board members that it's come to our attention that there are, um, German shepherds — all kinds of breeds, multiple breeds of dogs — that have been trained to identify water leaks. Um — so — which is great. And I think that one of the things that I want to highlight — that's very interesting; I appreciate you passing that along — is that there's a lot of — lot of interest in trying to help folks identify where these water leaks are occurring, and how that's happening. So — but we haven't — we haven't put the plans to build the kennel outside yet — but it could happen at some point. The one other thing I wanted to mention is that the Texas Water Foundation, in cooperation with the Texas Water Development Board, has officially launched their first state-funded water awareness campaign. It's called "This is Texas Water." If you type that in — "This is Texas Water" — you'll be able to get to a website that provides information on where your water comes from. And one of the interesting things that we have here — and just to remind everybody, our purpose here is to prevent subsidence, and we do that by reducing our reliance on groundwater; the way we do that is by moving our — our demand from groundwater to an alternative source; and that means that, for our area in particular, we get water from multiple sources, primarily groundwater and treated surface water — and it's important to understand — for the folks in this area to understand — where that water comes from. Look at the Trinity River, the San Jacinto, or the Brazos: how much of that comes from which source, and also how much reuse is being done in that area as well. So this campaign is intended to provide additional information on that, for — for the local water users, and it's just being rolled out — and you'll be seeing more things come out about this statewide, as you travel the state, and maybe even some things locally here.

[2:06:45] **CHAIRMAN PETROV:** All right, any questions for Mike? (None.) And that takes us to agenda item nine, with our general counsel — an update on groundwater issues and legislation.

[2:07:08] **MR. ELLIS:** I'll keep this as short as I can. Again, groundwater has become a giant issue across the state. The giant exports by the central Texas projects are continuing; the lawsuit from Georgetown (name uncertain, per the audio) is continuing; fighting in San [audio unclear] County for groundwater availability the City of Corpus Christi is continuing, along the — a portion of the rain helped them with their lake situation — that kind of put their dead date off, maybe to early next year — but it really depends on how much rain falls between now and then. So — this is a giant, giant issue. The — the governor has commented that we should somehow put a moratorium on development of data centers until the legislature addresses this. I want to make it — and then — I raise this up because I want to make it clear: for groundwater conservation districts and subsidence districts alike, our job is to address the impact of withdrawing groundwater. We want to prevent harms that might occur as a result of those groundwater withdrawals. Who withdraws that water, and where it goes after it's withdrawn, doesn't impact what happens when it's withdrawn. So our decisions have to be based on how much you're going to produce, where you are, whether you have alternative water supply available to you, and whether or not you utilize that water. And so — it's extremely important that we not say "data centers are bad; we don't want to have data centers." We already have data centers in this district, by the way — I think there are a lot in Houston. But if we have a big, giant, concentrated demand in one area, that potentially could lead to subsidence in that area, and we need to address that by placing limitations — and frankly, in our case, we're probably going to follow the exact same rules we do for everybody else: if you have an available alternative, you have to use it. And that alternative can be whatever is available to you as an alternative — doesn't have to be water from cities or anybody else. It can be — one alternative is a closed-loop system. Another alternative could be rainwater. Another alternative can be to use something other than water, as there are lots of other alternatives available, depending on who we're talking

to. But we don't — we don't draw up rules for data centers any more than we draw rules for churches, or for specific utility users. We just don't need that.

The, um — Kyle Bass situation has now moved to federal court. Kyle Bass — you remember — he is a landowner who has property in three different counties, up along I-45 and the Trinity River. He has filed a federal lawsuit claiming a takings claim and a violation of his due process protection rights. He has sued the Neches and Trinity Valleys Groundwater Conservation District, and each of their individual directors. That district declared a moratorium — that was going to go through October 1 of this year — on accepting any new applications that would increase the amount of groundwater withdrawn, while they went through a rule-making procedure. They have now proposed those rules. It looks like they're going to meet that deadline — they're going to have those rules in place before October first. But he's suing, in part, to say that those — those rules, and — and the board's action, can't be applied to us, because we applied for permits a long time ago — and another — another court action, you might remember, invalidated the prior action, to — to allow them to proceed with that application; and so they didn't; and then they declared the moratorium and said he's going to have to reapply. So we'll have to see what happens in that federal lawsuit. I'm sure that Mr. Smith (identity uncertain) is going to be involved with that — their general counsel. Southeast Texas, and a couple of other small districts in east Texas, were represented by a friend of mine who passed away a couple months ago, and so they have moved on now with new counsel [audio unclear] for the Southeast Texas district. And of course, the Southeast Texas district is facing the same kind of problems as the Neches & Trinity Valleys district — but it just is becoming much more litigious.

And the last thing I want to mention on — on the litigation side, is: I am now handling — on thebehalf of four different clients — seven or eight different contested cases, where people have — and these aren't — this isn't a problem between the general manager and the applicant; this is a problem between third parties saying, "don't give them that permit," and they file a protest. You go to a preliminary hearing to determine whether or not they have

standing, whether they're properly raising the issue, and if they have standing, you move on to the contested case. That's just happening more and more often. People have become very conscious of the fact that the only way you protect groundwater supplies is by getting involved when your neighbor applies.

Legislatively: both legislative committees are trying to go through and see if they can reach consensus on any proposed legislation for this session. You might remember I mentioned that they came in with a list of, I think, 75 proposed issues that they were going to look at. Of that 75, if we get five through that process — with consensus that that ought to be the law — I'll be surprised. I think it's going to — it's going to narrow that down quite a bit. But what that really does tell us is: all of those will probably come in as legislation, because everybody who's proposing one is going to get somebody to file that bill. And we're likely to see more groundwater legislation this session than I've ever seen in — in history. The Texas Water Conservation Association (reference uncertain) is going through a similar process. Again, I don't think — they have to reach 90%, and that's very difficult to do. I don't know how many members — you know, we have about a third of the membership from West Texas, and there is everything in between. So it's going to be hard to get consensus in that group. I think — I think that's everything on the list. Any questions?

[2:13:54] **DIRECTOR ?:** The one thing I did include for all of you — recent documents that are data center background information — the technology is changing so quickly that by the time it's printed, it's obsolete. And the data centers we're basing our evidence on, in terms of water demand and energy use, are nothing like the data center that's going to get built in the next five years. They're making huge strides in — in saving water and saving energy. That doesn't make them any better neighbor — as a neighbor — that — I can understand that. But in terms of their demand on the — on the grid, their demand on water supply, they are making huge strides in taking care of those problems.

[2:14:45] **DIRECTOR ?:** I saw an article — CNN or ABC or somebody — that they're going to be putting data centers in space, using solar panels, and they won't need the cooling capacity,

because space is super cold. So — [audio unclear] — or somebody in California wants to build data centers at sites — just — [audio unclear].

[2:16:15] **CHAIRMAN PETROV:** Any other questions? All right. Thank you. Thank you. And we've already taken care of our executive session — I assume nothing further is needed on that. So, that concludes our agenda for today. Thank you all very much.

END OF MASTER TRANSCRIPT

*— End of transcript. The recording ends at adjournment. —*

**— END OF MASTER TRANSCRIPT —**

**Excerpt — HGSD Well Database (native Excel workbook, December 2025 edition), Wells Nos. 3606 and 7694 (Woodloch MHP LLC)**

*The native workbook contains 15,296 well records with 74 data fields per well, including annual metered pumpage for each year 1976 through 2024. The complete native file accompanies this Appendix. Selected fields for the Woodloch wells are reproduced below.*

| WellNo | SystemAggLead | Permittee | PermitNo | BeginDate | EndDate | RegulatoryArea | Status |
|--------|---------------|-----------|----------|-----------|---------|----------------|--------|
| 3606 | 3606 | Woodloch MHP LLC | WP2025-115048 | 2025-08-01 | 2026-07-31 | 3 | O |
| 7694 | 3606 | Woodloch MHP LLC | WP2025-115048 | 2025-08-01 | 2026-07-31 | 3 | O |

**Annual metered pumpage (gallons), 2013–2024, per the District's native records:**

| WellNo | 2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 |
|--------|------|------|------|------|------|------|------|------|------|------|------|------|
| 3606 | 11086900 | 14368800 | 8690000 | 3844500 | 4085000 | 4861100 | 4383700 | 3715250 | 4165650 | 4451000 | 4550000 | 4013500 |
| 7694 | 0 | 7402000 | 3300300 | 3844500 | 4085000 | 4861100 | 4383700 | 3715250 | 4165650 | 4451000 | 4550000 | 4013500 |